**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| PIPELINE FOODS, LLC, *et al.*,[1] | ) Case No. 21-11002 (KBO) |
|  | ) |
| Debtors. | ) Joint Administration Requested |
|  | ) |

**OMNIBUS DECLARATION OF WINSTON MAR IN SUPPORT OF DEBTORS'**
**INITIAL EMERGENCY FIRST DAY MOTIONS AND RELATED RELIEF**

I, Winston Mar, hereby declare under penalty of perjury that the following (this "Declaration") is true to the best of my knowledge, information and belief:

1.     I am the Chief Restructuring Officer of Pipeline Foods, LLC ("**Pipeline Foods**"), Pipeline Holdings, LLC ("**Pipeline Holdings**"), Pipeline Foods Real Estate Holding Company, LLC ("**Pipeline Real Estate**"), Pipeline Foods, ULC ("**Pipeline Canada**"), Pipeline Foods Southern Cone S.R.L. ("**Pipeline Argentina**"), and Pipeline Foods II, LLC ("**Pipeline Foods II**"), debtors and debtors in possession in the above captioned cases (collectively, the "**Debtors**").

2.     I am over the age of eighteen (18) and am authorized by the Debtors to submit this Declaration.

3.     I am a partner and senior managing director at SierraConstellation Partners ("SCP").  SCP is an interim management, consulting and advisory firm that specializes in corporate restructurings, operations improvement, litigation analytics, valuations and bankruptcy case management services with headquarters in Los Angeles and offices in New York, Boston,

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Pipeline Foods, LLC (5070); Pipeline Holdings, LLC (5754); Pipeline Foods Real Estate Holding Company, LLC (7057); Pipeline Foods, ULC (3762); Pipeline Foods Southern Cone S.R.L. (5978); and Pipeline Foods II, LLC (9653).  The Debtors' mailing address is 6499 University Avenue NE, Suite 200, Fridley, MN 55432.

Houston, Dallas, and Seattle.  SCP has extensive experience working with and for distressed companies in complex financial and operational restructurings, both out-of-court and in Chapter 11 proceedings throughout the United States.  SCP professionals have advised debtors, creditors and equity constituents in numerous reorganizations, which advisory services have included financial analysis and budgeting, forecasting, cash management, operational assessments and improvements, and the provision of interim management.  SCP has advised companies with annual sales ranging from $20 million to over $800 million in a broad range of industries.  SCP is nationally recognized as one of the preeminent turnaround firms and is well respected in the turnaround industry.

4.      SCP has diverse experience, knowledge, and reputation in restructuring of businesses in a variety of industries, including food and agricultural products, and an understanding of the issues involved in chapter 11 cases.  SCP has provided CRO services in other chapter 11 cases, including, among others:  *In re Liberty Asset Mgmt. Corp.*, Case No. 16- 13575 (Bankr. C.D. Cal. 2016); *In re Bethel Healthcare, Inc. & Corinthian Sub-Acute & Rehab. Ctr., Inc.*, Case No. 13-12220 (Bankr. C.D. Cal. 2013); *see also In re NORPAC Foods, Inc.*, Case No. 19-62584 (Bankr. D. Or. 2019); *In re CFO Mgmt. Holdings, LLC*, Case No. 19-40426 (Bankr. E.D. Tex. 2019); *In re J&M Sales Inc.*, Case No. 18-11801 (Bankr. D. Del. 2018); *In re Woodbridge Grp. of Cos. LLC*, Case No. 17-12560 (Bankr. D. Del. 2017); *In re Katy Indus., Inc.*, Case No. 17-11101 (Bankr. D. Del. 2017).

5.      I have been appointed CRO in the following cases: *In re Cranberry Growers Cooperative d/b/a CranGrow*, Case No. Case No. 17-13318-cjf (Bankr, W.D. Wis.); *In re North Pacific Canners & Packers, Inc., Hermiston Foods, LLC, and NPCP Quincy, LLC*, Case No. Case No. 19-62584 pcm11 (Bankr. D. Oregon).

38495462.10

6.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team, the Debtors' employees or the Debtors' advisors, my review of the relevant documents and information concerning the Debtors' operations, financial affairs and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would competently testify to the facts set forth in this Declaration.

7.     I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records, as well as the Debtors' restructuring efforts.  I became the chief restructuring officer of Pipeline Foods on April 20, 2021.  My firsthand knowledge of the Debtors' operations and business affairs began when I became Pipeline Foods' chief restructuring officer.

8.     I submit this Declaration: (a) to assist the Court and all parties in interest in understanding, among other things, the Debtors' operations, their corporate structures, and the circumstances that led to the commencement of these chapter 11 cases, (b) in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**") filed by Pipeline Foods, Pipeline Holdings, Pipeline Real Estate, and Pipeline Foods II on July 8, 2021 and by Pipeline Canada and Pipeline Argentina on July 12, 2021 (together,  the "**Petition Date**"); and (c) in support of the relief that the Debtors request from the Court pursuant to the "First Day Motions" described in this Declaration, namely, the motion for joint administration of the Debtors' chapter 11 cases, the application to retain a claims and noticing agent, the motion to file a consolidated creditor matrix and list of twenty largest unsecured creditors, the motion for use of cash collateral, the motion to continue using the Debtors' existing cash management system, the motion to authorize payment of prepetition employee compensation, and the motion to determine and provide adequate assurance of payment to utilities.

38495462.10

I.    **DESCRIPTION OF THE DEBTORS' HISTORY, STRUCTURE AND BUSINESS OPERATIONS**

9.    Pipeline Holdings is a Delaware limited liability company.  The members of Pipeline Holdings are:  AMERRA PF Holdings, LLC (97.5%), Pipeline Opportunity Partners, LLC (1.3%), OV Holdings, LLC (0.7%),  SISJAS, LLC (0.3%), and Moore Lake Equity Partners, LLC (0.2%).  Pipeline Holdings is managed by a Board of Managers consisting of: Craig Tashjian, Eric Jackson, and Bradley Dietz.

10.    Pipeline Foods is a Delaware limited liability company.  The sole member of Pipeline Foods is Pipeline Holdings.

11.    Pipeline Real Estate is a Delaware limited liability company.  The sole member of Pipeline Real Estate is Pipeline Foods.

12.    Pipeline Canada is an unlimited liability corporation incorporated under the laws of the Province of British Columbia.  Pipeline Foods is the sole owner of the equity interest in Pipeline Canada.

13.    Pipeline Argentina is a limited liability company organized in Buenos Aires, Argentina.  Pipeline Foods owns 99.5% of the equity interest in Pipeline Argentina.

14.    Pipeline Foods II is a Delaware limited liability company.  Pipeline Foods is the sole member of Pipeline Foods II.   Pipeline Foods II owns 0.5% of the equity interest in Pipeline Argentina.

15.    Pipeline Foods and its subsidiaries (collectively, the "**Company**") is a U.S.-based supply chain solutions company focused on accelerating the availability and reliability of organic, non-GMO, and regeneratively grown food. Its purpose is to contribute to a healthier, traceable, and more sustainable food system.  Founded in January 2017 and headquartered in Fridley, Minnesota, the Company has been a pioneer in the organic industry and is a leading supplier and

4

manufacturer of organic, non-GMO and specialty food and feed ingredients with a diverse customer base around the globe.  In April of 2019, Eric Jackson, founder, was replaced as CEO, first on an interim basis by Robert Hodgen of AMERRA Capital and subsequently by Anthony Sepich as the new-full time CEO.

16.    The Company has been a pioneer in the organic supply-chain category as one of the only U.S.-based ingredient supplier exclusively focused on organic and non-GMO ingredients, with a strong commitment to sustainability and supporting regenerative farming practices.  The Company provides farmers with education and financial support in the process of converting to organic practices.  The Company adheres to the strict regulatory guidance established not only by the U.S. FDA, but also by the Canadian Food Inspection Agency, and other similar governmental regulatory agencies (e.g. Argentina) to ensure both food safety and the integrity of the organic supply-chain.

17.    Within the organic category, the Company is specifically known for quality products, stringent quality assurance procedures, and its expertise in the logistics and manufacturing of food ingredients.  The Company complements its agronomics and merchandising teams with diverse operational capabilities including (i) several state-of-the art manufacturing facilities strategically located in major organic grain production areas in the U.S., Canada, and Argentina, (ii) proprietary processes, and (iii) an outstanding reputation for product quality with an unrivaled compliance and regulatory track record.

18.    After its formation in 2017, the Company began acquiring a selection of grain storage and ingredient processing assets that could be rapidly converted to be 100% organic and non-GMO within the U.S. and Canada.  In early 2019, the Company acquired select organic and non-GMO assets from SunOpta Grain and Foods, Inc.  The acquisition of these assets quickly

doubled the scale of the Company and solidified the Company's strategic positioning within the broader North American organic ingredient supply-chain industry.  Known for its expertise in the handling and manufacturing of organic and non-GMO ingredients, the Company  manufactures custom ingredients in the form of meals, grits, flours and other commodity ingredients supplied in a variety of bulk packaging formats.

