# **<u>Exhibit 1</u>**

# EXCLUSIVE SUPPLY AGREEMENT

This EXCLUSIVE SUPPLY AGREEMENT (the "Agreement") is made as of the 22nd day of February, 2019 ("Effective Date") by and between SunOpta Grains and Foods Inc., a Minnesota corporation, whose address and principal place of business is located at 7301 Ohms Lane, Suite 600, Edina, Minnesota 55439 ("Purchaser") and Pipeline Foods, LLC, a Delaware limited liability company, whose address and principal place of business is located at 1250 East Moore Lake Dr., Suite 200, Minneapolis, Minnesota 55432 ("Supplier").

WHEREAS, Purchaser is engaged in the business of, among other things, purchasing, manufacturing, marketing, selling, and distributing food products to manufacturers and retailers of food and other products;

WHEREAS, Supplier is engaged in the business of, among other things, contracting for, processing, manufacturing, packaging, distributing, and selling certain food products;

WHEREAS, Purchaser wishes to purchase from Supplier on an exclusive basis and Supplier wishes to sell to Purchaser, the Products (as defined below) on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is acknowledged by each of the parties, the parties agree as follows:

**1. MANUFACTURING SERVICES; PRICING**.

Supplier agrees to use its facilities and all necessary equipment to manufacture and package Purchaser's products listed in Schedule A (the "Products") at a price determined by the protocol set forth on Schedule A (the "Price"). Supplier agrees to adhere to the Purchaser specifications ("Specifications") provided in Schedule B.

**2. PACKAGING.**

Supplier will package Purchaser's Products in accordance with the packaging specifications provided in Schedule B. Unless otherwise stated in Schedule B, Supplier will be responsible for all packaging pertaining to all Products listed in Schedule A, and the stated prices will cover all packaging costs.

**3. SAMPLES AND QUALITY ASSURANCE**.

(a) Supplier shall submit periodic samples of the Products as Purchaser may reasonably request, so that Purchaser may assure itself that the Products are being processed in accordance with the Specifications.

(b) Supplier will provide Purchaser with a Certificate of Analysis ("COA") for each Product shipment. Supplier's COA will provide results for such tests to show compliance with the applicable Specifications in Schedule B. Supplier will be required to adhere to Purchaser's testing requirements, which shall include not only COA Specification verification, but also non-GMO

and/or organic certification of the raw materials being acquired by Supplier as well as compliance with Purchaser's supplier quality system.

(c) Supplier shall register, or ensure its suppliers register, all facilities used to manufacture, process, pack, and/or hold the Products with the United States Food and Drug Administration ("FDA") and will maintain all other licenses and registrations required by other federal, state or local regulatory bodies. Upon request, Supplier will provide Purchaser with the applicable FDA facility registration numbers for all foreign or domestic facilities that are or will be used to manufacture, process, pack or hold the Products.

(d) Supplier shall perform such auditing and verification activities of its suppliers as are necessary to (i) ensure Products it supplies comply with this Agreement and are not adulterated or misbranded under United States law; and (ii) comply with Supplier's obligations under the U.S. FDA Food Safety Modernization Act.

(e) If any portion of the facilities used to manufacture, process, pack or hold Products, including the facilities utilized by Supplier's suppliers, do not otherwise comply with the applicable Specifications, all applicable laws, or with the other terms and conditions of this Agreement, Supplier will promptly take such action as will correct the deficiencies and bring such facilities into compliance with the Specifications, all applicable laws, and with the terms and conditions of this Agreement.

(f) Supplier shall immediately notify Purchaser and provide Purchaser with all documents relating to any known inquiry, investigation, inspection, revocation or suspension of license or registration, recall, detention of goods, or any other formal action by any governmental body or agency regarding quality, safety, labeling, marketing or distribution of the Products (including, without limitation, any FDA Form 483 or similar forms). If Supplier becomes aware of any information regarding the Products that would indicate a potential quality, safety or labeling defect or error, Supplier shall notify Purchaser immediately by personal contact with Purchaser's quality control representative and its account representative by email and telephone in addition to any notification required by applicable law. To the extent reasonable and not otherwise in violation of applicable law, Supplier shall consult with Purchaser regarding any evaluation and decision to place the Product on hold, the process to retrieve such Products or the decision to report to any governmental body or regulatory agency or to recall Products due to any suspected quality, safety or labeling defect or error.