19.    The food and agriculture industry, like many others, must adhere to a rigorous set of food safety, environmental, human health and safety, and organic regulatory compliance frameworks. The Company's best in class management systems help to ensure regulatory compliance in all of these areas, as well as provide adherence to internally established policies and procedures. The Company operates in compliance with all applicable U.S. Department of Agriculture and Food & Drug Administration standards, including the Food Safety Modernization Act, National Organic Program, and the Agricultural Marketing Service division's audit and accreditation programs, which are based on international standards, principles, and guidelines to provide producers and suppliers of agricultural products the opportunity to assure customers of their ability to provide consistent quality products or services.

20.    The Company supplies a diverse portfolio of specialty food & feed ingredients and provides transparent and collaborative supply-chain solutions to meet the needs of individual customers and farmers. The Company is a market leader in organic soybean, corn, and wheat with access to a significant percentage of total supply in the U.S. and Canada, respectively.

21.    The Company's customers consist of large consumer packaged goods ("**CPG**") companies, food manufacturers, international trading groups, and top animal protein producers. The Company is the supplier of choice for many specialty food-grade/feed-grade ingredients. With

6

strong and loyal partnerships with a diverse blue-chip customer base, the Company has low customer concentration.

22.     The Company's farmer suppliers are key stakeholders in the organic value chain. The Company originates organic and non-GMO grains from major growing regions around the world. The Company sources approximately 55% to 65% of planned sales volumes from producers in the U.S. and originates approximately 25% to 30% from Canada.  In the long-term, the Company plans to grow origination networks in Argentina and India to source 5% to 10% of future total volumes. With geographic sourcing diversity, the Company is able to minimize supply disruptions from extreme weather events around the globe and also take advantage of pricing arbitrage opportunities.

23.     The Company has prime access to organic/non-GMO grains produced in the U.S. and Canada through its Ag Impact and Farm Profit Programs.  More than 90% of volumes are directly sourced from farmers with the balance of remaining volumes sourced from third-party trading relationships.  The Company diligently analyzes and traces the source of each product to validates the organic certifications.

24.     The Company's sales activity drives the sourcing strategy.  The Company enters into short-term and long-term offtake contracts with farmers with annual repricing mechanisms. In 2019, the Company contracted with 1,461 growers and sent market updates and bid sheets to over 1,800 growers in Canada and the U.S.

25.     Part of the Company's business model is to build efficiencies into the supply chain by investing in assets on rail lines, thereby minimizing the total distance to transport crops from farm gate to food company, as well as decreasing the environmental impact and logistical costs of transportation.

38495462.10

26.     The Company owns nine facilities, which are strategically situated near major producing regions and transportation lines (i.e. BNSF, Union Pacific, Canadian National, Canadian Pacific), allowing the Company to source from nearby farmers and serve major domestic and international end markets.  The Company also has relationships with more than 15 different trans-loaders, toll processors, and storage facilities to optimize logistics while minimizing capital expenditures

27.     The nine facilities owned by the Company are as follows:

| Location | Use | Owner | Mortgagee |
| --- | --- | --- | --- |
| Hope, Minnesota | certified organic & non-GMO soybean and corn food grade cleaning facility | Pipeline Foods | Compeer Financial, PCA |
| Moorhead, Minnesota | certified organic storage facility | Pipeline Foods | Compeer Financial, PCA |
| Ellendale, Minnesota | certified organic storage facility | Pipeline Foods | Compeer Financial, PCA |
| Lignite, North Dakota | certified organic storage and handling facility | Pipeline Foods | Compeer Financial, PCA |
| Cresco, Iowa | food-grade corn and specialty grain milling | Pipeline Foods | Compeer Financial, PCA |
| Bowbells, North Dakota | certified organic storage and handling facility | Pipeline Foods Real Estate | Compeer Financial, FLCA |
| Atlantic, Iowa* | certified organic/conventional storage and handling facility | Pipeline Foods | Farm Credit Leasing Services Corporation |
| Wapella, Saskatchewan** | certified organic storage and handling facility | Pipeline Canada | Farm Credit Canada |
| Gull Lake, Saskatchewan** | certified organic storage and handling facility | Pipeline Canada | Farm Credit Canada |

* The land in Atlantic, Iowa is owned by Pipeline Foods.  The facility is leased from Farm Credit Leasing Services Corporation.

**The land is leased by Pipeline Canada from Canadian Pacific Railway Company.

8

28.     In North America, logistics within the organic space are more complicated than the conventional space.  This is mainly due to a dispersed organic farmer network around the globe with end user demand points concentrated on the U.S. coasts and western Europe.  To bring efficiencies in the organic supply chain, the Company must find optimal transportation routes to end users and match them against the appropriate farmer network.  The Company has an internal Supply Chain Execution Team that handles daily dispatch and logistics coordination. Actual carrier services are outsourced to third-party providers and the Company has maintained long-term relationships with railroads, steamship lines, and trucking companies to ensure optimal service levels.

## II.     THE DEBTORS' CAPITAL STRUCTURE AND CREDIT FACILITIES

### A.     <u>Consolidated Revenue and Balance Sheet</u>

29.     The Company maintains its books and records on a consolidated basis. The total revenue for  FY2020 (year ended June 30, 2020) was $222.5 million. The total revenue for the period July 1, 2020 through May 31, 2021 was $208.1 million.

30.     As of May 31, 2021, the total liabilities of the Company were $143,727,252.  These consisted of: Accounts Payable - $31,747,494; Accrued Expenses - $1,397,883; Short Term Liabilities - $9,091,214; Debt Payable–Current Portion - $49,193,009; Forward Contract Liabilities - $26,460,950; Long-term Liabilities - $25,836,702.

31.     As of May 31, 2021, the book value of the Company's assets was $189,191,374.  This consisted of  Cash - $6,463,350; Cash – Margin Accounts - $1,163,270; Accounts Receivable - $25,742,529; Prepaid Expenses - $3,329,139; Inventory - $47,517,736; Forward Contract Receivables - $32,030,261; Fixed Assets less depreciation - $43,076,698; Deposits – Long Term

- $96,247; Deferred Tax Benefit - $763,300; Intangible Assets less accumulated amortization - $29,008,843.

       **B.**    **Compeer Financial, FLCA- Pipeline Real Estate Credit Agreement**

32.    Pipeline Real Estate, as borrower, and Compeer Financial, FLCA, as lender, entered into a Credit Agreement, dated as of April 3, 2018 (the "**Compeer-Pipeline Real Estate Credit Agreement**"). This agreement provided for a multiple advance term loan credit facility in the amount of $7,150,000 to finance the construction and equipping of a project near Bowbells, North Dakota consisting of an office building, receiving building, concrete bin cluster, two concrete tanks, and 5,500 feet of rail fixed assets (the "**Bowbells Facility**").

33.    To evidence the obligations of Pipeline Real Estate for repayment, Pipeline Real Estate executed a Promissory Note, dated April 3, 2018, in the principal amount of $7,150,000. The Maturity Date is May 1, 2023.

34.    To secure its obligations under the Compeer-Pipeline Real Estate Credit Agreement, Pipeline Real Estate granted a security interest in all of its personal property, including all accounts, equipment, inventory, and general intangibles, to Compeer Financial, FLCA. A UCC-1 Financing Statement perfecting the security interest was filed with the Delaware Secretary of State on April 3, 2018.

35.    To secure its obligations under the Compeer-Pipeline Real Estate Credit Agreement, Pipeline Real Estate also granted a Construction Mortgage and Assignment of Leases and Rents and Fixture Financing Statement, dated as of April 3, 2018, to Compeer Financial, FLCA on real property and improvements constituting the Bowbells Facility. This mortgage was recorded with the Burke County Recorder on April 4, 2018.

36.     The obligations under the Compeer-Pipeline Real Estate Credit Agreement are guaranteed by Pipeline Holdings and Pipeline Foods

37.     The current balance due to Compeer Financial, FLCA is approximately $6,117,000.

**C.     Rabobank Credit Agreement**

38.     Pipeline Foods, as borrower, and Coöperatieve Rabobank U.A., New York Branch ("**Rabobank**") and other banks and financial institutions from time to time (collectively, the "**Lenders**"), and Rabobank as administrative agent and collateral agent for the Lenders ("**Rabobank as Agent**"), entered into an Uncommitted Revolving Credit Agreement, dated as of June 26, 2018 (the "**Original Rabobank Credit Agreement**").

39.     The Original Rabobank Credit Agreement provided for a revolving credit facility to provide working capital in the maximum amount of $30,000,000.  Under the Original Rabobank Credit Agreement, Rabobank was the only lender.   The termination date under the Original Rabobank Credit Agreement was June 25, 2019.