(g) Supplier shall have a system in place to enable Supplier to trace promptly, and in all cases within twenty-four (24) hours of Purchaser's request, the entire history of a particular lot of Product while in Supplier's control, including but not limited to records pertaining to all raw materials, ingredients, packaging materials, manufacturing processes and procedures, packaging, storing, shipment and delivery. If any government or regulatory agency requires the recall of one or more Products or if Purchaser or Supplier wish voluntarily to recall one or more Products, Purchaser and Supplier shall coordinate such recall consistent with industry standards and requirements, as applicable, and as required under applicable law. To the extent the Purchaser demands the voluntary recall of Product and the Product otherwise complies with this Agreement, the Purchaser shall reimburse the Supplier for its direct costs of recalling the Product.

(h)  Supplier shall provide Purchaser with a copy of continuing product guarantees and warranties promptly upon request. Such continuing product guarantees and warranties act to supplement, but do not limit, the representations and warranties, and terms of this Agreement.

(i)  Supplier shall adhere to Purchaser's Code of Conduct, available at http://www.sunopta.com/files/sunopta_supplier_partner_code_of_conduct.pdf as amended from time to time, with such amendments taking effect thirty (30) days after notice thereof is provided to Supplier.

**4. PURCHASE ORDERS.**

Purchaser shall purchase Products by issuing a purchase order ("Purchase Order") to Supplier in such quantities and in such intervals as Purchaser may elect to order. Subject hereto, Purchaser agrees to purchase from Supplier and Supplier agrees to provide to Purchaser the Products identified in the Purchase Order, which such Products shall conform to all Specifications in Schedule B.  Supplier shall deliver the Products in the quantities and on the date(s) specified in the Purchase Order or as otherwise agreed in writing by the parties (the "Delivery Date"). Supplier must provide Purchaser prior written notice if it requires Purchaser to return any packaging material. Any return of such packaging material shall be made at Supplier's sole expense and risk of loss.

Supplier acknowledges that time is of the essence with respect to Supplier's obligations hereunder and the timely delivery of the Products. Unless Supplier rejects a Purchase Order within five (5) days of receipt, Supplier shall supply Purchaser with Products according to the quantity term and delivery conditions set forth in the Purchase Order.  To the extent the Supplier timely rejects a Purchase Order, neither the Supplier nor the Purchaser shall be in default of this Agreement.   If the Supplier delivers more or less than the quantity of Product ordered, and if the Purchaser does not reject the Products and instead accepts the delivery of the Products at the increased or reduced quantity, the Price for the Products shall be adjusted on a pro-rata basis based on the contract price.  If the Supplier delivered more than the quantity of Product ordered, the Purchaser may only reject that portion of the Products that exceeds the quantity of Product ordered.  For the avoidance of confusion, the preceding sentence shall apply only to rejections that arise solely from quantity deviations described in this Section 4 and not to rejections for any other reasons.  If the Supplier delivered less than the quantity of Product ordered, the Purchaser may make demand for the additional undelivered Product and the Supplier shall make such reasonable effort to deliver the additional Product.

**5. DELIVERY; TITLE AND RISK OF LOSS**.

Unless otherwise agreed by the parties in writing, Supplier shall deliver Products to the loading dock of Supplier's facility at Hope, Minnesota ("Supplier's Facility").  Unless otherwise agreed by the parties in writing, all deliveries are FOB origin (Supplier's Facility). Title and risk of loss on the Products shall pass to Purchaser upon the loading of the Product onto Purchaser's truck, or its designated carrier's truck, at Supplier's Facility.  Supplier will load all products ordered in accordance with the Specifications and in a manner suitable for shipment and sufficient to enable the Products to withstand the effects of shipping.