40.     Thereafter, the Original Rabobank Credit Agreement was amended, as follows:

(a) Omnibus Amendment, dated as of February 22, 2019, which, *inter alia*, permitted the Compeer-Pipeline Foods Credit Agreement (described below);

(b) Amendment No. 2, dated as of June 25, 2019, which, *inter alia*, extended the termination date to September 25, 2019 and increased the total facility amount to $35,000,000;

(c) Amendment No. 3, dated as of September 20, 2019, which, *inter alia*, increased the total facility amount to $60,000,000.  Pursuant to Amendment No. 3, ING Capital, LLC and CoBank, ACB became Lenders;

(d) Amendment No. 5, dated as of January 31, 2020, which, *inter alia*, revised certain financial covenants.  (Note: There was no Amendment No. 4);

(e) Amendment No. 6, dated as of September 17, 2020, which, *inter alia*, extended the termination date to January 29, 2021 and revised certain financial covenants;

(f) Amendment No. 7, dated as of November 6, 2020, which, *inter alia*, revised the borrowing base; and

(g) Amendment No. 8, dated as of January 15, 2021, which, *inter alia*, extended the termination date to April 30, 2021, revised certain financial covenants, and revised certain reporting covenants.

The Original Rabobank Credit Agreement, as amended, is referred to hereafter as the "**Rabobank Credit Agreement**".

41.     Under the Rabobank Credit Agreement, no Lender has any obligation to make any loan requested by Pipeline Foods and each Lender has the sole discretion to decide whether to make the loan requested.

42.     The obligations of Pipeline Foods under the Rabobank Credit Agreement are guaranteed by Pipeline Holdings, Pipeline Real Estate, Pipeline Canada, Pipeline Argentina, and Pipeline Foods II, pursuant to a Guaranty, dated as of June 26, 2018 (the "**Guaranty**").

43.     To secure their obligations under the Rabobank Credit Agreement and the Guaranty, Pipeline Foods, Pipeline Foods II, Pipeline Canada, and Pipeline Argentina granted a security interest to Rabobank as Agent in all of their personal property pursuant to a Security Agreement, dated  as of June 26, 2018.  UCC-1 financing statements were filed against Pipeline Foods with the Delaware Secretary of State on June 18, 2018 and June 25, 2018.

44.     To secure their obligations under the Rabobank Credit Agreement and the Guaranty, Pipeline Holdings, Pipeline Foods, and Pipeline Foods II pledged various equity interests pursuant to a Pledge Agreement, dated as of June 26, 2018, as amended by the Omnibus Amendment, dated as of February 22, 2019, as follows:

| Pledgor | Issuer | Ownership |
|---|---|---|
| Pipeline Holdings, LLC | Pipeline Foods, LLC | 100% |
| | | |
| Pipeline Foods, LLC | Pipeline Foods II, LLC | 100% |
| | Pipeline Foods, ULC | 100% |
| | Pipeline Foods Southern Cone S.R.L. | 50% |
| | | |
| Pipeline Foods II, LLC | Pipeline Foods Southern Cone S.R.L. | 50% |

The Pledge Agreement expressly excludes Pipeline Foods' interest in Pipeline Real Estate.

45.     Pipeline Foods granted a security interest in a commodities account with R.J. O'Brien & Associates, LLC to Rabobank as Agent, pursuant to a Commodities Account Security Agreement, dated as of June 26, 2018.

46.     Pipeline Foods, as customer, and Rabobank as Agent, as secured party, entered into a Deposit Account Control Agreement, dated as of July 5, 2018, for a deposit account (no. xxxxxxxx8352) at Bank of America, N.A.

47.     Pipeline Foods, as customer, and Rabobank as Agent, as secured party, entered into a Deposit Account Control Agreement, dated as of June 26, 2018, for a deposit account (no. xxx591) at BMO Harris Bank, N.A.

48.     Pipeline Canada granted a security interest in all of its personal property to Rabobank, as Agent, pursuant to a General Security Agreement, dated as of June 26, 2018.  This security interest was perfected by the filing of financing statements with the Personal Property Registry for the Provinces of Saskatchewan, Manitoba, and British Columbia, on June 18, 2018, June 19, 2018, and June 21, 2018, respectively.

38495462.10

49.     Pipeline Canada, as customer, and Rabobank as Agent, as secured party, entered into a Deposit Account Control Agreement, dated as of July 30, 2018, for a deposit account (no. xxxx-xxxx8218) at Bank of America, N.A. Canada Branch.

50.     Pipeline Canada, Rabobank as Agent, and Bank of Montreal entered into a Blocked Account Agreement, dated as of June 26, 2018 for deposit account (no. xxxx-xxxx-967).

51.     The current balance due Rabobank as Agent is approximately $43,853,000 (including $1,800,000 for an outstanding letter of credit).

52.     Compeer Financial, FLCA, as Senior Creditor, and Rabobank as Agent, as Junior Creditor, and Pipeline Real Estate, as debtor, executed a Subordination Agreement, dated as of June 26, 2018, pursuant to which the payment of all obligations of Pipeline Real Estate to Rabobank as Agent is subordinated to the prior satisfaction of all obligations of Pipeline Real Estate to Compeer Financial, FLCA.  Rabobank as Agent also agreed not to hold any lien on any real or personal property of Pipeline Real Estate.

**D.     Compeer Financial, PCA – Pipeline Foods Credit Agreement**

53.     Pipeline Foods, as borrower, and Compeer Financial, PCA, as lender, entered into a Credit Agreement, dated as of February 22, 2019 (the "**Compeer-Pipeline Foods Credit Agreement**").  This agreement provided for a term loan in the amount of $26,000,000 to finance a portion of Pipeline Foods' purchase of assets of SunOpta Grain and Foods, Inc., including the purchase of real property located in Howard County, Iowa; Clay County, Minnesota; and Steele County, Minnesota, and a lease of real property in Blooming Prairie, Minnesota.

54.     To evidence the obligations of Pipeline Foods for repayment, Pipeline Foods executed a Term Note, dated February 22, 2019, in the principal amount of $26,000,000.  The maturity date is February 22, 2025.

55.    To secure its obligations under the Compeer-Pipeline Foods Credit Agreement, Pipeline Foods granted a security interest to Compeer Financial, PCA in all of its personal property.    A UCC-1 Financing Statement was filed with the Delaware Secretary of State on February 22, 2019.

56.    To secure its obligations under the Compeer-Pipeline Foods Credit Agreement, Pipeline Foods also granted the following mortgages (the "**Compeer Financial PCA Mortgages**") to Compeer Financial, PCA:

(a) Mortgage Security Agreement, Assignment of Leases and Rents, and Fixture Financing Statement, dated as of February 22, 2019, with respect to (i) real property and improvements in Cresco (Howard County), Iowa, (ii) all personal property attached to or necessary for use on the premises, and (iii) all leases and rents relating to the premises.  This mortgage was recorded with the Howard County Recorder on February 27, 2019;

(b) Mortgage Security Agreement, Assignment of Leases and Rents, and Fixture Financing Statement, dated as of February 22, 2019, with respect to (i) real property and improvements in Ellendale (Steele County), Minnesota; Moorehead (Clay County), Minnesota; and Hope (Steele County), Minnesota  (ii) all personal property attached to or necessary for use on the premises, and (iii) all leases and rents relating to the premises.  This mortgage was recorded with the Clay County Recorder on February 27, 2019 and the Steele County Recorder on February 28, 2019. This mortgage was amended, as of September 15, 2020, to add an additional parcel of property in Steele County, Minnesota and the amendment was recorded with  the Steele County Recorder on September 24, 2020.

As additional security for the obligations of Pipeline Foods under the Compeer-Pipeline Foods Credit Agreement, Pipeline Real Estate granted the following mortgage to Compeer Financial, PCA:

> Third Party Mortgage and Assignment of Leases and Rents, and Fixture Financing Statement, dated as of February 22, 2019, with respect to (i) real property and improvements in Lignite (Burke County), North Dakota, (ii) all personal property attached to or necessary for use on the premises, and (iii) all leases and rents relating to the premises.  This mortgage was recorded with the Burke County Recorder on March 1, 2019;

57.    The obligations of Pipeline Foods under the Compeer-Pipeline Foods Credit Agreement are guaranteed by Pipeline Holdings.

58.    To secure its obligations under the guaranty, Pipeline Holdings granted a security interest in all of its personal property to Compeer Financial, PCA.  A UCC-1 Financing Statement was filed against Pipeline Holdings with the Delaware Secretary of State on February 22, 2019.

59.    As further security for the obligations of the borrower and guarantor under the Compeer-Pipeline Foods Credit Agreement, Pipeline Foods, Pipeline Holdings, and Pipeline Foods II executed a Pledge Agreement in which they pledged the equity interests owned by each pledgor as follows:

| Pledgor | Issuer | Ownership |
|---|---|---|
| Pipeline Holdings, LLC | Pipeline Foods, LLC | 100% |
|  |  |  |
| Pipeline Foods, LLC | Pipeline Foods II, LLC | 100% |
|  | Pipeline Foods, ULC | 100% |
|  | Pipeline Foods Southern Cone S.R.L. | 50% |
|  | Pipeline Foods Real Estate Holding Company, LLC | 100% |
|  |  |  |
| Pipeline Foods II, LLC | Pipeline Foods Southern Cone S.R.L. | 50% |

60.     The current balance due to Compeer Financial, PCA is approximately $19,933,000.

**E.      Compeer Financial, PCA - Rabobank Intercreditor Agreement**

61.     Compeer Financial, PCA, as administrative and collateral agent under the Compeer-Pipeline Foods Credit Agreement, and Rabobank, as administrative and collateral agent under the Rabobank Credit Agreement, entered into an Intercreditor Agreement, made effective as of February 22, 2019 (the "**Intercreditor Agreement**").