**6. INSPECTION AND REJECTION OF NONCONFORMING PRODUCT**.

Purchaser has the right to inspect the Product on or after the Delivery Date. Purchaser, at its sole option, may inspect all or a sample of the Product, and may reject all or any portion of the Product if it determines the Product is nonconforming with the terms of this Agreement. If Purchaser rejects any portion of the Product, Purchaser has the right, effective upon written notice to Supplier of the specific reason for the rejection and an opportunity for the Supplier to separately inspect the Product, to: (a) accept the Product at a reasonably and agreed reduced price; or (b) reject the Product and require replacement of the rejected Product. If Purchaser requires replacement of the Product, Purchaser shall provide Supplier notice and reasonable time to deliver a substitute Product that complies with this Agreement.  To the extent a substitute Product is not delivered, the Purchaser may replace it with goods from a third party and charge Supplier the reasonable buy-in or replacement costs.  Any inspection or other action by Purchaser under this Section shall not reduce or otherwise affect Supplier's obligations under the Agreement, and Purchaser shall have the right to conduct further inspections after Supplier has carried out its remedial actions.  Nothing in this Section will be deemed to prevent Purchaser from revoking acceptance with respect to Products for which nonconformity could not reasonably have been discovered in connection with incoming inspection to the extent written notice of the nonconformity is given at least fourteen (14) days after delivery of the Product.  To the extent the Product is rejected but is later found to have complied with the requirements of this Agreement, Purchaser shall pay Supplier's direct costs related to such wrongful rejection.

**7. PAYMENT.**

Supplier shall issue an invoice to Purchaser on or after title and risk of losses passes to Purchaser under Section 5.  Purchaser shall pay all properly invoiced amounts due to Supplier within 30 days after Purchaser's receipt of such invoice, except for any amounts disputed by Purchaser in good faith. All payments hereunder must be in US dollars.  In the event of a payment dispute, the parties shall seek to resolve all such disputes expeditiously and in good faith.  Supplier shall continue performing its obligations under this Agreement notwithstanding any such dispute.

**8. WARRANTIES.**

Supplier represents and warrants to Purchaser as follows:

(a) Each Product processed by Supplier and all raw ingredients and other products supplied to Supplier and used in the processing of Products delivered to Purchaser pursuant to this Agreement shall be processed in compliance with all applicable state and federal laws and regulations, where and as applicable, including but not limited to (i) the U.S. Federal Food, Drug, and Cosmetic Act, and all amendments, supplements, and regulations promulgated thereunder, including but not limited to the U.S. FDA Food Safety Modernization Act, current Good Manufacturing Practices ("CGMP") (21 C.F.R. Part 110), and all applicable food safety, composition, labeling, registration, and manufacturing provisions; (ii) the Public Health Security and Bioterrorism Preparedness and Response Act (the "Bioterrorism Act") and all amendments, supplements, and regulations promulgated thereunder; (iii) when applicable, the National Organic Program (7 C.F.R. 205) and the organic food regulations adopted pursuant to the Federal Organic Foods Production Act; and (iv) applicable state and local laws and regulations regarding the

manufacture, storage, and shipment of food products and establishments, including, when applicable, the California Organic Foods Act, as amended, and all applicable organic food certification programs.

(b) Each Product processed by Supplier pursuant to this Agreement shall: (i) conform to Specifications in Schedule B; (ii) run, within the variations permitted by this Agreement, of even kind, quality and quantity within each unit and among all units involved; (iii) be adequately contained, packaged and labeled as this Agreement requires; and (iv) not be adulterated or misbranded within the meaning of federal or state law.

(c) No Product shall contain any food additive or other substance which is unsafe for human consumption within the meaning of any applicable federal, state or local laws or rules or regulations promulgated thereunder, as they may be amended from time to time, including without limitation, the Food Additive Amendment of 1958.