62.     Under the Intercreditor Agreement, any liens or security interests of Compeer Financial, PCA are senior and prior to any liens of Rabobank as Agent on the collateral referred to in the Intercreditor Agreement as the "Compeer Collateral", which includes:

- All real property owned by Pipeline Foods that is subject to the mortgages granted by Pipeline Foods and Pipeline Real Estate to Compeer Financial, PCA and the real property that is leased by Pipeline Foods in Blooming Prairie Minnesota.

- All fixtures, machinery, appliances, equipment and other tangible personal property installed in, attached to or located in or upon the foregoing real property and used in connection with the operation or maintenance of the real property.

63.     Under the Intercreditor Agreement, any liens or security interests of Rabobank as Agent are senior and prior to any liens of Compeer Financial, PCA on the collateral referred to in the Intercreditor Agreement as the "Working Capital Collateral", which includes:

- All personal property of Pipeline Foods, Pipeline Holdings, or any affiliate, that would be treated as a current asset under GAAP, other than the Compeer Collateral.

- The membership interest of Pipeline Holdings in Pipeline Foods and the membership interests of Pipeline Foods in all of its subsidiaries.

64.     Under the Intercreditor Agreement: (a) Compeer Financial, PCA may not take any enforcement action (as defined in the Intercreditor Agreement) against the Working Capital Collateral for a period of one-hundred eighty (180) days after Rabobank as Agent has received notice of an event of default under the Compeer-Pipeline Foods Credit Agreement; and (b) Rabobank as Agent may not take any enforcement action (as defined in the Intercreditor Agreement) against the Compeer Collateral for a period of one-hundred eighty (180) days after Compeer Financial, PCA has received notice of an event of default under the Rabobank Credit Agreement.

## F.    **Rabobank and Compeer Notices of Default**

65.     On April 13, 2021, Rabobank, as lender, issued a "Declining Lender Notice" to Rabobank, as administrative agent, pursuant to Section 2.01(d) of the Rabobank Credit Agreement, instructing Rabobank, as administrative agent "not to make any additional Revolving Loans, approve the making of additional Swingline Loans, approve the issuance of additional Letters of Credit or approve amendments or extensions to any existing Letters of Credit".

66.     On April 13, 2021, CoBank, ACB, as lender, issued a "Declining Lender Notice" to Rabobank, as administrative agent, pursuant to Section 2.01(d) of the Rabobank Credit Agreement, instructing Rabobank, as administrative agent "not to make any additional Revolving Loans, approve the making of additional Swingline Loans, approve the issuance of additional Letters of Credit or approve amendments or extensions to any existing Letters of Credit".

67.     On April 14, 2021, ING Capital LLC, as lender, issued a "Declining Lender Notice" to Rabobank, as administrative agent, pursuant to Section 2.01(d) of the Rabobank Credit Agreement, instructing Rabobank, as administrative agent "not to make any additional Revolving

Loans, approve the making of additional Swingline Loans, approve the issuance of additional Letters of Credit or approve amendments or extensions to any existing Letters of Credit".

68.    On April 22, 2021, Rabobank, as administrative agent, sent a notice to Pipeline Foods, pursuant to Section 2.01(e)(iv) of the Rabobank Credit Agreement, that: (a) no other Lender responded indicating a willingness to enter into an Assignment and Acceptance with any Declining Lender, and (b) on the first Business Day after the date of the notice, Pipeline Foods is required to: (i) pay $44,350,000 as the "Prepayment Amount" to Rabobank, as administrative agent, (ii) deposit $1,890,000 with Rabobank, as administrative agent, as the Cash Collateral Amount for the outstanding letters of credit, and (iii) pay interest and fees totaling $137,371.86.

69.    On April 27, 2021, Rabobank, as administrative agent, sent a Notice of Event of Default and Reservation of Rights to Pipeline Foods stating that an Event of Default has occurred and is continuing under the Credit Agreement as a result of the failure of Pipeline Foods to pay the Prepayment Amount due on April 26, 2021.

70.    On May 6, 2021, Compeer Financial, PCA, as agent, and Compeer Financial, FLCA, as lender, sent a Notice of Default and Reservation of Rights to Pipeline Foods and Pipeline Foods Real Estate stating that the occurrence and continuance of the event of default under the Rabobank Credit Agreement is an Event of Default under the Compeer-Pipeline Foods Credit Agreement and the Compeer-Pipeline Foods Real Estate Credit Agreement.

## G.    Farm Credit Canada

71.    On October 25, 2018, Farm Credit Canada made a loan to Pipeline Canada in the amount of $2,500,000.  The loan is secured by a security interest in all personal property of Pipeline Canada and an assignment of Pipeline Canada's interests as lessee under leases for the real property in Wapella, Saskatchewan and Gull Lake, Saskatchewan, subject to the liens and security

interests of Rabobank as Agent. A financing statement was filed with the Personal Property Registry for the Province of Saskatchewan on October 29, 2018. The loan is guaranteed by Pipeline Foods and Pipeline Holdings.  The current balance of the loan is approximately $1,535,000.  The loan matures on November 1, 2023.

## III.    CIRCUMSTANCES LEADING TO BANKRUPTCY

72.    The COVID-19 pandemic adversely affected the Company's business in calendar year 2020, which impacted the Company's ability to service its obligations. The research and development teams at CPG companies stalled new product development and the inclusion of new ingredients, thereby reducing the demand for the Company's products. The sourcing teams at CPG companies could not travel to visit and approve new manufacturing facilities, thereby reducing the Company's ability to increase volumes at its facilities.  Food service customer orders declined due to the slowdown in their businesses.

73.    As a result, the Company was unable to timely pay all of its operating expenses.

74.    On May 4, 2021, the Minnesota Department of Agriculture (the "**MDA**") issued an Order for Records to Pipeline Foods stating that it had received several producer complaints of late payment and requesting that Pipeline Foods provide the MDA with certain financial information. On June 1, 2021, Pipeline Foods delivered the requested information to the MDA and in late June had a meeting with the MDA.  Thereafter, on June 28, 2021, the MDA advised Pipeline Foods that it would be allowed to operate as a licensed grain buying and storage entity under certain reporting and other conditions.  The MDA further advised Pipeline Foods that following the report to be provided on September 6, 2021 the MDA would decide on continuation of conditional licensure. Pipeline Foods continues to cooperate with the MDA as it consistently

monitors the financial position of the Company to ensure it adheres to the stringent conditions outlined or risk suspension or revocation of the critical license.

75.     On June 25, 2021, Pipeline Foods received a Memorandum of Adjustments from the Iowa Department of Agriculture and Land Stewardship, Grain Warehouse Bureau requiring immediate payment of aged payables as identified.

76.     Further, as noted above, in April 2021, Pipeline Foods' working capital lenders advised Pipeline Foods that they would not make any further loans, demanded repayment of the outstanding loans in full, and declared the loans in default.  Shortly thereafter, Compeer Financial, PCA and Compeer Financial, FLCA declared their loans in default as a result of the default declared by the working capital lenders.

## IV.   OVERVIEW AND EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS

77.     Contemporaneously with this Declaration, the Debtors have filed or expect to file a number of First Day Pleadings seeking orders granting various forms of relief intended to preserve value as the Debtors pursue a sale, stabilize the Debtors' business, facilitate the efficient administration of these chapter 11 cases, lessen the impact of the chapter 11 cases on the Debtors' day-to-day operations, and facilitate a successful chapter 11 Plan for the Debtors.  I believe that this Court's approval of the relief requested in the First Day Pleadings is essential to avoid immediate and irreparable harm to the Debtors and their estate, to provide the Debtors with an opportunity to continue to meet their obligations in the ordinary course of business, to provide for a smooth transition into chapter 11, and to provide for the efficient and swift administration of these chapter 11 cases.  A description of the relief requested, and the facts supporting each of the First Day Pleadings, is set forth below.

38495462.10

## Administrative and Procedural Motions

### A.      Motion for Joint Administration

78.      The Debtors have filed the *Motion of the Debtors for an Entry of an Order Directing Joint Administration of Chapter 11 Cases*.  As in many large chapter 11 cases that are jointly administered, the Debtors' operations are integrated by nature, and each of the Debtors are liable for the Debtors' working capital loan.  Joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

### B.      Application to Retain Claims and Noticing Agent

79.      The Debtors have filed an *Application for Entry of an Order Pursuant to 28 U.S.C. 156(c), Bankruptcy Code Section 105(a) and Local Rule 2002-1(f), Authorizing Appointment of Bankruptcy Management Solutions, Inc. D/B/A Stretto as Claims and Noticing Agent to the Debtors, Nunc Pro Tunc to the Petition Date*.  The Debtors request the approval of Debtors' retention and employment of Stretto as claims and noticing agent for the Debtors in lieu of the Clerk of the United States Bankruptcy Court for the District of Delaware.  The Debtors anticipate that there will be over a thousand entities to be noticed in these cases.  It is my understanding that, in view of the number of anticipated claimants and the complexity of the Debtors' businesses, the appointment of the Claims and Noticing Agent is both necessary and in the best interests of the Debtors' estates and their creditors because the Debtors will be relieved of the burdens associated with Claims and Noticing Services.