(d) No pesticides or other chemicals will be applied to land used to grow the Products or to the Products themselves, other than those pesticides or other chemicals specifically allowed for use with the Products under the U.S. Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), as amended, and any other federal or state laws relating to herbicides, pesticides or other chemical products.  Supplier further warrants that the Products will not contain pesticide or chemical residues prohibited by or in excess of the tolerances established under FIFRA, as amended, or any other U.S. state or Federal law, including the U.S. Federal Food, Drug and Cosmetic Act.

(e) Products will comply in all respects with the requirements of the California Safe Drinking Water and Toxic Enforcement Act of 1986 and the regulations thereunder ("Proposition 65"), as amended from time to time, and no exposure to a chemical determined thereunder to cause cancer or reproductive toxicity will occur from exposure to any such Product within the meaning of Proposition 65.

(f) Supplier has obtained and will maintain all licenses, registrations, certifications, consents and permits required to perform lawfully this Agreement, which it agrees to supply to Purchaser upon request.

(g) No Product or any components thereof, including packaging, are or will be articles that cannot, by law, be introduced into interstate commerce.

(h) Supplier warrants and agrees that Purchaser will obtain good and marketable title to Products purchased by and delivered to Purchaser, free and clear of liens, liabilities, encumbrances and charges made, done or suffered by Supplier, except for liens arising in favor of Supplier under application of law from any failure of Purchaser to pay Supplier any amounts that Purchaser is obligated to pay to Supplier under this Agreement.

## 9. INDEMNIFICATION.

Supplier agrees to indemnify, defend and hold Purchaser, its successors, assigns, directors, officers, employees, agents and/or customers harmless from any losses related to actual damages, claims, demands and expenses, including attorneys' fees and disbursements (for the purposes of

this Section 9 a "Claim" or "Claims"), incurred or sustained by Purchaser, its successors, assigns, affiliates, directors, officers, employees, agents and/or customers by reason of: (a) the failure of the Products to conform to the warranties in this Agreement if such failure is not cured within seven (7) days after delivery of written notice of the Claim by Purchaser to Supplier, (b) death or injury to persons or damage to property caused by the Products or defects therein which are the result of Supplier's acts or omissions or failure to perform its obligations in accordance with this Agreement, or (c) any gross negligence or fraud by the Supplier. Such indemnities shall be in addition to any other remedies provided by law and shall survive acceptance of the Products and payment by Purchaser.

**10. INSURANCE.**

Supplier shall, at its cost, procure and maintain throughout the Term: (a) commercial general liability ("CGL") insurance including contractual liability and products liability coverage (with an endorsement naming Purchaser as an additional insured) with the following limits: CGL covering bodily injury (including death) and property damage of not less than $2,000,000 per occurrence combined single limit and $3,000,000 in the aggregate; and (b) product recall insurance of not less than $2,000,000 that includes all recall and all company business interruption costs. The policies shall include a clause or endorsement denying the insurer any rights of subrogation against Purchaser or its affiliates, and Supplier waives any right of recovery against Purchaser for injury or loss due to hazards covered by said insurance to the extent of the injury, or loss covered thereby. Supplier shall also maintain CGL insurance (with an endorsement naming Purchaser as an additional insured) and shall submit a certificate of insurance to Purchaser evidencing the above coverages.

All coverages shall be written on an "occurrence form" and shall be carried with insurer(s) having a minimum Best Rating of A (IX) and otherwise reasonably acceptable to Purchaser. Supplier shall submit to Purchaser certificates of insurance evidencing the above coverages. The coverages provided by Supplier under this Agreement shall be primary and noncontributing with any similar insurance which may be maintained or provided by Supplier.

Product liability insurance shall continue in effect for Purchaser's benefit for a period of one (1) year from the date of last delivery of Product to Purchaser. In case of Supplier's failure to maintain the required insurance in effect, Purchaser may, at its option, procure the aforementioned insurance and charge Supplier for the amount so expended by Purchaser.