### C.      Motion for Authority to File Consolidated Creditor Matrix

80.      The Debtors have filed the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix, and (II) Authorizing the Debtors to File a Consolidated List of the Debtors' 20 Largest Unsecured Creditors*.  Therein, the Debtors

request that the Court authorize the filing of a single consolidated list of their 20 largest general unsecured creditors and a consolidated creditor matrix. I believe that such relief is appropriate under the circumstances for the efficient and orderly administration of these cases. Also, a consolidated list of the Debtors' top 20 creditors is more reflective of the body of creditors that have the greatest stake in the outcome of these cases.

## Operational Motions

### D.    Motion for Use of Cash Collateral

81.    The Debtors have filed the *Motion of the Debtors for Interim and Final Agreed Orders (I) Authorizing the Use Of Cash Collateral; (II) Granting Adequate Protection; (III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**Cash Collateral Motion**").

82.    In the Cash Collateral Motion, the Debtors request entry of an interim order ("**Interim Order**"), substantially in the form attached thereto as Exhibit A: (a) authorizing the Debtors' use of Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code), and all other Prepetition Rabobank Collateral (as defined therein), on the terms and conditions set forth in the Interim Order and subject to the Budget (as defined therein); (b) providing adequate protection to the Prepetition Rabobank Agent (as defined therein) for the benefit of the Prepetition Rabobank Secured Parties (as defined therein), pursuant to sections 361, 362, and 363(e) of the Bankruptcy Code, for any diminution in value in the Prepetition Rabobank Collateral; (c) approving certain stipulations of the Debtors with respect to the Rabobank Credit Agreement (as defined therein) and the liens and security interests arising therefrom, subject to the challenge rights of certain parties in interest; (d) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to effectuate the terms and provisions of the Interim Order and to permit the Prepetition Rabobank Secured Parties to exercise their rights upon an

23

Event of Default (as defined therein), subject to notice and rights to a hearing as provided therein; (e) subject to entry of a final order ("**Final Order**"), waiving the Debtors' ability to surcharge against the Prepetition Rabobank Collateral or the Adequate Protection Collateral (as defined therein) pursuant to section 506(c) of the Bankruptcy Code, waiving the applicability of the "equities of the case" exception under 552(b) of the Bankruptcy Code, and waiving the equitable doctrine of "marshalling" or any similar doctrine; (f) authorizing the Debtors to maintain and extend existing letters of credit under the Rabobank Credit Agreement or obtain new replacement letters of credit; (g) scheduling a final hearing to consider entry of the Final Order; (h) waiving any stay under Bankruptcy Rule 6004(h); and (i) granting related relief.

83.     The Debtors require immediate access to liquidity to ensure that they are able to continue operating their businesses during these chapter 11 cases, preserve the value of their estates for the benefit of all parties in interest, and administer a value-maximizing chapter 11 process. However, all of the Debtors' cash is Cash Collateral, and, without prompt access to such Cash Collateral, the Debtors would be unable to satisfy employee compensation obligations, satisfy trade payables incurred in the ordinary course of business, preserve and maximize the value of their estates, and fund the administration of these chapter 11 cases, which would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

84.     During these chapter 11 cases, the Debtors will generate cash from their operations and will need to use such cash to satisfy payroll obligations, continue satisfying obligations under their customer contracts, maintain insurance coverage, pay taxes, and make any other payments essential to the continued management, operation, and preservation of the Debtors' businesses. The ability to satisfy these expenses as and when due is essential to the Debtors' continued operation of their businesses during the pendency of the chapter 11 cases.  Other than the Cash

Collateral, the Debtors do not have access to funds sufficient to continue operation of their businesses.

85.    For the foregoing reasons, the Debtors' continued use of Cash Collateral is necessary to preserve the value of their estates and maximize their value for the benefit of all stakeholders. Under the proposed Interim Order, the Debtors' use of Cash Collateral is subject to certain limitations, including that the Debtors may only use Cash Collateral in accordance with the agreed upon budget attached as Exhibit 1 to the Interim Order, as may be modified from time to time with the consent of the Prepetition Rabobank Agent, in its discretion ("**Budget**").

86.    In addition, the Debtors and the Prepetition Rabobank Secured Parties negotiated the proposed general terms of the Debtors' use of Cash Collateral in good faith and at arm's length. I believe that the terms on which the Prepetition Rabobank Secured Parties ultimately agreed to permit the Debtors to use Cash Collateral are the most favorable terms the Debtors reasonably could have achieved under the circumstances.

87.    As a condition to the use of Cash Collateral, the Prepetition Rabobank Secured Parties required an adequate protection package consisting of Adequate Protection Liens, Adequate Protection Superpriority Claims, Adequate Protection Interest Payments, Adequate Protection Excess Proceeds Payments, Adequate Protection Fees and Expenses, and the right to credit bid at any sale of the Prepetition Rabobank Collateral, as described above and in the Interim Order (collectively, "**Adequate Protection**").

88.    The Debtors submit that the proposed Adequate Protection will sufficiently protect the Prepetition Secured Parties from any diminution in value of the Prepetition Rabobank Collateral during the pendency of these chapter 11 cases.

38495462.10

89.     Without access to Cash Collateral, the Debtors will be unable to continue operating. I believe the Adequate Protection is necessary and sufficient for the Debtors to continue to use Cash Collateral.  In light of the foregoing, the Debtors submit that the proposed Adequate Protection to be provided for the benefit of the Prepetition Rabobank Secured Parties is appropriate.  The Debtors' proposed Adequate Protection is not only necessary to protect the Prepetition Rabobank Secured Parties against any diminution in value, but is also fair and appropriate on an interim basis under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral in the near term for the benefit of all parties in interest and their estates.

90.     To the extent required, the Debtors submit that the Adequate Protection constitutes adequate protection of any interests of Compeer Financial, PCA or Farm Credit Canada in Cash Collateral.

**E.      Motion to Continue Using Existing Cash Management System**

91.     The Debtors have filed the *Motion of the Debtors for Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System, Bank and Investment Accounts, Purchasing Card and Business Forms and Payment of Related Prepetition Obligations, and (II) Waiving Certain Deposit Requirements* (the "**Cash Management Motion**").

92.     Prior to the Petition Date, and in the ordinary course of their business, the Debtors maintained a cash management system designed to, among other things, efficiently collect, concentrate, and disburse the funds generated by the Debtors' business operations ("**Cash Management System**").

93.     The Cash Management System is comprised primarily of five (5) bank accounts (the "**Cash Management Bank Account**"): (i) a Pipeline Foods operating account at Bank of America in Minneapolis, Minnesota (the "**Pipeline Foods Operating Account**"), (ii) a Pipeline

Canada depository account at Bank of America in Toronto, Ontario (the "**Pipeline Canada Depository Account**"), (iii) a Pipeline Canada disbursement account at Bank of America in Toronto, Ontario (the "**Pipeline Canada Disbursement Account**"), (iv) a Pipeline Argentina depository account at Banco Galicia in Acassuso, Buenos Aires (the "**Pipeline Argentina Depository Account**"), and (v) a Pipeline Argentina disbursement account at Banco Macro S.A. – Casa Central (the "**Pipeline Argentina Disbursement Account**").

94.     All payments from customers of Pipeline Foods are made into the Pipeline Foods Operating Account. All disbursements made by Pipeline Foods are made from the Pipeline Foods Operating Account.

95.     The majority of payments from customers of Pipeline Canada are made into the Pipeline Foods Operating Account.  Some payments from customers of Pipeline Canada are made into the Pipeline Canada Depository Account.  All disbursements made by Pipeline Canada are made from the Pipeline Canada Disbursement Account.  Funds in the Pipeline Canada Depository Account are transferred into the Pipeline Canada Disbursement Account as needed to fund disbursements.  Additional funds are transferred from the Pipeline Foods Operating Account into the Pipeline Canada Depository Account, from time to time, as needed.

96.     All payments from customers of Pipeline Argentina are made into the Pipeline Foods Operating Account.  All disbursements made by Pipeline Argentina are made from the Pipeline Argentina Disbursement Account.  Funds are transferred from the Pipeline Foods Operating Account into the Pipeline Argentina Operating Account, from time to time, as needed.

97.     All disbursements made for Pipeline Foods Real Estate are made from the Pipeline Foods Operating Account.

98.    The Debtors intend to use the Cash Management Bank Accounts during the pendency of these cases in a manner consistent with prepetition operations.  A list of the Cash Management Bank Accounts is attached to the Cash Management Motion as Exhibit C.  The Cash Management System allows the Debtors to control the administration of these Bank Accounts.