**11. CONFIDENTIAL INFORMATION.**

As used in this Agreement, the term "Confidential Information" means proprietary techniques and any non-public information that Purchaser has or will develop, compile, or own, which is disclosed to Supplier after the Effective Date pursuant to this Agreement. Confidential Information includes information disclosed by Purchaser (including its employees, affiliates, agents, and independent contractors) or its customers to Supplier during the Term of this Agreement. Confidential Information is to be broadly defined and includes: (a) all information that has commercial value in the business in which Purchaser or its customers are engaged; and (b) all information that, if disclosed without authorization, could reasonably be considered detrimental to the interest of Purchaser or its customers, whether or not such information is identified as Confidential

Information. By example and without limitation, Confidential Information includes all information on Purchaser's Products, product specifications, product formulations, pricing strategies, customers, customer contacts, customer requirements, processes, formulas, trade secrets, inventions, discoveries, improvements, research or development test results, specifications, data, know-how, formats, marketing plans, business plans, strategies, forecasts, unpublished financial information, budgets, proposals, projections, and customer and supplier agreements, including the terms of this Agreement. Confidential Information does not include (i) any information that at the time of disclosure is generally available to and known by the public (other than as a result of an unauthorized disclosure by either party or anyone for whom such party is responsible under applicable law), (ii) is developed by Supplier without reliance on the Confidential Information, (iii) is or was available to Supplier on a non-confidential basis from a source other than Purchaser who is not prohibited from transmitting the information to Supplier by contractual, legal or fiduciary obligation to Purchaser, or (iv) any information that Supplier owns to operate its dehulling operations.  Supplier shall use Confidential Information solely for the purpose of fulfilling its obligations pursuant to this Agreement.  Supplier shall, and shall cause its affiliates and its and their officers, directors, employees and representatives to keep the Confidential Information confidential and not disclose any Confidential Information in any manner whatsoever other than disclosure to representatives who need to know such information for purposes of carrying out this Agreement or disclosures required by applicable law; provided that if disclosure is required by applicable law, Supplier shall (x) notify Purchaser in writing prior to such disclosure and (y) cooperate with Purchaser in seeking a protective order or other available remedy to avoid or limit any such disclosure.  The restrictions on use of the Confidential Information and obligations regarding non-disclosure thereof shall survive for two (2) years from the termination of this Agreement; provided that with respect to Confidential Information that is a trade secret under the laws of any jurisdiction, such rights and obligations will survive such expiration until, if ever, such Confidential Information loses its trade secret protection (other than due to an act or omission of Supplier).

**12.  REVIEW MEETINGS.**

The parties shall meet (a) on a quarterly basis during the first year of this Agreement, and (b) annually thereafter, to discuss the parties' performance under the terms and conditions of this Agreement.  At these meetings, Supplier may also discuss any opportunities that may be of interest to Purchaser, including but not limited to Supplier's products or product development, capabilities, capacity or capital investments.

**13. TERM.**

The initial term of this Agreement shall commence on the Effective Date and shall continue in full force and effect until September 30, 2022 (the "Initial Term"). Thereafter, this Agreement shall automatically renew for one (1) year periods (each a "Renewal Term", and together with the Initial Term, the "Term") if Purchaser, no later than January 1 of the year in which the Initial Term or applicable Renewal Term is set to expire, provides Supplier with a Commitment Schedule for the period commencing immediately after the expiration of the applicable Initial Term or Renewal Term.

**14. TERMINATION.**

In addition to any remedies that may be provided elsewhere in this Agreement (including in Schedule A), this Agreement shall be terminable or shall terminate if and when any of the following events occur:

(a) Purchaser may terminate this Agreement immediately upon written notice to Supplier if Supplier fails to cure any breach of its obligations hereunder within sixty (60) calendar days after delivery by Purchaser to Supplier of written notice of such breach.

(b) Supplier may terminate this Agreement immediately upon written notice to Purchaser if Purchaser fails to cure any breach of its obligations hereunder within sixty (60) calendar days after delivery by Supplier to Purchaser of written notice of any such breach.

(c) Either party may terminate this Agreement immediately upon written notice if the other party ceases or fails to do business, elects to dissolve, is judicially determined to be insolvent, makes a general assignment for the benefit of creditors, or files or has filed against it any petition in bankruptcy or for relief under the provisions of the bankruptcy laws and, in the event of an involuntary bankruptcy, the bankruptcy is not dismissed within one hundred and twenty (120) days.