99.    The Debtors have two additional bank accounts (the "**Additional Bank Accounts**") that are not used as part of its general cash management system.  Pipeline Canada has a depository account at Bank of Montreal in Toronto, Ontario, which has not had material activity for the past two (2) years.  The current balance in the account is approximately $600.  Pipeline Foods also has an account at BMO Harris Bank, N.A., in Chicago, Illinois, which has not had material activity for the past two (2) years.  The current balance of the account is approximately $43,000.  The Additional Bank Accounts are also listed on Exhibit C to the Cash Management Motion.  The Cash Management Bank Accounts and the Additional Bank Accounts are collectively referred to as the "**Bank Accounts**").

100.    The Debtors also maintain an investment account at R.J. O'Brien & Associates, LLC (the "**R.J. O'Brien Investment Account**") for the purposes of the purchase of futures contracts for traded commodities.  The Debtors' positions in the account include long and short positions on soybeans, corn, wheat, and other commodities commonly listed on the Chicago Board of Trade with a total account market value on average of $200,000.  The Debtors maintain an immaterial cash position in the account.  The R.J. O'Brien Investment Account is also listed on Exhibit C to the Cash Management Motion.

101.    The Debtors' personnel, located at the Debtors' headquarters, oversee all cash receipt and disbursement activity in the Cash Management System, with the exception of immaterial amounts managed by the regional manager in Pipeline Argentina.  This centralization

facilitates the Debtors' cash forecasting, monitoring of collections, control and approval of disbursement of funds, preservation of capital, and management of liquidity requirements.  It also facilitates the management of the Debtors' hedging against foreign exchange and currency movements.

102.    As described above, the Debtors receive all revenues and make all payments through their Cash Management System.  If the Debtors are unable to maintain their Cash Management System, the Debtors' operations will be severely impeded.  The Debtors, with the assistance of their advisors, have implemented protocols to ensure that only claims arising postpetition and certain claims arising prepetition (if payment of such prepetition claims is approved by this Court) will be paid by the Debtors.

103.    From time to time, and in the ordinary course of business, the Debtors incur obligations for the maintenance of the Cash Management System.  These obligations primarily consist of (a) amounts owed to Bank of America for the maintenance of and services related to the Cash Management Bank Accounts ("**Bank Fees**"), together with other fees and obligations relating to the maintenance of the Cash Management System, the ("**Cash Management Fees**").  Bank Fees average approximately $7,500 per month. The Debtors estimate that accrued, unpaid, and undisputed prepetition amounts outstanding as of the date hereof on account of the Cash Management Fees, including Bank Fees total approximately $7,500 in the aggregate.

104.    The Debtors use various business forms, such as checks, invoices, letterhead, and other business and marketing materials in the ordinary course of their business ("**Business Forms**").  Because the Business Forms were used prepetition, they do not reference the Debtors' current status as a debtors in possession.  Requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless

expenses on the estate.  Thus, the Debtors request that they be authorized to use their existing

Business Forms without placing a "Debtor In Possession" legend on each.

105.    Requiring the Debtors to adopt a new, segmented cash management system during

these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the

Debtors' operations.  Any disruption of the Cash Management System could have severe adverse

effects on the Debtors' restructuring efforts, the cost of which would ultimately be borne by the

Debtors' creditors and other stakeholders.  Maintaining the current Cash Management System will

facilitate the Debtors' smooth transition into and operation in chapter 11 by, among other things,

minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.

**F.    Motion to Authorize Payment of Prepetition Employee Compensation and Benefits**

106.    The Debtors have filed the *Motion of the Debtors for Entry of Interim and Final*

*Orders (I) Authorizing the Debtors to (A) Pay Certain Prepetition Salary, Wages, Benefits and*

*Other Compensation, and (B) Continue Employee Compensation and Employee Benefits*

*Programs, and (II) Granting Related Relief* (the "**Employee Compensation Motion**").

107.    As of the Petition Date, Pipeline Foods employs or pays for the employment of

eighty-five full-time (85) employees and one (1) intern (collectively, the "**Employees**").  Sixty-

eight (68) of the full-time Employees and the intern (collectively, the "**U.S. Employees**") are

employed by Pipeline Foods.  Thirteen (13) of the Employees (the "**Canada Employees**") are

employees of Pipeline Canada.  Four (4) of the Employees (the "**Argentina Employees**") are

employees of Pipeline Argentina. In the ordinary course of business, Pipeline Foods pays for all

of the Employees' salary, wages, expense reimbursements, and other forms of compensation that

are described herein.

1.      **U.S. Employee Compensation**

108.    The following summarizes the various types of U.S. Employee compensation offered by the Debtors (collectively, the "**U.S. Employee Compensation**"):

109.    <u>Salaries and Wages</u>.  All of the U.S. Employees receive their salaries, wages and other compensation by direct deposit.

110.    In the ordinary course of business, U.S. Employees are paid on a semi-monthly basis.  Thirty-four (34) of the U.S. Employees are paid on a salaried basis.  The salaried U.S. Employees are paid for the semi-monthly period ended on the date of payment.  Thirty-five (35) of the U.S. Employees (including the intern) are paid wages on an hourly basis.  The hourly U.S. Employees are paid for the two week period ended approximately two weeks prior to the date of payment.

111.    The next scheduled payroll for the U.S. Employees is due to be paid on July 15, 2021.  For the salaried U.S. Employees, this will cover the period July 1, 2021 through July 15, 2021.  The Debtors estimate that the total amount of the July 15, 2021 payroll for the salaried U.S. Employees will be approximately $160,267.  A portion of this pay period for the salaried U.S. Employees (July 1-7, 2021) is prior to the Petition Date.  For the hourly U.S. Employees, the July 15, 2021 payroll will cover the period June 20, 2021 through July 3, 2021.  The Debtors estimate that the total amount of the July 15, 2021 payroll for hourly U.S. Employees will be approximately $53,963.  The entire pay period for the hourly U.S. Employees for the July 15, 2021 payroll is prior to the Petition Date.  Prior to the Petition Date, however, on July 7, 2021, Pipeline Foods paid to Paylocity the estimated amount of the July 15, 2021 gross payroll for all U.S. Employees.

112.    Another payroll for U.S. Employees is scheduled to be made on July 30, 2021.  For the salaried U.S. Employees, this will cover the period July 16, 2021 through July 30, 2021.

Accordingly, no portion of this pay period for the salaried U.S. Employees will have accrued prior to the Petition Date.  For the hourly U.S. Employees, this pay period will cover July 4, 2021 through July 17, 2021.  Accordingly, a portion of this pay period (July 4-7, 2021) will have accrued prior to the Petition Date.  The Debtors seek authority to pay the hourly U.S. Employees the amounts owed for wages for the period accruing prior to the Petition Date in the July 30, 2021 payroll.  This amount is estimated to be $24,605.

113.    <u>Holidays/Paid Time-Off and Leaves of Absence</u>. The Debtors offer full-time U.S. Employees pay for predetermined holidays ("**Paid Holidays**").  In addition, U.S. Employees are eligible for paid time away from work based length of service.  These absences include personal illness, family illness, personal days and vacation (collectively, "**Paid Time Off**").  Paid Time Off can be carried over from year to year. Employees can only redeem accrued Paid Time Off, however, on their last payroll, not during employment. Moreover, the amount that a U.S. Employee may receive for accrued Paid Time Off on their last payroll cannot exceed the annual accrual amount for such U.S. Employee. The Debtors anticipate that after the Petition Date, certain U.S. Employees will seek to use or redeem for cash Paid Time Off accrued during the prepetition period ("**PTO Payouts**").  As of the Petition Date, the Debtors estimate that their accrued liability in connection with unused Paid Time Off for U.S. Employees is approximately $208,000.  All amounts for Paid Time Off that are due with the July 15, 2021 payroll were funded by the Debtors (i.e. paid to Paylocity) on July 7, 2021. The Debtors estimate that the amount of Paid Time Off that will be due with the July 30, 2021 payroll is approximately $20,000.

114.    In the Employee Compensation Motion, the Debtors request authority to honor all unused Paid Time Off for U.S. Employees that accrued prior to the Petition Date in accordance with their historical practices and in the ordinary course of business.  The Debtors also seek

32

authority to continue to incur and pay eligible U.S. Employees for Paid Holidays consistent with past practices.

### 2.    U.S. Employee Deductions and Withholdings

115.    During each applicable payroll period, the Debtors routinely deduct certain amounts from the U.S. Employees' gross pay, including, without limitation, (a) pre-tax and after-tax deductions payable pursuant to the U. S. Employee benefit plans discussed herein (e.g., garnishments,  contributions relating to health care benefits, insurance premiums and flexible spending programs) and (b) other miscellaneous deductions (collectively, the "**U.S. Deductions**"). Out of an abundance of caution, in the Employee Compensation Motion, the Debtors request authority to remit any unpaid prepetition U.S. Deductions that exist. Additionally, the Debtors seek authority to continue deducting amounts from the applicable U. S. Employee's wages and salaries and forwarding U.S. Deductions to the appropriate third-party recipients on a postpetition basis, in the ordinary course of business, and consistent with past practices.  The U.S. Deductions represent earnings that applicable authorities have designated for deduction from U.S. Employees' paychecks and thus may not be property of the Debtors' estates.