**15. CONTINUING OBLIGATIONS.**

Each party shall abide by and uphold any and all rights or obligations of the other accrued or existing as of the termination date, including but not limited to, any obligation of Purchaser to pay any amount which may then be owing to Supplier for any Products, which may have been delivered to Purchaser prior to such termination, and any obligation of Supplier to fulfill unshipped Purchase Orders for Products. The acceptance of Purchase Orders from Purchaser after termination of this Agreement or the continued sale of Products to Purchaser or any other act after termination of this Agreement shall not be construed as a renewal of this Agreement for any further term or as a waiver of the termination.

**16. FORCE MAJEURE.**

The obligations of Supplier and Purchaser under this Agreement may be delayed or excused by events resulting from causes beyond control of the party, including, but not limited to, fires, strikes, insurrections, riots, embargoes, inability to obtain supplies of raw materials, or requirements or regulations of the United States government or any other civil, governmental or military authority (a "Force Majeure Event"). The party who claims that its performance may be delayed or excused by reason of a Force Majeure Event (the "Force Majeure Party") shall give prompt written notice to the other party, which notice shall state the details and expected duration of the Force Majeure Event. The Force Majeure Party shall use commercially reasonable efforts to resume compliance with this Agreement as soon as possible. If the period of suspension due to a Force Majeure Event of Supplier lasts longer than thirty (30) days, then the Supplier will cover the supply needs of the Purchaser via a third party approved by Purchaser, which consent may not be unreasonably withheld, until Supplier resumes its ability to supply Products to the Purchaser.

US.121373845.11

**17. ENTIRE AGREEMENT; MODIFICATION; WAIVER.**

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings between them. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all the parties. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

**18. CONSTRUCTION.**

The language of this Agreement and of each and every paragraph, term and/or provision of this Agreement shall, in all cases, for any and all purposes, and in any and all circumstances be construed as a whole, according to its meaning, not strictly for or against Purchaser or Supplier, and with no regard whatsoever to the identity or status of any person or persons who drafted all or any portion of this Agreement.

**19. EXCLUSIVITY.**

Unless otherwise agreed upon by the parties in writing, during the Term of this Agreement, Purchaser shall purchase from Supplier, and Supplier shall manufacture and sell to Purchaser, 100% of Purchaser's requirements of the Products.

**20. RELATIONSHIP OF THE PARTIES**.

The parties hereto are acting and shall act as independent contractors.  Neither party is, nor will be deemed to be, an agent, legal representative, joint venture or partner of the other party for any purpose.  Neither party will be entitled to (a) enter into any contracts in the name of or on behalf of the other party; (b) pledge the credit of the other party in any way or hold itself out as having authority to do so; or (c) make commitments or incur any charges or expenses for or in the name of the other party.

**21. NOTICES.**

All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of delivery if delivered electronically, personally or by express courier to the party to whom or which notice is to be given, or on the 10th day after mailing if mailed to the party to whom or which notice is to be given, by first class mail, registered or certified, postage prepaid, properly addressed to the party to receive the notice at the following address or at any other address given to the other party in the manner provided by this Section 21.

| | |
|---|---|
| If to Purchaser: | SunOpta Grains and Foods Inc.<br>7301 Ohms Lane, Suite 600<br>Edina, MN 55439<br>Attention: General Counsel<br>Email: legal@sunopta.com |
| If to Supplier: | Pipeline Foods, LLC<br>1250 East Moore Lake Dr.<br>Suite 200<br>Minneapolis, MN 55432<br>Attention: Wade Ellis<br>Email: wellis@pipelinefoods.com |

Nothing contained herein shall justify or excuse failure to give oral notice for the purpose of informing the other party hereto when prompt notification is required, but it is understood that such oral notice shall in no way satisfy the requirement of a written notice.