116.    In addition to the U.S. Deductions, the Debtors are required by law to withhold amounts related to federal income taxes, as well as Social Security and Medicare taxes for remittance to the appropriate taxing authority (collectively, the "**U. S. Withheld Amounts**")*.*  The Debtors are also required to pay additional amounts for federal and state unemployment insurance (together with the U.S. Withheld Amounts, the "**U.S. Payroll Taxes**").  The amount due for U.S. Payroll Taxes for the July 15, 2021 payroll (approximately $95,000), which amount includes employer taxes plus what is withheld and remitted on behalf of the employee was funded by the Debtors (i.e. paid to Paylocity) on July 7, 2021.

38495462.10

117.     The Debtors estimate that the amount of the U.S. Payroll taxes that will be due for

the July 30, 2021 payroll is approximately $50,165, of which approximately $4,652 is attributable

to the period (July 4-7, 2021) prior to the Petition Date. Because the U.S. Deductions and U.S.

Payroll Taxes are not property of the Debtors' estates, the Debtors request that the Court authorize

the Debtors to transmit these amounts, all of which will become due within the first 21 days of

these Chapter 11 Cases, to the appropriate parties in the ordinary course of business.

### 3.     U.S. Employee Benefits

118.     The Debtors offer the U.S. Employees the opportunity to participate in a number of

insurance and benefit programs, including medical insurance, life and disability insurance, and

other employee benefit plans as described below (collectively, the "**U.S. Employee Benefits**").

Maintaining these benefits and honoring obligations thereunder is necessary to preserve employee

morale and maintain the stability of the Debtors' workforce during the Chapter 11 Cases.

119.     <u>U.S. Medical, Dental and Vision Plans</u>.  The Debtors provide health care coverage

and dental care to all of the full-time U.S. Employees and their dependents under various benefit

plans, as described below (collectively, the "U.S. Medical, Dental and Vision Plans").   The

Debtors offer U.S. Employees the following Medical, Dental and Vision Plans:

- *Medical Plans.*  Eligible U.S. Employees may enroll in one of several medical plans through Blue Cross Blue Shield of Minnesota. The premiums, deductibles, and benefits vary by plan. The plans include pharmaceutical coverage, and a vision plan through EyeMed Vision Care.  The monthly cost to the Debtors for the Medical Plan, including Employee contributions, is approximately $43,000.

- *Dental Plans.*  The Debtors offer eligible U.S. Employees dental coverage through plans offered by Blue Cross Blue Shield.  The premiums, deductibles and benefits vary by plan. The monthly cost to the Debtors for the Dental Plan is approximately $3,300.

38495462.10

120.     In the aggregate, the Debtors estimate that they incur approximately $46,300 in aggregate monthly premiums and administrative costs associated with the U.S. Medical, Dental and Vision Plans described above.

121.     In the Employee Compensation Motion, the Debtors request authority to (a) continue the U.S. Medical, Dental and Vision Plans in the ordinary course of business, and (b) continue making the above-described contributions to the U.S. Medical, Dental and Vision Plans, in the ordinary course of business.  The monthly premiums for the U.S. Medical, Dental and Vision Plans are generally paid on the 20th day of the prior month.  The premiums for July 2021 were paid on June 20, 2021.  Moreover, the premiums for August 2021 were paid on July 8, 2021, i.e. prior to the Petition Date.  Accordingly, no payment for the premiums for the U.S. Medical, Dental and Vision Plans for any accrued period prior to the Petition Date need to be paid post-petition.

122.     <u>U.S. Insurance and Disability Benefits</u>. The Debtors provide certain U.S. Employees with life insurance, accidental death and dismemberment and short-term and long-term disability coverage (collectively, the "**U.S. Insurance and Disability Benefits**").  The Debtors pay the premiums for U.S. Employees' basic life insurance and certain short-term disability coverage, and U.S. Employees pay for all other coverages related thereto.  The monthly premium for the U.S. Insurance and Disability Benefits, net of amounts paid by U.S. Employees, is approximately $3,100.  In the Employee Compensation Motion, the Debtors request authority to continue paying premiums for the U.S. Insurance and Disability Benefits in the ordinary course of business.

123.     The Debtors also provide certain benefits to U.S. Employees pursuant to the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**") in the ordinary course of business.  On a monthly basis, the Debtors' current obligations under COBRA are approximately $625.  In

38495462.10

the Employee Compensation Motion, the Debtors seek authority to continue providing these benefits in the ordinary course of business, including any amounts accruing prepetition.

124.     <u>U.S. Employee Savings Plans</u>. The Debtors maintain for the benefit of eligible U.S. Employees an employee savings plan, which is a tax-qualified plan within the meaning of, and administered in accordance with, the requirements of section 401(k) and other applicable sections of the Internal Revenue Code (the "**401(k) Plan**").  There are approximately 100 participants in this plan, which is administered by Pipeline Foods, LLC in coordination with Alerus Financial Corporation ("**Alerus**").    The Debtors withhold certain amounts from participating U.S. Employees' paychecks and contribute such amounts to the 401(k) Plan (the "**Employee 401(k) Contributions**").    The Debtors withhold a total of approximately $32,100 per pay period in Employee 401(k) Contributions.  In the Employee Compensation Motion, the Debtors request authority to continue the Employee 401(k) Contributions on a postpetition basis.  The Debtors also have historically matched all contributions to the 401(k) Plan, although this is discretionary. The Debtors request authority to continue matching the 401(k) contributions.  The Debtors further request authority to pay prepetition fees owed to Alerus, in the amount of $3,000, to ensure the continued administration of the 401(k) Plan without interruption.

125.     <u>Cell Phone and Safety Shoe Allowance</u>.  The Debtors provide all U.S. Employees an allowance for cell phone usage and safety shoes (the "**Cell Phone and Safety Shoe Allowance**"). The total amount of the cell phone allowance for each pay period is approximately $5,200.  The total amount of the safety shoe allowance for each pay period is approximately $300.

**4.     Canada Employee Compensation**

126.     The following summarizes the various types of Canada Employee compensation offered by the Debtors (collectively, the "**Canada Employee Compensation**"):

127.    <u>Salaries and Wages</u>.  In the ordinary course of business, the Canada Employees are paid on the same semi-monthly basis as the U.S. Employees.  The dates of the payroll for the Canada Employees and the corresponding pay periods for the Canada Employees are the same as for the U.S. Employees.  As noted above, the funds for the payroll for the Canada Employees are paid directly by Pipeline Foods to Blue Marble, the payroll processor for the Canada Employees. Seven (7) of the Canada Employees are paid on a salaried basis. Six (6) of the Canada Employees are paid on an hourly basis.

128.    Another payroll for the Canada Employees is scheduled to be made on July 30, 2021.  For the salaried Canada Employees, this will cover the period July 16, 2021 through July 30, 2021.  Accordingly, no portion of this pay period for the salaried Canada Employees will have accrued prior to the Petition Date.  For the hourly Canada Employees, this pay period will cover July 4, 2021 through July 17, 2021.  Accordingly, a portion of this pay period (July 4-7, 2021) will have accrued prior to the Petition Date.  The Debtors seek authority to pay the hourly Canada Employees the amounts owed for wages for the period accruing prior to the Petition Date in the July 30, 2021 payroll.  This amount is estimated to be $2,530.

129.    <u>Holidays/Paid Time-Off and Leaves of Absence</u>. As with the U.S. Employees, the Debtors offer full-time Canada Employees pay for Paid Holidays and Paid Time Off. Also, as with the U.S. Employees, Paid Time Off can be carried over from year to year, but can only be redeemed by on the last payroll, not during employment. Unlike with U.S. Employees, however, there is no limit on the amount that the Canada Employees can redeem. The Debtors anticipate that after the Petition Date, certain Canada Employees will seek PTO Payouts.  As of the Petition Date, the Debtors estimate that their accrued liability in connection with unused Paid Time Off for Canada Employees is approximately $78,890 (U.S. Dollars).  All amounts for Paid Time Off that are due

37

with the July 15, 2021 payroll were funded by the Debtors (i.e. paid to Blue Marble) on July 7, 2021. The Debtors estimate that the amount of Paid Time Off that will be due with the July 30, 2021 payroll is approximately $14,220.

130.     In the Employee Compensation Motion, the Debtors request authority to honor all unused Paid Time Off for Canada Employees that accrued prior to the Petition Date in accordance with their historical practices and in the ordinary course of business.  The Debtors also seek authority to continue to incur and pay eligible Canada Employees for Paid Holidays consistent with past practices.