## 22. SEVERABILITY.

If any provision of this Agreement is determined to be invalid or unenforceable, the provision shall be deemed to be severable from the remainder of this Agreement and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

## 23. ASSIGNMENT.

This Agreement constitutes a personal contract among the parties. Neither party may transfer or assign this Agreement or any part thereof without the prior written approval of the other, which approval shall not be unreasonably withheld. Provided, however, either party hereto may without such consent, assign this Agreement in connection with the sale or transfer of all or substantially all of its business or in connection with a merger or other consolidation with another entity.

## 24. NATIONAL GRAIN AND FEED ASSOCIATION TRADE RULES; GOVERNING LAW AND VENUE.

To the extent they do not conflict with any term of this Agreement or any document incorporated herein, the grain trade rules of the National Grain and Feed Association (NGFA) shall apply with respect to the transactions contemplated by this Agreement.  Notwithstanding the foregoing, no arbitration provisions of the NGFA grain trade rules will apply to the transactions contemplated by this Agreement.  This Agreement shall be governed by and construed in accordance with the laws the State of Minnesota, USA, without regard to Minnesota choice-of-law principles, and applicable U.S. federal laws. The parties further agree that any litigation arising out of this Agreement shall take place in the appropriate court of Hennepin County, Minnesota. The parties agree that the United Nations Convention on Contracts for the International Sale of Goods shall not apply in any respect to this Agreement or the parties hereto.

## 25. SURVIVAL.

Unless a shorter term is explicitly provided in this Agreement, all provisions that by their terms survive, shall survive the expiration or termination of this Agreement.

## 26. COUNTERPARTS.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

## 27. COUNSEL.

Each party acknowledges that it has had the opportunity to review this Agreement and the transactions contemplated hereby with its own legal counsel and understands the terms and provisions of this Agreement and the laws and regulations referenced in this Agreement.

## 28. CAPTIONS.

The captions of the sections of this Agreement are included for reference purposes only and are not intended to be a part of the Agreement or in any way to define, limit or describe the scope or intent of the particular provision to which they refer.

(SIGNATURE PAGE TO FOLLOW)

IN WITNESS WHEREOF, the parties have caused their respective duly authorized representatives to execute this Agreement to be effective as of the Effective Date.

| **SunOpta Grains and Foods Inc.** | **Pipeline Foods, LLC** |
|---|---|
| By: *(signed)* | By: _____ |
| Name: Jill Barnett | Name: _____ |
| Its: VP & Corp Secretary | Its: _____ |
| Date: February 22, 2019 | Date: _____ |

IN WITNESS WHEREOF, the parties have caused their respective duly authorized representatives to execute this Agreement to be effective as of the Effective Date.

| **SunOpta Grains and Foods Inc.** | **Pipeline Foods, LLC** |
|---|---|
| By: _____ | By: _____ |
| Name: _____ | Name: _Eric Jackson_____ |
| Its: _____ | Its: _CEO_____ |
| Date: _____ | Date: _2/21/19_____ |

IN WITNESS WHEREOF, the parties have caused their respective duly authorized representatives to execute this Agreement to be effective as of the Effective Date.

| **SunOpta Grains and Foods Inc.** | **Pipeline Foods, LLC** |
|---|---|
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Its: _____ | Its: _____ |
| Date: _____ | Date: _____ |

# SCHEDULE A
# PRODUCTS AND PRICING

A.   Products: Soybeans and soy bits, splits and pieces produced from soybeans (Organic and Non-GMO) which consist of soybeans dehulled and processed at Supplier's facility to the specifications provided by Purchaser.

B.   Price:

**SunOpta Transfer Pricing (FOB Hope, MN)**

| *Organic Soybeans* | | *Non-GMO Soybeans* | |
|---|---|---|---|
| Price/bu. | Bit Pricing/# | Price/bu. | Bit Pricing/# |
| $ 18.00 | $ 0.445 | $ 7.00 | $ 0.215 |
| $ 19.00 | $ 0.465 | $ 8.00 | $ 0.235 |
| $ 20.00 | $ 0.485 | $ 9.00 | $ 0.250 |
| $ 21.00 | $ 0.505 | $ 10.00 | $ 0.270 |
| $ 22.00 | $ 0.530 | $ 11.00 | $ 0.290 |
| $ 23.00 | $ 0.550 | $ 12.00 | $ 0.310 |
| $ 24.00 | $ 0.575 | $ 13.00 | $ 0.330 |