### 5.     Canada Deductions and Withholdings

131.     During each payroll period, the Debtors deduct or withhold certain amounts from the Canada Employees' gross pay for: federal tax, the Canadian pension plan, and employment insurance (collectively, the "**Canada Deductions and Withholdings**").  The total amount of the Canada Deductions and Withholdings for each pay period is approximately $12,875 (U.S. Dollars).  The amount due for Canada Deductions and Withholdings for the July 15, 2021 payroll (approximately $12,875) was funded by the Debtors (i.e. paid to Blue Marble) on July 7, 2021. The Debtors estimate that the amount of the Canada Deductions and Withholdings that will be due for the July 30, 2021 payroll is approximately $12,030, of which approximately $630 is attributable to the period (July 4-7, 2021) prior to the Petition Date.

### 6.     Canada Employee Benefits

132.     The Debtors offer the Canada Employees the opportunity to participate in insurance and benefits programs, including medical insurance, life and disability insurance, and other employee benefit plans as described below (collectively, the "**Canada Employee Benefits**").

Maintaining these benefits and honoring obligations thereunder is necessary to preserve employee morale and maintain the stability of the Debtors' workforce during the Chapter 11 Cases.

133.    <u>Medical and Dental Plans</u>.  The Debtors provide health care coverage and dental care to all of the full-time Canada Employees and their dependents, as described below (collectively, the "**Canada Medical and Dental Plans**").  The Debtors offer Canada Employees the following Medical and Dental Plans:

- *Medical Plan.*  Eligible Canada Employees may enroll in a medical plan through Blue Cross Blue Shield of Canada. The monthly cost to the Debtors for the Medical Plan, Including Employee contributions, is approximately $748.

- *Dental Plan.*  The Debtors offer eligible Canada Employees dental coverage through a plan offered by Blue Cross Blue Shield of Canada.  The monthly cost to the Debtors for the Dental Plan is approximately $901.

134.    In the aggregate, the Debtors estimate that they incur approximately $1,749 in aggregate monthly premiums and administrative costs associated with the Canada Medical and Dental  Plans described above.

135.    In the Employee Compensation Motion, the Debtors request authority to (a) continue the Canada Medical and Dental Plans in the ordinary course of business, and (b) continue making the above-described contributions to the Canada Medical and Dental Plans, in the ordinary course of business.  The monthly premiums for the Canada Medical and Dental Plans are generally paid on the 20th day of the prior month.  The premiums for July 2021 were paid on June 20, 2021. Moreover, the premiums for August 2021 were paid on July 8, 2021, i.e. prior to the Petition Date. Accordingly, no payment for the premiums for the Canada Medical and Dental Plans for any accrued period prior to the Petition Date needs to be paid post-petition.

136.    <u>Insurance and Disability Benefits</u>.  The Debtors provide certain Canada Employees with life insurance, accidental death and dismemberment and short-term and long-term disability

coverage (collectively, the "**Canada Insurance and Disability Benefits**"). The monthly premium

for the Canada Insurance and Disability Benefits, net of amounts paid by Canada Employees, is

zero ($0).

### 7.    Argentina Gross Payroll

137.    All four (4) of the Argentina Employees are paid on a salary basis. In the ordinary

course of business, the gross payroll for the Argentina Employees (the "**Argentina Gross**

**Payroll**") is paid by Pipeline Argentina with funds from Pipeline Foods. Periodically, Pipeline

Argentina will request such funds from Pipeline Foods. On June 29, 2021, upon request of Pipeline

Argentina, Pipeline Foods transferred $16,730 to Pipeline Argentina for the cost of the Argentina

Gross Payroll for May 2021. This amount consisted of: $11,600 for net salary paid directly to the

Argentina Employees; $4,934 for taxes and other withholdings; and $196 for health benefits. The

Debtors anticipate that the cost of the Argentina Gross Payroll for June 2021 will be approximately

the same as the cost was for May 2021.  In the Employee Compensation Motion, the Debtors seek

authority to pay the amounts needed for the Argentina Gross Payroll for all periods accruing prior

to the Petition Date.  The Debtors do not anticipate making any payments for the Argentina Gross

Payroll in the next twenty-one (21) days but seek to pay such amount as they come due in the

ordinary course.

### 8.    Reimbursable Expenses

138.    Prior to the Petition Date and in the ordinary course of business, Pipeline Foods

reimbursed Employees, subject to approval, for certain allowed expenses incurred on behalf of the

Debtors (the "**Reimbursable Expenses**").  Reimbursable Expenses generally include, among

other things, business travel (e.g., airfare/rail, gas mileage, taxis, hotel and telephone/internet) and

meals (e.g., business travel-related and onsite).  Employees pay for such expenses directly from

their own funds and are reimbursed upon the submission of an expense reimbursement form itemizing the applicable business expenses. Reimbursement is contingent on the Debtors' determination that the charges are for legitimate, reimbursable business expenses.

139. Reimbursable Expenses typically are approximately $20,000 per month for Employees, although the incurrence of Reimbursable Expenses varies from month to month; as a result, the Debtors cannot precisely estimate prepetition, unpaid Reimbursable Expenses.

140. Employees incurred the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed. To avoid harming Employees who incurred the Reimbursable Expenses, in the Employee Compensation Motion, the Debtors request authority to: (a) continue paying the Reimbursable Expenses in accordance with prepetition practices in accordance with the Debtors' policy for reimbursing such expenses, and continue honoring any prepetition obligations related thereto to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses; and (b) modify their prepetition policy relating thereto as they deem appropriate without the need for further court approval.

### 9. The Payroll Processors

141. As noted above, the Debtors utilize the services of Paylocity and Blue Marble to administer payroll for U.S. Employees and Canada Employees, respectively. Though the Debtors do not believe that any fees are owing to Paylocity or Blue Marble for prepetition services, out of an abundance of caution, because the services provided by Paylocity and Blue Marble are crucial to the smooth functioning of the Debtors' payroll system, the Debtors request permission to pay any unpaid fees to Paylocity and Blue Marble and to continue to pay fees that accrue during the ordinary course of business.

142.    I believe that payment of the foregoing employee obligations is critical to the ongoing operation of the Debtors' businesses.  If these obligations are not paid, the Debtors will risk tangible and intangible loss of the value of their businesses, including, among other things, losses relating to the cost of replacing Employees who seek alternative employment and losses related to the disruption of, and lower productivity in, the Debtors' business operations resulting from low employee morale and high turnover.

**G.    Motion to Approve Proposed Adequate Assurance of Payment to Utility Companies**

143.    The Debtors have filed the *Motion of the Debtors for Entry of Interim and Final Orders: (I) Authorizing Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service* (the "**Utilities Motion**").

144.    In the ordinary course of business, the Debtors obtain traditional utility services related to the day-to-day operation and/or maintenance of their businesses from approximately thirty-six (36) different utility providers (each a "**Utility Company**" and collectively, the "**Utility Companies**"), for water, electricity, gas, trash, waste disposal, telephone and internet services (the "**Utility Services**").  The Utility Companies include, without limitation, the entities set forth on the list attached the Utilities Motion as Exhibit C (the "**Utility Companies List**").

145.    Currently, two of the Utility Companies are holding security deposits.  A security deposit in the amount of $639.00 is being held by Black Hills Energy.  Another security deposit is being held by Montana-Dakota Utilities in the amount of $2,190.00.

146.    Uninterrupted Utility Services are essential to the continued operation of the Debtors' businesses and, consequently, to the success of their Chapter 11 Cases.  Should any

42

Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' reorganization efforts.  Accordingly, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Companies without hindering the Debtors' ability to function as a going concern.

147.    The Debtors estimate that the cost for the Utility Services during the next month (not including any deposits to be paid, and based upon the recent average monthly expenses for the Utility Services) will be approximately $45,000.  The Debtors intend to pay their undisputed postpetition obligations to the Utility Companies on a timely basis and have the ability to do so. The Debtors anticipate that they will have sufficient funds to pay the amounts described in this Motion.

148.    The Debtors propose to deposit $45,000, an amount equal to approximately one month of Utility Services, calculated as a historical average of all billings for Utility Services incurred by the Debtors (each an "**Adequate Assurance Deposit**") into a segregated bank account designated for the Adequate Assurance Deposits (the "**Adequate Assurance Deposit Account**") on behalf of all Utility Companies identified in Exhibit C to the Utilities Motion within 20 days of the Petition Date.  The Adequate Assurance Deposit may be applied to any postpetition defaults in payment to the Utility Companies. All funds held in the Adequate Assurance Deposit Account shall be returned to Debtors upon the earliest to occur of: (a) confirmation of a Chapter 11 plan of reorganization or liquidation with respect to the Debtors; (b) the closing of a transaction or series of transactions that in aggregate result in the sale of substantially all of the Debtors' assets; (c) conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (d) dismissal of these Chapter 11 Cases; or (e) conclusion of these Chapter 11 Cases.

38495462.10

I have reviewed each of the First Day Motions, the underlying operative documents and company records, the facts stated therein and the descriptions of the relief they request. I have reviewed same with the Debtors' executives and employees; together with the Debtors' counsel and advisors and based on such review believe that the contents of the First Day Motions and this Declaration are true and correct to the best of my information and belief. Accordingly, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of the First Day Motions and the contents of the foregoing Declaration are true and correct to the best of my information and belief.

Dated:  July 12, 2021

/s/ Winston Mar
Winston Mar, Chief Restructuring Officer

44

38495462.10