C.   <u>Commitment Schedule</u>: Purchaser shall purchase, and Supplier shall supply, all of Purchaser's soybean and soybit requirements during the Initial Term as specified in Schedule B. In January 2019, Purchaser entered into purchase contracts for a total of 400,000 bushels of soybeans for soybits to be delivered between January 1, 2019 and December 31, 2019, which number is inclusive of carry-in Product from fiscal year 2018.

Purchaser also agrees to purchase 280,000 bushels of soybeans to be delivered between January 1, 2020 and September 30, 2020. Prior to January 1, 2020, Purchaser shall provide Supplier with its volume commitment of Products to be delivered between October 1, 2020 and September 30, 2021. Prior to January 1, 2021, Purchaser shall provide Supplier with its volume commitment of Products to be delivered between October 1, 2021 and September 30, 2022. Each of the foregoing volume commitments for the applicable delivery periods shall be referred to as the "Commitment Schedule."

Purchaser shall purchase Product in compliance with the applicable Commitment Schedule, with the exception that Purchaser is given a grace period of forty-five (45) days after the expiration of the applicable Commitment Schedule period to satisfy the purchase requirements for that Commitment Schedule period (the "Grace Period"). If Purchaser fails to purchase the full amount by the end of the applicable Grace Period, Supplier shall be entitled to a payment equal to 6% per annum on the portion of the contracted purchase price amount remaining unpurchased following the Grace Period (pro-rated on a daily basis until Purchaser purchases the full amount of Product for the applicable Commitment Schedule period).

On or before the beginning of each calendar quarter, Purchaser will provide Supplier with a non-binding rolling 12-month forecast where Purchaser estimates its quarterly Product requirements for the upcoming four quarters ("Forecast"). In the event Purchaser's requirements for any subsequent quarter exceeds the estimate in the Forecast by more than 20%, any inability on the

part of Supplier to provide the volume of Products in excess of the estimate in the Forecast will not constitute a breach with respect to such excess volume of Products and Supplier will have the opportunity to supply such excess volume of Products by utilizing a third party approved by Purchaser, which consent may not be unreasonably withheld, until the requirements are fulfilled.

D.    In the event pricing falls outside of the pricing grid noted above, the parties agree to negotiate in good faith in order to determine the price of the Products with Purchaser having the right to audit the soybean cost per bushel Supplier received from its growers.

If the parties cannot reach a resolution regarding pricing outside of the pricing grid noted above, the price per bushel is above the price per bushel included in the pricing grid and the price proposed by Supplier exceeds $0.03 per dollar (on a pro-rated basis) for each bushel above the price per bushel included in the pricing grid, Purchaser may provide written notice of termination of the Agreement to Supplier, which termination shall be effective sixty (60) days following such written notice of termination.  For example, if the price per bushel for organic soybeans is $26.00 and the price proposed by Supplier exceeds $0.635 per pound, Purchaser may terminate the Agreement pursuant to the preceding sentence.

If the parties cannot reach a resolution regarding pricing outside of the pricing grid noted above, the price per bushel is below the price per bushel included in the pricing grid and the price proposed by Supplier is not at least $0.02 per dollar (on a pro-rated basis) for each bushel below the price per bushel included in the pricing grid, Purchaser may provide written notice of termination of the Agreement to Supplier, which termination shall be effective sixty (60) days following such written notice of termination.  For example, if the price per bushel for organic soybeans is $14.00 and the price proposed by Supplier is not less than $0.365 per pound, Purchaser may terminate the Agreement pursuant to the preceding sentence.

Packaging format of Products by Purchaser's facility location:

Alexandria, MN=Bulk Truck
Crookston, MN=Tote Sack
Modesto, CA=Tote Sack

# SCHEDULE B
# SPECIFICATIONS AND PACKAGING