# <u>Exhibit 3</u>

Standard Purchase Order 3400807, 0



| Type | **Standard Purchase Order** |
|---|---|
| Order | **3400807** |
| Revision | **0** |
| Order Date | **24-JUN-2021** |
| Created By | **KLEINDL, EUGENE** |
| Telephone | |
| Fax | |
| Revision Date | |
| Current Buyer | |

Supplier: **PIPELINE FOODS LLC**
**3824 SW 93RD ST**
**HOPE, MN 56046**
**UNITED STATES**

Ship To: **601 3rd Avenue W**
**Alexandria, MN 56308**
**UNITED STATES**

Bill To: **7301 Ohms Lane, Suite 600**
**Edina, MN 55439**
**UNITED STATES**

E-Mail: **shared.services@sunopta.com**

| Customer Account No. | Supplier No. | Payment Terms | Freight Terms | FOB | Transportation | Ship Via |
|---|---|---|---|---|---|---|
| | **21604** | **NET 30** | | | | |
| Confirm To/Telephone | | | Requester/Deliver To | | | |
| **RAQUEL, HANSEN 507686-0707** | | | | | | |

*Notes:*    All dates referenced in this document are in GMT-6 America/Chicago
 Your invoice must contain this Oracle PO number in order for us to process payment.
All prices and amounts on this order are expressed in USD
Our preference is that you email your invoice to shared.services@sunopta.com.
 SunOpta Foods Inc. General Terms and Conditions of Purchase, a copy of which is attached, shall be
incorporated and apply to this purchase order.

| Line | Part Number / Description | Delivery Date/Time | Quantity | UOM | Unit Price (USD) | Tax Amount (USD) | Amount (USD) |
|---|---|---|---|---|---|---|---|
| 1 | 1104462<br>SOYBEAN CRACKED DEHULLED ORG BULK<br><br>Vesely hauling | Needed:<br>12-JUL-2021 17:00:00 | 54000 | Pound | .5530 | 0.00 | 29,862.00 |
| | | | | | | Subtotal: | 29,862.00 |
| | | | | | | Tax: | 0.00 |
| | | | | | | Total: | **29,862.00  (USD)** |

**SunOpta Foods Inc.**
**General Terms and Conditions of Purchase**

These General Terms and Conditions of Purchase ("Terms") apply to all offers made and tenders submitted to SunOpta Foods Inc., a Delaware corporation and any of its subsidiaries listed on the face of an attached purchase order ("SunOpta") and to all agreements to which SunOpta is a party as a buyer/commissioning party, except to the extent separately negotiated terms and conditions of purchase have been adopted by both parties in a written agreement to govern such offers made and tenders submitted ("Definitive Agreement").

1. Definitions.  "Buyer" means SunOpta. "Seller" means the person, firm, or other business entity indicated on the face of the Purchase Order ("PO")..

2. Offer and Acceptance. The PO is an offer by the Buyer or its designated affiliate to enter into the agreement it describes, including, without limitation, to purchase the materials, goods or services (collectively, the "Product") identified in such PO. Seller will be deemed to have accepted Buyer's offer and the PO in its entirety without modification, upon the earliest of (i) Seller's acceptance via a formal written acknowledgement to the Buyer, (ii) Seller's delivery of any Product that is the subject of the PO or (iii) any other conduct by Seller that recognizes the existence of the PO, including, but without limitation, preparation for the commencement of any of the work stated in the PO. Acceptance is expressly subject to these Terms and such other terms as are expressly referenced on the face of the PO (collectively, the "Agreement"). Any addition or modification proposed by Seller are expressly rejected by Buyer and are not part of this Agreement in the absence of an agreement in writing signed by an authorized representative of Buyer. By selling any Product to Buyer, Seller agrees to be bound by this Agreement.

3. Purchase. Subject hereto, Buyer agrees to purchase from Seller and Seller agrees to provide to Buyer the Product identified in the PO, which such Product shall conform to all current specifications, standards, drawings, samples and requirements of Buyer, including, without limitation those described in the PO and those pertaining to quantity, scope, dates for delivery and performance, and remaining shelf life (all such specifications and requirements "Specifications") provided by Buyer. Seller shall be prohibited from making any changes to its sourcing, processors, ingredient suppliers, or Specifications of the Product without first notifying Buyer and obtaining Buyer's written consent.

4. Order Procedure.
(a) Seller shall deliver the Product in the quantities and on the date(s) specified in the PO or as otherwise agreed in writing by the parties (the "Delivery Date"). If Seller fails to deliver the Product in full on the Delivery Date, Buyer may terminate this Agreement immediately by providing written notice to Seller, and Seller shall indemnify Buyer against any losses, claims, damages, and reasonable costs and expenses directly attributable to Seller's failure to deliver the Products on the Delivery Date. Buyer has the right to return any Product delivered prior to the Delivery Date at Seller's expense, and Seller shall redeliver such Product on the Delivery Date.
(b) Seller shall deliver all Product to the address specified in the PO (the "Delivery Point") during Buyer's normal business hours or as otherwise instructed by Buyer. Seller shall pack all goods for shipment according to Buyer's instructions or, if there are no instructions, in a manner sufficient to ensure that the Product is delivered in undamaged condition. Seller must provide Buyer prior written notice if it requires Buyer to return any packaging material. Any return of such packaging material shall be made at Seller's risk of loss and expense.
(c) Seller acknowledges that time is of the essence with respect to Seller's obligations hereunder and the timely delivery of the Product.

5. Quantity. If Seller delivers more than 5% of the quantity of Product ordered or less than the quantity of the Product ordered, Buyer may, at its election, reject all or any of the Product. Any such rejected Product shall be returned to Seller at Seller's sole risk and expense. If Buyer does not reject the Product and instead accepts the delivery of Product at the increased or reduced quantity, the Price for the Products shall be adjusted on a pro-rata basis.

6. Shipping Terms. Except as otherwise specifically provided in a PO, shipment of domestic Product shall be pursuant to DAP Incoterms 2010 and shipment of international Product shall be pursuant to DDP Incoterms 2010. The PO number must appear on all shipping documents, shipping labels, invoices, and correspondence pertaining to the PO. The Bill of Lading (BOL) and Certificate of Analysis shall accompany any shipment and a copy of both documents shall be provided to the appropriate person within Buyer's organization within twenty four (24) hours. Title and Risk will transfer to Buyer upon delivery of the Product at the Delivery Point. All shipments are to adhere to the following requirements: (a) appropriate temperature control during transport where required; (b) Monitor and maintain sanitary condition of transportation vehicles, including pest control; (c) Monitor and manage shipping to prevent cross contamination or hauling with hazardous materials; (d) Perform and maintain proper tanker wash records where applicable; (e) Ensure driver training and knowledge of food handling safety and security; (f) Perform preventative maintenance to prevent leaks, door gaps, and condensation; (g) Maintain good employee hygiene; and (h) Employ proper secure transport methods, including security seals of full loads and locks on LTL shipments. Sealing trailers of full loads must be completed by Seller prior to shipment with corresponding seal number printed on the BOL. Failure to do so may result in full or partial rejection of the shipment. Any changes or additions to current FDA guidelines must also be followed.

7. Inspection and Rejection of Nonconforming Product. Buyer has the right to inspect the Product on or after the Delivery Date. Buyer, at its sole option, may inspect all or a sample of the Product, and may reject all or any portion of the Product if it determines the Product is nonconforming or defective or if it has been delivered with a sufficient shelf life remaining. If Buyer rejects any portion of the Product, Buyer has the right, effective upon written notice to Seller, to: (a) rescind this Agreement in its entirety; (b) accept the Product at a reasonably reduced price; or (c) reject the Product and require replacement of the rejected Product. If Buyer requires replacement of the Product, Seller shall, at its expense, promptly replace the nonconforming or defective Product and pay for all related expenses, including, but not limited to,transportation charges for the return of the defective Product and the delivery of replacement Product. If Seller fails to timely deliver replacement Product, Buyer may replace them with goods from a third party and charge Seller the cost thereof and terminate this Agreement. Any inspection or other action by Buyer under this Section shall not reduce or

otherwise affect Seller's obligations under the Agreement, and Buyer shall have the right to conduct further inspections after Seller has carried out its remedial actions.

8. Price. The price of the Product is the price stated in the PO, or, if applicable, the price set forth in a written pricing agreement between the Parties (the "Price"). If no price is included in the PO or contained in a separate pricing agreement, then the Price shall be the price set out in Seller's published price list in force as of the date of the PO. Unless otherwise specified in the PO, the Price includes all packaging, transportation costs to the Delivery Location, insurance, customs duties and fees and applicable taxes, including, but not limited to, all sales, use or excise taxes. No increase in the Price is effective, whether due to increased material, labor or transportation costs or otherwise, without the prior written consent of Buyer.

9. Payment Terms. Seller shall issue an invoice to Buyer on or after the completion of delivery and only in accordance with these Terms. Buyer shall pay all properly invoiced amounts due to Seller within 60 days after Buyer's receipt of such invoice, except for any amounts disputed by Buyer in good faith. All payments hereunder must be in US dollars. Without prejudice to any other right or remedy it may have, Buyer reserves the right to set off at any time any amount owing to it by Seller against any amount payable by Buyer to Seller under this Agreement. In the event of a payment dispute, the parties shall seek to resolve all such disputes expeditiously and in good faith. Seller shall continue performing its obligations under this Agreement notwithstanding any such dispute.

10. Change Orders. Buyer may at any time, by written instructions and/or drawings issued to Seller (each a "Change Order"), order changes to the Product or its Specifications. Seller shall within ten (10) days of receipt of a Change Order submit to Buyer a firm cost proposal for the Change Order; if Seller fails to respond within such ten (10) days then Seller is deemed to have accepted the change order without changes to pricing and Seller shall promptly proceed with the changes. If Buyer accepts such cost proposal, Seller shall proceed with the changed Products subject to the cost proposal and the Terms and Specifications. If Buyer does not accept the cost proposal, then the Parties shall exert good faith efforts to resolve, with Buyer having the right to terminate any PO and/or the Agreement upon notice to Seller.

11. Samples and Quality Assurance. (a) Seller shall submit, free of any charges to Buyer, such samples of the Product as Buyer may reasonably require, so that Buyer may assure itself that the Product is being packed and processed in accordance with the Specifications. Buyer shall be entitled to one case of samples per lot. Buyer shall notify Seller within ten (10) business days of receiving the samples for evaluation if, in Buyer's view, any Product does not conform to its particular Specifications. Should Buyer reject any Product or samples as not conforming to the Specifications, Buyer shall provide samples of the rejected Product to Seller for its inspection. If Seller disputes Buyer's judgment as to whether the particular Product conforms to the Specifications, the matter in dispute will be resolved by submitting a sample of such Product for analysis to a mutually agreed upon independent third party certified laboratory. The findings of such third party shall be final and binding on the parties, and the party whose opinion does not prevail shall bear the cost of the independent evaluation and report.
(b) Seller will provide Buyer with a Certificate of Analysis for each batch of Product with the shipment. Seller's Certificate of Analysis will provide results for such tests or other requirements Buyer specifies as necessary to show compliance with the applicable Product Specifications and all applicable laws and regulations.
(c) In response to Buyer's request, Seller shall promptly (as soon as possible) based upon the type of information needed and the situation necessitating the request, and in no event longer than two business days, provide Buyer with accurate and comprehensive information about the Products, including (without limitation) information related to nutritional content, allergens, and specification targets. Seller hereby (i) warrants and represents that said information shall be complete and accurate and that Seller shall promptly and proactively notify Buyer if updates to said information become necessary, (ii) acknowledges and expressly permits Buyer to share the information with those of its customers who require/request it as part of their supplier qualification process; (iii) acknowledges that Buyer (and its customers) will rely upon such information, and (iv) agrees that Buyer may cancel any PO's (without liability to Buyer) should Seller fail to promptly provide such information and updates.
(d) Seller shall register, or ensure its suppliers register, all facilities used to manufacture, process, pack, and/or hold the Products with the United States Food and Drug Administration ("FDA") and will maintain all other licenses and registrations required by other federal, state or local regulatory bodies. Upon request, Seller will provide Buyer with the FDA facility registration numbers for all foreign or domestic facilities that are or will be used to manufacture, process, pack or hold the Products.
(e) Seller shall perform such auditing and verification activities of its suppliers as are necessary to (i) ensure Products it supplies are of a consistently high quality and not adulterated or misbranded under United States law; (ii) comply with Seller's obligations under the U.S. FDA Food Safety Modernization Act; and (iii) ensure compliance with all other international or domestic laws.
(f) If any portion of the facilities used to manufacture, process, pack or hold Product, including the facilities utilized by Seller's suppliers, are in an unsanitary condition or do not otherwise comply with the applicable Product Specifications, all laws, or with the other terms and conditions of this Agreement, Seller will promptly take such action as will correct the deficiencies and bring such processes, inventories and/or equipment into compliance with the Product Specifications, all laws, and with the terms and conditions of this Agreement.
(g) Seller shall immediately notify Buyer and provide Buyer with all documents relating to any non-routine inquiry, investigation, inspection, revocation or suspension of license or

registration, recall, detention of goods, or any other action by any governmental body or agency regarding quality, safety, labeling, marketing or distribution of the Products (including, without limitation, any FDA Form 483 or similar forms). If Seller becomes aware of any information regarding the Products that may indicate that the Products are adulterated or misbranded or otherwise indicate a potential quality, safety or labeling defect or error, Seller shall notify Buyer immediately by personal contact with Buyer's quality control representative and its account representative in addition to any notification required by applicable law. Seller shall consult with Buyer regarding any evaluation and decision to place the Product on HOLD, the process to retrieve such Products or the decision to report to any governmental body or regulatory agency or to recall Products that so require quality, safety or labeling defect or error.

(h) Seller shall have a system in place to enable Seller to trace promptly, but in all cases within twenty-four (24) hours of Buyer's request, the entire history of a particular lot of Product while in Seller's control, including but not limited to records pertaining to all raw materials, ingredients, packaging materials, manufacturing processes and procedures, packaging, storing, shipment and delivery.

(i) Seller shall provide Buyer with a copy of continuing product guarantees and warranties on an as-requested basis. Such continuing product guarantees and warranties act to supplement, but do not limit, the representations and warranties, and terms of this Agreement.

12. **Warranties.** (a) From and after the Delivery Date, Seller warrants to Buyer that all Products will:

(i) not be adulterated or misbranded, as those terms are defined by the U.S. Federal Food, Drug and Cosmetic Act ("FFDCA");

(ii) be free from any defects in workmanship, material and design;

(iii) conform to applicable Specifications, drawings, designs, samples and other requirements specified by Buyer;

(iv) be fit for their intended purpose and operate as intended;

(v) be merchantable;

(vi) be free and clear of all liens, security interests or other encumbrances; not infringe or misappropriate any third party's patent or other intellectual property rights; comply with Buyer's Specifications for the Products; comply with all applicable laws and regulations, including but not limited to the FFDCA, and all amendments, supplements and regulations promulgated thereunder, the U.S. Food Safety Modernization Act and all amendments, supplements and regulations promulgated thereunder, the U.S. Federal Hazardous Substances Act, and all amendments, supplements and regulations promulgated thereunder, all state laws applicable to food products, and California's Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65); and

(vii) be produced in accordance with current Good Manufacturing Practices ("cGMPs"), and other governing industry regulations, guidance and standards.

(viii) These warranties survive any delivery, inspection, acceptance or payment of or for Product by Buyer.

(b) If applicable, Seller warrants to Buyer that it shall perform services contemplated by under this Agreement using personnel of required skill, experience and qualifications and in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services and shall devote adequate resources to meet its obligations under this Agreement.

**13. Employment and Affirmative Action Obligations. The parties hereby incorporate the requirements of 41 C.F.R.  □□ 60-1.4(a)(1)-(7) and 29 CFR Part 471, Appendix A to Subpart A, if applicable. In addition, this contractor and subcontractor shall abide by the requirements of 41 CFR 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status.**

14. General Indemnification. Seller shall defend, indemnify and hold harmless Buyer and Buyer's parent company, its subsidiaries, affiliates, successors or assigns and its respective directors, officers, shareholders, agents, contractors, consultants, and employees (collectively, "Indemnitees") from and against any and all loss, injury, death, damage, liability, claim, deficiency, action, judgment, interest, award, penalty, fine, cost or expense, including reasonable attorney and professional fees and costs, and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers (collectively, "Losses") arising out of or occurring in connection with (a) the Product purchased from Seller or (b) Seller's negligence, willful misconduct or breach of the Terms. Seller shall not enter into any settlement without Buyer's prior written consent.

15. Ownership, Proprietary Rights. Seller and Buyer agree that each party owned will continue to own all intellectual property rights that such party owned or held prior to these Terms becoming effective. Seller hereby grants to Buyer a perpetual, worldwide license to use and practice any intellectual property rights in the Products and any intellectual property that is otherwise provided by Seller under this Agreement, and to sell, offer for sale, make, have made, import, export and use merchandise containing Products. Seller shall not sell or otherwise provide Products developed specially for Buyer to any of its customers for use in the same type of application that Buyer is using such Product without first obtaining prior written consent from Buyer.

16. Intellectual Property Indemnification. Seller shall, at its expense, defend, indemnify and hold harmless Buyer and any Indemnitee against any and all Losses arising out of or in connection with any claim that Buyer's or Indemnitee's use or possession of the Product infringes or misappropriates the patent, copyright, trade secret or other intellectual property

right of any third party. In no event shall Seller enter into any settlement without Buyer's or Indemnitee's prior written consent.

17. Termination. In addition to any remedies that may be provided under these Terms, Buyer may terminate this Agreement with immediate effect upon written notice to Seller before or after the acceptance of the Product, if Seller has not performed or complied with these Terms, in whole or in part. If Seller becomes insolvent, files a petition for bankruptcy or commences or has commenced against it proceedings relating to bankruptcy, receivership, reorganization or assignment for the benefit of creditors, then Buyer may terminate this Agreement upon written notice to Seller to the extent permitted by law. If Buyer terminates the Agreement for any reason, Seller's sole and exclusive remedy is payment for the Products received and accepted and services accepted by Buyer prior to the termination.

18. Confidentiality. All non-public, confidential or proprietary information of Buyer, including but not limited to, Specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, customer lists, supplier lists, pricing, discounts or rebates, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential" in connection with this Agreement is confidential, is provided solely for the purpose of performing this Agreement and may not be disclosed or copied unless authorized in advance by Buyer in writing. Upon Buyer's request, Seller shall promptly return or destroy all documents and other materials received from Buyer. Buyer shall be entitled to injunctive relief for any violation of this Section. This Section does not apply to information that is: (a) in the public domain; (b) known to Seller at the time of disclosure by Buyer or its representatives; or (c) rightfully obtained by Seller on a non-confidential basis from a third party.

19. Insurance. Seller shall maintain, and cause its subcontractors to maintain at their expense, sufficient insurance coverage with generally acceptable insurers. Such insurance shall include contractual liability coverage, name Buyer as additional insured on all policies where applicable in connection with Sellers' performance of the PO, contain no material exclusions, and include a provision that waives the insurer's subrogation rights against Buyer.

20. Title and Risk. Unless otherwise stated on the face of the PO, title and risk of loss of the Product shall pass to Buyer, at Buyer's option, (a) upon receipt by Buyer at Buyer's warehouse or facilities, or (b) upon loading of Product onto an approved Buyer carrier.

21. Currency. Unless otherwise stated on the face of the PO, all payments and other financial requirements under this Agreement shall be in the currency of United States Dollar.

22. Waiver. No waiver by Buyer of any of the provisions of this Agreement is effective unless explicitly set forth in writing and signed by Buyer. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement operates, or may be construed, as a waiver thereof. No single or partial exercise of any right, remedy, power or privilege hereunder precludes any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

23. Assignment. Seller shall not assign, transfer, delegate or subcontract any of its rights or obligations under this Agreement without the prior written consent of Buyer. Any purported assignment or delegation in violation of this Section shall be null and void. No assignment or delegation shall relieve the Seller of any of its obligations hereunder.

24. Relationship of the Parties. The relationship between the Parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the Parties, and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever.

25. No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

26. Severability. If any term of this Agreement shall be held to be unenforceable, then the remainder shall not be affected thereby, and shall be valid and enforceable to the fullest extent permitted by law.

27. Notices. All notices, consents, claims, demands, waivers and other required communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth on the face of the PO or to such other address that may be designated by the receiving party in writing. A copy of any Notice provided under this Agreement to Buyer shall also be sent via email to legal@sunopta.com. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), email (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) upon receipt of the receiving party, and (b) if the party giving the Notice has complied with the requirements of this Section.

28. Code of Conduct. This Agreement shall be subject to and Seller shall adhere to Buyer's Code of Conduct, available at http://www.sunopta.com/files/sunopta_supplier_partner_code_of_conduct.pdf as amended from time to time.

29. Governing Law. This Agreement shall be interpreted and construed in accordance with Minnesota law. Seller consents to the jurisdiction of Minnesota courts.

30. Governing Terms. In the event of a conflict or inconsistency between the provisions of these Terms and any non-preprinted term on the PO, the provisions of the non-preprinted terms on the PO shall prevail. In the event of a conflict or inconsistency between the provisions of this Agreement and any Definitive Agreement, the provisions of the Definitive Agreement shall prevail.



| | |
|---|---|
| Type | **Standard Purchase Order** |
| Order | **3400809** |
| Revision | **0** |
| Order Date | **24-JUN-2021** |
| Created By | **KLEINDL, EUGENE** |
| Telephone | |
| Fax | |
| Revision Date | |
| Current Buyer | |

Supplier:  **PIPELINE FOODS LLC**
**3824 SW 93RD ST**
**HOPE, MN 56046**
**UNITED STATES**

Ship To:  **601 3rd Avenue W**
**Alexandria, MN 56308**
**UNITED STATES**

Bill To:  **7301 Ohms Lane, Suite 600**
**Edina, MN 55439**
**UNITED STATES**

E-Mail:  **shared.services@sunopta.com**

| Customer Account No. | Supplier No. | Payment Terms | Freight Terms | FOB | Transportation | Ship Via |
|---|---|---|---|---|---|---|
| | **21604** | **NET 30** | | | | |
| Confirm To/Telephone | | | | Requester/Deliver To | | |
| **RAQUEL, HANSEN 507686-0707** | | | | | | |

*Notes:*   All dates referenced in this document are in GMT-6 America/Chicago
 Your invoice must contain this Oracle PO number in order for us to process payment.
All prices and amounts on this order are expressed in USD
Our preference is that you email your invoice to shared.services@sunopta.com.
 SunOpta Foods Inc. General Terms and Conditions of Purchase, a copy of which is attached, shall be
incorporated and apply to this purchase order.

| Line | Part Number / Description | Delivery Date/Time | Quantity | UOM | Unit Price (USD) | Tax Amount (USD) | Amount (USD) |
|---|---|---|---|---|---|---|---|
| 1 | 1104462 | Needed: 16-JUL-2021 17:00:00 | 54000 | Pound | .5534 | 0.00 | 29,883.60 |
| | SOYBEAN CRACKED DEHULLED ORG BULK | | | | | | |
| | Vesely hauling | | | | | | |
| | | | | | | Subtotal: 29,883.60 | |
| | | | | | | Tax: 0.00 | |
| | | | | | | Total: **29,883.60  (USD)** | |

**SunOpta Foods Inc.**
**General Terms and Conditions of Purchase**

These General Terms and Conditions of Purchase ("Terms") apply to all offers made and tenders submitted to SunOpta Foods Inc., a Delaware corporation and any of its subsidiaries listed on the face of an attached purchase order ("SunOpta") and to all agreements to which SunOpta is a party as a buyer/commissioning party, except to the extent separately negotiated terms and conditions of purchase have been adopted by both parties in a written agreement to govern such offers made and tenders submitted ("Definitive Agreement").

1. Definitions.  "Buyer" means SunOpta. "Seller" means the person, firm, or other business entity indicated on the face of the Purchase Order ("PO")..

2. Offer and Acceptance. The PO is an offer by the Buyer or its designated affiliate to enter into the agreement it describes, including, without limitation, to purchase the materials, goods or services (collectively, the "Product") identified in such PO. Seller will be deemed to have accepted Buyer's offer and the PO is in its entirety without modification, upon the earliest of (i) Seller's acceptance via a formal written acknowledgement to the Buyer, (ii) Seller's delivery of any Product that is the subject of the PO or (iii) any other conduct by Seller that recognizes the existence of the PO, including, but without limitation, preparation for the commencement of any of the work stated in the PO. Acceptance is expressly subject to these Terms and such other terms as are expressly referenced on the face of the PO (collectively, the "Agreement"). Any addition or modification proposed by Seller are expressly rejected by Buyer and are not part of this Agreement in the absence of an agreement in writing signed by an authorized representative of Buyer. By selling any Product to Buyer, Seller agrees to be bound by this Agreement.

3. Purchase. Subject hereto, Buyer agrees to purchase from Seller and Seller agrees to provide to Buyer the Product identified in the PO, which such Product shall conform to all current specifications, standards, drawings, samples and requirements of Buyer, including, without limitation those described in the PO and those pertaining to quantity, scope, dates for delivery and performance, and remaining shelf life (all such specifications and requirements "Specifications") provided by Buyer. Seller shall be prohibited from making any changes to its sourcing, processors, ingredient suppliers, or Specifications of the Product without first notifying Buyer and obtaining Buyer's written consent.

4. Order Procedure.
(a) Seller shall deliver the Product in the quantities and on the date(s) specified in the PO or as otherwise agreed in writing by the parties (the "Delivery Date"). If Seller fails to deliver the Product in full on the Delivery Date, Buyer may terminate this Agreement immediately by providing written notice to Seller, and Seller shall indemnify Buyer against any losses, claims, damages, and reasonable costs and expenses directly attributable to Seller's failure to deliver the Products on the Delivery Date. Buyer has the right to return any Product delivered prior to the Delivery Date at Seller's expense, and Seller shall redeliver such Product on the Delivery Date.
(b) Seller shall deliver all Product to the address specified in the PO (the "Delivery Point") during Buyer's normal business hours or as otherwise instructed by Buyer. Seller shall pack all goods for shipment according to Buyer's instructions or, if there are no instructions, in a manner sufficient to ensure that the Product is delivered in undamaged condition. Seller must provide Buyer prior written notice if it requires Buyer to return any packaging material. Any return of such packaging material shall be made at Seller's risk of loss and expense.
(c) Seller acknowledges that time is of the essence with respect to Seller's obligations hereunder and the timely delivery of the Product.

5. Quantity. If Seller delivers more than 5% of the quantity of Product ordered or less than the quantity of the Product ordered, Buyer may, at its election, reject all or any of the Product. Any such rejected Product shall be returned to Seller at Seller's sole risk and expense. If Buyer does not reject the Product and instead accepts the delivery of Product at the increased or reduced quantity, the Price for the Products shall be adjusted on a pro-rata basis.

6. Shipping Terms. Except as otherwise specifically provided in a PO, shipment of domestic Product shall be pursuant to DAP Incoterms 2010 and shipment of international Product shall be pursuant to DDP Incoterms 2010. The PO number must appear on all shipping documents, shipping labels, invoices, and correspondence pertaining to the PO. The Bill of Lading (BOL) and Certificate of Analysis shall accompany any shipment and a copy of both documents shall be provided to the appropriate person within Buyer's organization within twenty four (24) hours. Title and Risk will transfer to Buyer upon delivery of the Product at the Delivery Point. All shipments are to adhere to the following requirements: (a) appropriate temperature control during transport where required; (b) Monitor and maintain sanitary condition of transportation vehicles, including pest control; (c) Monitor and manage shipping to prevent cross contamination or hauling with hazardous materials; (d) Perform and maintain proper tanker wash records where applicable; (e) Ensure driver training and knowledge of food handling safety and security; (f) Perform preventative maintenance to prevent leaks, door gaps, and condensation; (g) Maintain good employee hygiene; and (h) Employ proper secure transport methods, including security seals of full loads and locks on LTL shipments. Sealing trailers of full loads must be completed by Seller prior to shipment with corresponding seal number printed on the BOL. Failure to do so may result in full or partial rejection of the shipment. Any changes or additions to current FDA guidelines must also be followed.

7. Inspection and Rejection of Nonconforming Product. Buyer has the right to inspect the Product on or after the Delivery Date. Buyer, at its sole option, may inspect all or a sample of the Product, and may reject all or any portion of the Product if it determines the Product is nonconforming or defective or if it has been delivered with a sufficient shelf life remaining. If Buyer rejects any portion of the Product, Buyer has the right, effective upon written notice to Seller, to: (a) rescind this Agreement in its entirety; (b) accept the Product at a reasonably reduced price; or (c) reject the Product and require replacement of the rejected Product. If Buyer requires replacement of the Product, Seller shall, at its expense, promptly replace the nonconforming or defective Product and pay for all related expenses, including, but not limited to,transportation charges for the return of the defective Product and the delivery of replacement Product. If Seller fails to timely deliver replacement Product, Buyer may replace them with goods from a third party and charge Seller the cost thereof and terminate this Agreement. Any inspection or other action by Buyer under this Section shall not reduce or

otherwise affect Seller's obligations under the Agreement, and Buyer shall have the right to conduct further inspections after Seller has carried out its remedial actions.

8. Price. The price of the Product is the price stated in the PO, or, if applicable, the price set forth in a written pricing agreement between the Parties (the "Price"). If no price is included in the PO or contained in a separate pricing agreement, then the Price shall be the price set out in Seller's published price list in force as of the date of the PO. Unless otherwise specified in the PO, the Price includes all packaging, transportation costs to the Delivery Location, insurance, customs duties and fees and applicable taxes, including, but not limited to, all sales, use or excise taxes. No increase in the Price is effective, whether due to increased material, labor or transportation costs or otherwise, without the prior written consent of Buyer.

9. Payment Terms. Seller shall issue an invoice to Buyer on or after the completion of delivery and only in accordance with these Terms. Buyer shall pay all properly invoiced amounts due to Seller within 60 days after Buyer's receipt of such invoice, except for any amounts disputed by Buyer in good faith. All payments hereunder must be in US dollars. Without prejudice to any other right or remedy it may have, Buyer reserves the right to set off at any time any amount owing to it by Seller against any amount payable by Buyer to Seller under this Agreement. In the event of a payment dispute, the parties shall seek to resolve all such disputes expeditiously and in good faith. Seller shall continue performing its obligations under this Agreement notwithstanding any such dispute.

10. Change Orders. Buyer may at any time, by written instructions and/or drawings issued to Seller (each a "Change Order"), order changes to the Product or its Specifications. Seller shall within ten (10) days of receipt of a Change Order submit to Buyer a firm cost proposal for the Change Order; if Seller fails to respond within such ten (10) days then Seller is deemed to have accepted the change order without changes to pricing and Seller shall promptly proceed with the changes. If Buyer accepts such cost proposal, Seller shall proceed with the changed Products subject to the cost proposal and the Terms and Specifications. If Buyer does not accept the cost proposal, then the Parties shall exert good faith efforts to resolve, with Buyer having the right to terminate any PO and/or the Agreement upon notice to Seller.

11. Samples and Quality Assurance. (a) Seller shall submit, free of any charges to Buyer, such samples of the Product as Buyer may reasonably require, so that Buyer may assure itself that the Product is being packed and processed in accordance with the Specifications. Buyer shall be entitled to one case of samples per lot. Buyer shall notify Seller within ten (10) business days of receiving the samples for evaluation if, in Buyer's view, any Product does not conform to its particular Specifications. Should Buyer reject any Product or samples as not conforming to the Specifications, Buyer shall provide samples of the rejected Product to Seller for its inspection. If Seller disputes Buyer's judgment as to whether the particular Product conforms to the Specifications, the matter in dispute will be resolved by submitting a sample of such Product for analysis to a mutually agreed upon independent third party certified laboratory. The findings of such third party shall be final and binding on the parties, and the party whose opinion does not prevail shall bear the cost of the independent evaluation and report.
(b) Seller will provide Buyer with a Certificate of Analysis for each batch of Product with the shipment. Seller's Certificate of Analysis will provide results for such tests or other requirements Buyer specifies as necessary to show compliance with the applicable Product Specifications and all applicable laws and regulations.
(c) In response to Buyer's request, Seller shall promptly (as soon as possible) based upon the type of information needed and the situation necessitating the request, and in no event longer than two business days, provide Buyer with accurate and comprehensive information about the Products, including (without limitation) information related to nutritional content, allergens, and specification targets. Seller hereby (i) warrants and represents that said information shall be complete and accurate and that Seller shall promptly and proactively notify Buyer if updates to said information become necessary, (ii) acknowledges and expressly permits Buyer to share the information with those of its customers who require/request it as part of their supplier qualification process; (iii) acknowledges that Buyer (and its customers) will rely upon such information, and (iv) agrees that Buyer may cancel any PO's (without liability to Buyer) should Seller fail to promptly provide such information and updates.
(d) Seller shall register, or ensure its suppliers register, all facilities used to manufacture, process, pack, and/or hold the Products with the United States Food and Drug Administration ("FDA") and will maintain all other licenses and registrations required by other federal, state or local regulatory bodies. Upon request, Seller will provide Buyer with the FDA facility registration numbers for all foreign or domestic facilities that are or will be used to manufacture, process, pack or hold the Products.
(e) Seller shall perform such auditing and verification activities of its suppliers as are necessary to (i) ensure Products it supplies are of a consistently high quality and not adulterated or misbranded under United States law; (ii) comply with Seller's obligations under the U.S. FDA Food Safety Modernization Act; and (iii) ensure compliance with all other international or domestic laws.
(f) If any portion of the facilities used to manufacture, process, pack or hold Product, including the facilities utilized by Seller's suppliers, are in an unsanitary condition or do not otherwise comply with the applicable Product Specifications, all laws, or with the other terms and conditions of this Agreement, Seller will promptly take such action as will correct the deficiencies and bring such processes, inventories and/or equipment into compliance with the Product Specifications, all laws, and with the terms and conditions of this Agreement.
(g) Seller shall immediately notify Buyer and provide Buyer with all documents relating to any non-routine inquiry, investigation, inspection, revocation or suspension of license or

registration, recall, detention of goods, or any other action by any governmental body or agency regarding quality, safety, labeling, marketing or distribution of the Products (including, without limitation, any FDA Form 483 or similar forms). If Seller becomes aware of any information regarding the Products that may indicate that the Products are adulterated or misbranded or otherwise indicate a potential quality, safety or labeling defect or error, Seller shall notify Buyer immediately by personal contact with Buyer's quality control representative and its account representative in addition to any notification required by applicable law. Seller shall consult with Buyer regarding any evaluation and decision to place the Product on HOLD, the process to retrieve such Products or the decision to report to any governmental body or regulatory agency or to recall Products due to suspected quality, safety or labeling defect or error.

(h) Seller shall have a system in place to enable Seller to trace promptly, but in all cases within twenty-four (24) hours of Buyer's request, the entire history of a particular lot of Product while in Seller's control, including but not limited to records pertaining to all raw materials, ingredients, packaging materials, manufacturing processes and procedures, packaging, storing, shipment and delivery.

(i) Seller shall provide Buyer with a copy of continuing product guarantees and warranties on an as-requested basis. Such continuing product guarantees and warranties act to supplement, but do not limit, the representations and warranties, and terms of this Agreement.

12. Warranties. (a) From and after the Delivery Date, Seller warrants to Buyer that all Products will:

(i) not be adulterated or misbranded, as those terms are defined by the U.S. Federal Food, Drug and Cosmetic Act ("FFDCA");

(ii) be free from any defects in workmanship, material and design;

(iii) conform to applicable Specifications, drawings, designs, samples and other requirements specified by Buyer;

(iv) be fit for their intended purpose and operate as intended;

(v) be merchantable;

(vi) be free and clear of all liens, security interests or other encumbrances; not infringe or misappropriate any third party's patent or other intellectual property rights; comply with Buyer's Specifications for the Products; comply with all applicable laws and regulations, including but not limited to the FFDCA, and all amendments, supplements and regulations promulgated thereunder, the U.S. Food Safety Modernization Act and all amendments, supplements and regulations promulgated thereunder, the U.S. Federal Hazardous Substances Act, and all amendments, supplements and regulations promulgated thereunder, all state laws applicable to food products, and California's Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65); and

(vii) be produced in accordance with current Good Manufacturing Practices ("cGMPs"), and other governing industry regulations, guidance and standards.

(viii) These warranties survive any delivery, inspection, acceptance or payment of or for Product by Buyer.

(b) If applicable, Seller warrants to Buyer that it shall perform services contemplated by under this Agreement using personnel of required skill, experience and qualifications and in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services and shall devote adequate resources to meet its obligations under this Agreement.

**13. Employment and Affirmative Action Obligations. The parties hereby incorporate the requirements of 41 C.F.R. □□ 60-1.4(a)(1)-(7) and 29 CFR Part 471, Appendix A to Subpart A, if applicable. In addition, this contractor and subcontractor shall abide by the requirements of 41 CFR 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status.**

14. General Indemnification. Seller shall defend, indemnify and hold harmless Buyer and Buyer's parent company, its subsidiaries, affiliates, successors or assigns and its respective directors, officers, shareholders, agents, contractors, consultants, and employees (collectively, "Indemnitees") from and against any and all loss, injury, death, damage, liability, claim, deficiency, action, judgment, interest, award, penalty, fine, cost or expense, including reasonable attorney and professional fees and costs, and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers (collectively, "Losses") arising out of or occurring in connection with (a) the Product purchased from Seller or (b) Seller's negligence, willful misconduct or breach of the Terms. Seller shall not enter into any settlement without Buyer's prior written consent.

15. Ownership, Proprietary Rights. Seller and Buyer agree that each party now and will continue to own all intellectual property rights that such party owned or held prior to these Terms becoming effective. Seller hereby grants to Buyer a perpetual, worldwide license to use and practice any intellectual property rights in the Products and any intellectual property that is otherwise provided by Seller under this Agreement, and to sell, offer for sale, make, have made, import, export and use merchandise containing Products. Seller shall not sell or otherwise provide Products developed specially for Buyer to any of its customers for use in the same type of application that Buyer is using such Product without first obtaining prior written consent from Buyer.

16. Intellectual Property Indemnification. Seller shall, at its expense, defend, indemnify and hold harmless Buyer and an Indemnitee against any and all Losses arising out of or in connection with any claim that Buyer's or Indemnitee's use or possession of the Product infringes or misappropriates the patent, copyright,trade secret or other intellectual property

right of any third party. In no event shall Seller enter into any settlement without Buyer's or Indemnitee's prior written consent.

17. Termination. In addition to any remedies that may be provided under these Terms, Buyer may terminate this Agreement with immediate effect upon written notice to Seller before or after the acceptance of the Product, if Seller has not performed or complied with these Terms, in whole or in part. If Seller becomes insolvent, files a petition for bankruptcy or commences or has commenced against it proceedings relating to bankruptcy, receivership, reorganization or assignment for the benefit of creditors, then Buyer may terminate this Agreement upon written notice to Seller to the extent permitted by law. If Buyer terminates the Agreement for any reason, Seller's sole and exclusive remedy is payment for the Products received and accepted and services accepted by Buyer prior to the termination.

18. Confidentiality. All non-public, confidential or proprietary information of Buyer, including but not limited to, Specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, customer lists, supplier lists, pricing, discounts or rebates, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential" in connection with this Agreement is confidential, is provided solely for the purpose of performing this Agreement and may not be disclosed or copied unless authorized in advance by Buyer in writing. Upon Buyer's request, Seller shall promptly return or destroy all documents and other materials received from Buyer. Buyer shall be entitled to injunctive relief for any violation of this Section. This Section does not apply to information that is: (a) in the public domain; (b) known to Seller at the time of disclosure by Buyer or its representatives; or (c) rightfully obtained by Seller on a non-confidential basis from a third party.

19. Insurance. Seller shall maintain, and cause its subcontractors to maintain at their expense, sufficient insurance coverage with generally acceptable insurers. Such insurance shall include contractual liability coverage, name Buyer as additional insured on all policies where applicable in connection with Sellers' performance of the PO, contain no material exclusions, and include a provision that waives the insurer's subrogation rights against Buyer.

20. Title and Risk. Unless otherwise stated on the face of the PO, title and risk of loss of the Product shall pass to Buyer, at Buyer's option, (a) upon receipt by Buyer at Buyer's warehouse or facilities, or (b) upon loading of Product onto an approved Buyer carrier.

21. Currency. Unless otherwise stated on the face of the PO, all payments and other financial requirements under this Agreement shall be in the currency of United States Dollar.

22. Waiver. No waiver by Buyer of any of the provisions of this Agreement is effective unless explicitly set forth in writing and signed by Buyer. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement operates, or may be construed, as a waiver thereof. No single or partial exercise of any right, remedy, power or privilege hereunder precludes any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

23. Assignment. Seller shall not assign, transfer, delegate or subcontract any of its rights or obligations under this Agreement without the prior written consent of Buyer. Any purported assignment or delegation in violation of this Section shall be null and void. No assignment or delegation shall relieve the Seller of any of its obligations hereunder.

24. Relationship of the Parties. The relationship between the Parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the Parties, and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever.

25. No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

26. Severability. If any term of this Agreement shall be held to be unenforceable, then the remainder shall not be affected thereby, and shall be valid and enforceable to the fullest extent permitted by law.

27. Notices. All notices, consents, claims, demands, waivers and other required communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth on the face of the PO or to such other address that may be designated by the receiving party in writing. A copy of any Notice provided under this Agreement to Buyer shall also be sent via email to legal@sunopta.com. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), email (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) upon receipt of the receiving party, and (b) if the party giving the Notice has complied with the requirements of this Section.

28. Code of Conduct. This Agreement shall be subject to and Seller shall adhere to Buyer's Code of Conduct, available at http://www.sunopta.com/files/sunopta_supplier_partner_code_of_conduct.pdf as amended from time to time.

29. Governing Law. This Agreement shall be interpreted and construed in accordance with Minnesota law. Seller consents to the jurisdiction of Minnesota courts.

30. Governing Terms. In the event of a conflict or inconsistency between the provisions of these Terms and any non-preprinted term on the PO, the provisions of the non-preprinted terms on the PO shall prevail. In the event of a conflict or inconsistency between the provisions of this Agreement and any Definitive Agreement, the provisions of the Definitive Agreement shall prevail.



| Type | **Standard Purchase Order** |
|---|---|
| Order | **3400334** |
| Revision | **1** |
| Order Date | **17-JUN-2021** |
| Created By | **KLEINDL, EUGENE** |
| Telephone | |
| Fax | |
| Revision Date | **21-JUN-2021** |
| Current Buyer | **KLEINDL, EUGENE** |

Supplier: **PIPELINE FOODS LLC**
**3824 SW 93RD ST**
**HOPE, MN 56046**
**UNITED STATES**

Ship To: **601 3rd Avenue W**
**Alexandria, MN 56308**
**UNITED STATES**

Bill To: **7301 Ohms Lane, Suite 600**
**Edina, MN 55439**
**UNITED STATES**

E-Mail: **shared.services@sunopta.com**

| Customer Account No. | Supplier No. | Payment Terms | Freight Terms | FOB | Transportation | Ship Via |
|---|---|---|---|---|---|---|
| | **21604** | **NET 30** | | | | |
| Confirm To/Telephone | | | | Requester/Deliver To | | |
| **RAQUEL, HANSEN 507686-0707** | | | | | | |

*Notes:*  All dates referenced in this document are in GMT-6 America/Chicago
 Your invoice must contain this Oracle PO number in order for us to process payment.
All prices and amounts on this order are expressed in USD
Our preference is that you email your invoice to shared.services@sunopta.com.
 SunOpta Foods Inc. General Terms and Conditions of Purchase, a copy of which is attached, shall be
incorporated and apply to this purchase order.

| Line | Part Number / Description | Delivery Date/Time | Quantity | UOM | Unit Price (USD) | Tax Amount (USD) | Amount (USD) |
|---|---|---|---|---|---|---|---|
| 1 | 1055572 | Needed: 07-JUL-2021 17:00:00 | 44000 | Pound | .4150 | 0.00 | 18,260.00 |
| | SOYBEAN CRACKED DEHULLED CONV 2000LB TOTE | | | | | | |
| | Pfeninger hauling | | | | | | |

| | | | | | | Subtotal: 18,260.00 |
|---|---|---|---|---|---|---|
| | | | | | | Tax: 0.00 |
| | | | | | | Total: **18,260.00  (USD)** |

Proprietary and Confidential

**SunOpta Foods Inc.**
**General Terms and Conditions of Purchase**

These General Terms and Conditions of Purchase ("Terms") apply to all offers made and tenders submitted to SunOpta Foods Inc., a Delaware corporation and any of its subsidiaries listed on the face of an attached purchase order ("SunOpta") and to all agreements to which SunOpta is a party as a buyer/commissioning party, except to the extent separately negotiated terms and conditions of purchase have been adopted by both parties in a written agreement to govern such offers made and tenders submitted ("Definitive Agreement").

1. Definitions.  "Buyer" means SunOpta. "Seller" means the person, firm, or other business entity indicated on the face of the Purchase Order ("PO").. 

2. Offer and Acceptance. The PO is an offer by the Buyer or its designated affiliate to enter into the agreement it describes, including, without limitation, to purchase the materials, goods or services (collectively, the "Product") identified in such PO. Seller will be deemed to have accepted Buyer's offer and the PO in its entirety without modification, upon the earliest of (i) Seller's acceptance via a formal written acknowledgement to the Buyer, (ii) Seller's delivery of any Product that is the subject of the PO or (iii) any other conduct by Seller that recognizes the existence of the PO, including, but without limitation, preparation for the commencement of any of the work stated in the PO. Acceptance is expressly subject to these Terms and such other terms as are expressly referenced on the face of the PO (collectively, the "Agreement"). Any addition or modification proposed by Seller are expressly rejected by Buyer and are not part of this Agreement in the absence of an agreement in writing signed by an authorized representative of Buyer. By selling any Product to Buyer, Seller agrees to be bound by this Agreement.

3. Purchase. Subject hereto, Buyer agrees to purchase from Seller and Seller agrees to provide to Buyer the Product identified in the PO, which such Product shall conform to all current specifications, standards, drawings, samples and requirements of Buyer, including, without limitation those described in the PO and those pertaining to quantity, scope, dates for delivery and performance, and remaining shelf life (all such specifications and requirements "Specifications") provided by Buyer. Seller shall be prohibited from making any changes to its sourcing, processors, ingredient suppliers, or Specifications of the Product without first notifying Buyer and obtaining Buyer's written consent.

4. Order Procedure.
(a) Seller shall deliver the Product in the quantities and on the date(s) specified in the PO or as otherwise agreed in writing by the parties (the "Delivery Date"). If Seller fails to deliver the Product in full on the Delivery Date, Buyer may terminate this Agreement immediately by providing written notice to Seller, and Seller shall indemnify Buyer against any losses, claims, damages, and reasonable costs and expenses directly attributable to Seller's failure to deliver the Products on the Delivery Date. Buyer has the right to return any Product delivered prior to the Delivery Date at Seller's expense, and Seller shall redeliver such Product on the Delivery Date.
(b) Seller shall deliver all Product to the address specified in the PO (the "Delivery Point") during Buyer's normal business hours or as otherwise instructed by Buyer. Seller shall pack all goods for shipment according to Buyer's instructions or, if there are no instructions, in a manner sufficient to ensure that the Product is delivered in undamaged condition. Seller must provide Buyer prior written notice if it requires Buyer to return any packaging material. Any return of such packaging material shall be made at Seller's risk of loss and expense.
(c) Seller acknowledges that time is of the essence with respect to Seller's obligations hereunder and the timely delivery of the Product.

5. Quantity. If Seller delivers more than 5% of the quantity of Product ordered or less than the quantity of the Product ordered, Buyer may, at its election, reject all or any of the Product. Any such rejected Product shall be returned to Seller at Seller's sole risk and expense. If Buyer does not reject the Product and instead accepts the delivery of Product at the increased or reduced quantity, the Price for the Products shall be adjusted on a pro-rata basis.

6. Shipping Terms. Except as otherwise specifically provided in a PO, shipment of domestic Product shall be pursuant to DAP Incoterms 2010 and shipment of international Product shall be pursuant to DDP Incoterms 2010. The PO number must appear on all shipping documents, shipping labels, invoices, and correspondence pertaining to the PO. The Bill of Lading (BOL) and Certificate of Analysis shall accompany any shipment and a copy of both documents shall be provided to the appropriate person within Buyer's organization within twenty four (24) hours. Title and Risk will transfer to Buyer upon delivery of the Product at the Delivery Point. All shipments are to adhere to the following requirements: (a) appropriate temperature control during transport where required; (b) Monitor and maintain sanitary condition of transportation vehicles, including pest control; (c) Monitor and manage shipping to prevent cross contamination or hauling with hazardous materials; (d) Perform and maintain proper tanker wash records where applicable; (e) Ensure driver training and knowledge of food handling safety and security; (f) Perform preventative maintenance to prevent leaks, door gaps, and condensation; (g) Maintain good employee hygiene; and (h) Employ proper secure transport methods, including security seals of full loads and locks on LTL shipments. Sealing trailers of full loads must be completed by Seller prior to shipment with corresponding seal number printed on the BOL. Failure to do so may result in full or partial rejection of the shipment. Any changes or additions to current FDA guidelines must also be followed.

7. Inspection and Rejection of Nonconforming Product. Buyer has the right to inspect the Product on or after the Delivery Date. Buyer, at its sole option, may inspect all or a sample of the Product, and may reject all or any portion of the Product if it determines the Product is nonconforming or defective or if it has been delivered with a sufficient shelf life remaining. If Buyer rejects any portion of the Product, Buyer has the right, effective upon written notice to Seller, to: (a) rescind this Agreement in its entirety; (b) accept the Product at a reasonably reduced price; or (c) reject the Product and require replacement of the rejected Product. If Buyer requires replacement of the Product, Seller shall, at its expense, promptly replace the nonconforming or defective Product and pay for all related expenses, including, but not limited to,transportation charges for the return of the defective Product and the delivery of replacement Product. If Seller fails to timely deliver replacement Product, Buyer may replace them with goods from a third party and charge Seller the cost thereof and terminate this Agreement. Any inspection or other action by Buyer under this Section shall not reduce or

otherwise affect Seller's obligations under the Agreement, and Buyer shall have the right to conduct further inspections after Seller has carried out its remedial actions.

8. Price. The price of the Product is the price stated in the PO, or, if applicable, the price set forth in a written pricing agreement between the Parties (the "Price"). If no price is included in the PO or contained in a separate pricing agreement, then the Price shall be the price set out in Seller's published price list in force as of the date of the PO. Unless otherwise specified in the PO, the Price includes all packaging, transportation costs to the Delivery Location, insurance, customs duties and fees and applicable taxes, including, but not limited to, all sales, use or excise taxes. No increase in the Price is effective, whether due to increased material, labor or transportation costs or otherwise, without the prior written consent of Buyer.

9. Payment Terms. Seller shall issue an invoice to Buyer on or after the completion of delivery and only in accordance with these Terms. Buyer shall pay all properly invoiced amounts due to Seller within 60 days after Buyer's receipt of such invoice, except for any amounts disputed by Buyer in good faith. All payments hereunder must be in US dollars. Without prejudice to any other right or remedy it may have, Buyer reserves the right to set off at any time any amount owing to it by Seller against any amount payable by Buyer to Seller under this Agreement. In the event of a payment dispute, the parties shall seek to resolve all such disputes expeditiously and in good faith. Seller shall continue performing its obligations under this Agreement notwithstanding any such dispute.

10. Change Orders. Buyer may at any time, by written instructions and/or drawings issued to Seller (each a "Change Order"), order changes to the Product or its Specifications. Seller shall within ten (10) days of receipt of a Change Order submit to Buyer a firm cost proposal for the Change Order; if Seller fails to respond within such ten (10) days then Seller is deemed to have accepted the change order without changes to pricing and Seller shall promptly proceed with the changes. If Buyer accepts such cost proposal, Seller shall proceed with the changed Products subject to the cost proposal and the Terms and Specifications. If Buyer does not accept the cost proposal, then the Parties shall exert good faith efforts to resolve, with Buyer having the right to terminate any PO and/or the Agreement upon notice to Seller.

11. Samples and Quality Assurance. (a) Seller shall submit, free of any charges to Buyer, such samples of the Product as Buyer may reasonably require, so that Buyer may assure itself that the Product is being packed and processed in accordance with the Specifications. Buyer shall be entitled to one case of samples per lot. Buyer shall notify Seller within ten (10) business days of receiving the samples for evaluation if, in Buyer's view, any Product does not conform to its particular Specifications. Should Buyer reject any Product or samples as not conforming to the Specifications, Buyer shall provide samples of the rejected Product to Seller for its inspection. If Seller disputes Buyer's judgment as to whether the particular Product conforms to the Specifications, the matter in dispute will be resolved by submitting a sample of such Product for analysis to a mutually agreed independent third party certified laboratory. The findings of such third party shall be final and binding on the parties, and the party whose opinion does not prevail shall bear the cost of the independent evaluation and report.
(b) Seller will provide Buyer with a Certificate of Analysis for each batch of Product with the shipment. Seller's Certificate of Analysis will provide results for such tests or other requirements Buyer specifies as necessary to show compliance with the applicable Product Specifications and all applicable laws and regulations.
(c) In response to Buyer's request, Seller shall promptly (as soon as possible) based upon the type of information needed and the situation necessitating the request, and in no event longer than two business days, provide Buyer with accurate and comprehensive information about the Products, including (without limitation) information related to nutritional content, allergens, and specification targets. Seller hereby (i) warrants and represents that said information shall be complete and accurate and that Seller shall promptly and proactively notify Buyer if updates to said information become necessary, (ii) acknowledges and expressly permits Buyer to share the information with those of its customers who require/request it as part of their supplier qualification process; (iii) acknowledges that Buyer (and its customers) will rely upon such information, and (iv) agrees that Buyer may cancel any PO's (without liability to Buyer) should Seller fail to promptly provide such information and updates.
(d) Seller shall register, or ensure its suppliers register, all facilities used to manufacture, process, pack, and/or hold the Products with the United States Food and Drug Administration ("FDA") and will maintain all other licenses and registrations required by other federal, state or local regulatory bodies. Upon request, Seller will provide Buyer with the FDA facility registration numbers for all foreign or domestic facilities that are or will be used to manufacture, process, pack or hold the Products.
(e) Seller shall perform such auditing and verification activities of its suppliers as are necessary to (i) ensure Products it supplies are of a consistently high quality and not adulterated or misbranded under United States law; (ii) comply with Seller's obligations under the U.S. FDA Food Safety Modernization Act; and (iii) ensure compliance with all other international or domestic laws.
(f) If any portion of the facilities used to manufacture, process, pack or hold Product, including the facilities utilized by Seller's suppliers, are in an unsanitary condition or do not otherwise comply with the applicable Product Specifications, all laws, or with the other terms and conditions of this Agreement, Seller will promptly take such action as will correct the deficiencies and bring such processes, inventories and/or equipment into compliance with the Product Specifications, all laws, and with the terms and conditions of this Agreement.
(g) Seller shall immediately notify Buyer and provide Buyer with all documents relating to any non-routine inquiry, investigation, inspection, revocation or suspension of license or

registration, recall, detention of goods, or any other action by any governmental body or agency regarding quality, safety, labeling, marketing or distribution of the Products (including, without limitation, any FDA Form 483 or similar forms). If Seller becomes aware of any information regarding the Products that may indicate that the Products are adulterated or misbranded or otherwise indicate a potential quality, safety or labeling defect or error, Seller shall notify Buyer immediately by personal contact with Buyer's quality control representative and its account representative in addition to any notification required by applicable law. Seller shall consult with Buyer regarding any evaluation and decision to place the Product on HOLD, the process to retrieve such Products or the decision to report to any governmental body or regulatory agency or to recall Products due to suspected quality, safety or labeling defect or error.

(h) Seller shall have a system in place to enable Seller to trace promptly, but in all cases within twenty-four (24) hours of Buyer's request, the entire history of a particular lot of Product while in Seller's control, including but not limited to records pertaining to all raw materials, ingredients, packaging materials, manufacturing processes and procedures, packaging, storing, shipment and delivery.

(i) Seller shall provide Buyer with a copy of continuing product guarantees and warranties on an as-requested basis. Such continuing product guarantees and warranties act to supplement, but do not limit, the representations and warranties, and terms of this Agreement.

12. Warranties. (a) From and after the Delivery Date, Seller warrants to Buyer that all Products will:

(i) not be adulterated or misbranded, as those terms are defined by the U.S. Federal Food, Drug and Cosmetic Act ("FFDCA");

(ii) be free from any defects in workmanship, material and design;

(iii) conform to applicable Specifications, drawings, designs, samples and other requirements specified by Buyer;

(iv) be fit for their intended purpose and operate as intended;

(v) be merchantable;

(vi) be free and clear of all liens, security interests or other encumbrances; not infringe or misappropriate any third party's patent or other intellectual property rights; comply with Buyer's Specifications for the Products; comply with all applicable laws and regulations, including but not limited to the FFDCA, and all amendments, supplements and regulations promulgated thereunder, the U.S. Food Safety Modernization Act and all amendments, supplements and regulations promulgated thereunder, the U.S. Federal Hazardous Substances Act, and all amendments, supplements and regulations promulgated thereunder, all state laws applicable to food products, and California's Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65); and

(vii) be produced in accordance with current Good Manufacturing Practices ("cGMPs"), and other governing industry regulations, guidance and standards.

(viii) These warranties survive any delivery, inspection, acceptance or payment of or for Product by Buyer.

(b) If applicable, Seller warrants to Buyer that it shall perform services contemplated by under this Agreement using personnel of required skill, experience and qualifications and in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services and shall devote adequate resources to meet its obligations under this Agreement.

**13. Employment and Affirmative Action Obligations. The parties hereby incorporate the requirements of 41 C.F.R. □□ 60-1.4(a)(1)-(7) and 29 CFR Part 471, Appendix A to Subpart A, if applicable. In addition, this contractor and subcontractor shall abide by the requirements of 41 CFR 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status.**

14. General Indemnification. Seller shall defend, indemnify and hold harmless Buyer and Buyer's parent company, its subsidiaries, affiliates, successors or assigns and its respective directors, officers, shareholders, agents, contractors, consultants, and employees (collectively, "Indemnitees") from and against any and all loss, injury, death, damage, liability, claim, deficiency, action, judgment, interest, award, penalty, fine, cost or expense, including reasonable attorney and professional fees and costs, and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers (collectively, "Losses") arising out of or occurring in connection with (a) the Product purchased from Seller or (b) Seller's negligence, willful misconduct or breach of the Terms. Seller shall not enter into any settlement without Buyer's prior written consent.

15. Ownership, Proprietary Rights. Seller and Buyer agree that each party now and will continue to own all intellectual property rights that such party owned or held prior to these Terms becoming effective. Seller hereby grants to Buyer a perpetual, worldwide license to use and practice any intellectual property rights in the Products and any intellectual property that is otherwise provided by Seller under this Agreement, and to sell, offer for sale, make, have made, import, export and use merchandise containing Products. Seller shall not sell or otherwise provide Products developed specially for Buyer to any of its customers for use in the same type of application that Buyer is using such Product without first obtaining prior written consent from Buyer.

16. Intellectual Property Indemnification. Seller shall, at its expense, defend, indemnify and hold harmless Buyer and any Indemnitee against any and all Losses arising out of or in connection with any claim that Buyer's or Indemnitee's use or possession of the Product infringes or misappropriates the patent, copyright,trade secret or other intellectual property

right of any third party. In no event shall Seller enter into any settlement without Buyer's or Indemnitee's prior written consent.

17. Termination. In addition to any remedies that may be provided under these Terms, Buyer may terminate this Agreement with immediate effect upon written notice to Seller before or after the acceptance of the Product, if Seller has not performed or complied with these Terms, in whole or in part. If Seller becomes insolvent, files a petition for bankruptcy or commences or has commenced against it proceedings relating to bankruptcy, receivership, reorganization or assignment for the benefit of creditors, then Buyer may terminate this Agreement upon written notice to Seller to the extent permitted by law. If Buyer terminates the Agreement for any reason, Seller's sole and exclusive remedy is payment for the Products received and accepted and services accepted by Buyer prior to the termination.

18. Confidentiality. All non-public, confidential or proprietary information of Buyer, including but not limited to, Specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, customer lists, supplier lists, pricing, discounts or rebates, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential" in connection with this Agreement is confidential, is provided solely for the purpose of performing this Agreement and may not be disclosed or copied unless authorized in advance by Buyer in writing. Upon Buyer's request, Seller shall promptly return or destroy all documents and other materials received from Buyer. Buyer shall be entitled to injunctive relief for any violation of this Section. This Section does not apply to information that is: (a) in the public domain; (b) known to Seller at the time of disclosure by Buyer or its representatives; or (c) rightfully obtained by Seller on a non-confidential basis from a third party.

19. Insurance. Seller shall maintain, and cause its subcontractors to maintain at their expense, sufficient insurance coverage with generally acceptable insurers. Such insurance shall include contractual liability coverage, name Buyer as additional insured on all policies where applicable in connection with Sellers' performance of the PO, contain no material exclusions, and include a provision that waives the insurer's subrogation rights against Buyer.

20. Title and Risk. Unless otherwise stated on the face of the PO, title and risk of loss of the Product shall pass to Buyer, at Buyer's option, (a) upon receipt by Buyer at Buyer's warehouse or facilities, or (b) upon loading of Product onto an approved Buyer carrier.

21. Currency. Unless otherwise stated on the face of the PO, all payments and other financial requirements under this Agreement shall be in the currency of United States Dollar.

22. Waiver. No waiver by Buyer of any of the provisions of this Agreement is effective unless explicitly set forth in writing and signed by Buyer. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement operates, or may be construed, as a waiver thereof. No single or partial exercise of any right, remedy, power or privilege hereunder precludes any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

23. Assignment. Seller shall not assign, transfer, delegate or subcontract any of its rights or obligations under this Agreement without the prior written consent of Buyer. Any purported assignment or delegation in violation of this Section shall be null and void. No assignment or delegation shall relieve the Seller of any of its obligations hereunder.

24. Relationship of the Parties. The relationship between the Parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the Parties, and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever.

25. No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

26. Severability. If any term of this Agreement shall be held to be unenforceable, then the remainder shall not be affected thereby, and shall be valid and enforceable to the fullest extent permitted by law.

27. Notices. All notices, consents, claims, demands, waivers and other required communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth on the face of the PO or to such other address that may be designated by the receiving party in writing. A copy of any Notice provided under this Agreement to Buyer shall also be sent via email to legal@sunopta.com. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), email (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) upon receipt of the receiving party, and (b) if the party giving the Notice has complied with the requirements of this Section.

28. Code of Conduct. This Agreement shall be subject to and Seller shall adhere to Buyer's Code of Conduct, available at http://www.sunopta.com/files/sunopta_supplier_partner_code_of_conduct.pdf as amended from time to time.

29. Governing Law. This Agreement shall be interpreted and construed in accordance with Minnesota law. Seller consents to the jurisdiction of Minnesota courts.

30. Governing Terms. In the event of a conflict or inconsistency between the provisions of these Terms and any non-preprinted term on the PO, the provisions of the non-preprinted terms on the PO shall prevail. In the event of a conflict or inconsistency between the provisions of this Agreement and any Definitive Agreement, the provisions of the Definitive Agreement shall prevail.



| Type | **Standard Purchase Order** |
|---|---|
| Order | **3398995** |
| Revision | **0** |
| Order Date | **02-JUN-2021** |
| Created By | **KLEINDL, EUGENE** |
| Telephone | |
| Fax | |
| Revision Date | |
| Current Buyer | |

Supplier: **PIPELINE FOODS LLC**
**3824 SW 93RD ST**
**HOPE, MN 56046**
**UNITED STATES**

Ship To: **601 3rd Avenue W**
**Alexandria, MN 56308**
**UNITED STATES**

Bill To: **7301 Ohms Lane, Suite 600**
**Edina, MN 55439**
**UNITED STATES**

E-Mail: **shared.services@sunopta.com**

| Customer Account No. | Supplier No. | Payment Terms | Freight Terms | FOB | Transportation | Ship Via |
|---|---|---|---|---|---|---|
| | **21604** | **NET 30** | | | | |
| Confirm To/Telephone | | | Requester/Deliver To | | | |
| **RAQUEL, HANSEN 507686-0707** | | | | | | |

*Notes:*   All dates referenced in this document are in GMT-6 America/Chicago
 Your invoice must contain this Oracle PO number in order for us to process payment.
All prices and amounts on this order are expressed in USD
Our preference is that you email your invoice to shared.services@sunopta.com.
 SunOpta Foods Inc. General Terms and Conditions of Purchase, a copy of which is attached, shall be
incorporated and apply to this purchase order.

| Line | Part Number / Description | Delivery Date/Time | Quantity | UOM | Unit Price (USD) | Tax Amount (USD) | Amount (USD) |
|---|---|---|---|---|---|---|---|
| 1 | 1243920<br><br>SOYBEANS ORGANIC PCR TESTED<br><br>Vesely hauling | Needed:<br>13-JUL-2021 17:00:00 | 44000 | Pound | .5531 | 0.00 | 24,336.40 |
| | | | | | | Subtotal: | 24,336.40 |
| | | | | | | Tax: | 0.00 |
| | | | | | | **Total:** | **24,336.40  (USD)** |

**SunOpta Foods Inc.**
**General Terms and Conditions of Purchase**

These General Terms and Conditions of Purchase ("Terms") apply to all offers made and tenders submitted to SunOpta Foods Inc., a Delaware corporation and any of its subsidiaries listed on the face of an attached purchase order ("SunOpta") and to all agreements to which SunOpta is a party as a buyer/commissioning party, except to the extent separately negotiated terms and conditions of purchase have been adopted by both parties in a written agreement to govern such offers made and tenders submitted ("Definitive Agreement").

1. Definitions.  "Buyer" means SunOpta. "Seller" means the person, firm, or other business entity indicated on the face of the Purchase Order ("PO")..

2. Offer and Acceptance. The PO is an offer by the Buyer or its designated affiliate to enter into the agreement it describes, including, without limitation, to purchase the materials, goods or services (collectively, the "Product") identified in such PO. Seller will be deemed to have accepted Buyer's offer and the PO is in its entirety without modification, upon the earliest of (i) Seller's acceptance via a formal written acknowledgement to the Buyer, (ii) Seller's delivery of any Product that is the subject of the PO or (iii) any other conduct by Seller that recognizes the existence of the PO, including, but without limitation, preparation for the commencement of any of the work stated in the PO. Acceptance is expressly subject to these Terms and such other terms as are expressly referenced on the face of the PO (collectively, the "Agreement"). Any addition or modification proposed by Seller are expressly rejected by Buyer and are not part of this Agreement in the absence of an agreement in writing signed by an authorized representative of Buyer. By selling any Product to Buyer, Seller agrees to be bound by this Agreement.

3. Purchase. Subject hereto, Buyer agrees to purchase from Seller and Seller agrees to provide to Buyer the Product identified in the PO, which such Product shall conform to all current specifications, standards, drawings, samples and requirements of Buyer, including, without limitation those described in the PO and those pertaining to quantity, scope, dates for delivery and performance, and remaining shelf life (all such specifications and requirements "Specifications") provided by Buyer. Seller shall be prohibited from making any changes to its sourcing, processors, ingredient suppliers, or Specifications of the Product without first notifying Buyer and obtaining Buyer's written consent.

4. Order Procedure.
(a) Seller shall deliver the Product in the quantities and on the date(s) specified in the PO or as otherwise agreed in writing by the parties (the "Delivery Date"). If Seller fails to deliver the Product in full on the Delivery Date, Buyer may terminate this Agreement immediately by providing written notice to Seller, and Seller shall indemnify Buyer against any losses, claims, damages, and reasonable costs and expenses directly attributable to Seller's failure to deliver the Products on the Delivery Date. Buyer has the right to return any Product delivered prior to the Delivery Date at Seller's expense, and Seller shall redeliver such Product on the Delivery Date.
(b) Seller shall deliver all Product to the address specified in the PO (the "Delivery Point") during Buyer's normal business hours or as otherwise instructed by Buyer. Seller shall pack all goods for shipment according to Buyer's instructions or, if there are no instructions, in a manner sufficient to ensure that the Product is delivered in undamaged condition. Seller must provide Buyer prior written notice if it requires Buyer to return any packaging material. Any return of such packaging material shall be made at Seller's risk of loss and expense.
(c) Seller acknowledges that time is of the essence with respect to Seller's obligations hereunder and the timely delivery of the Product.

5. Quantity. If Seller delivers more than 5% of any quantity of Product ordered or less than the quantity of the Product ordered, Buyer may, at its election, reject all or any of the Product. Any such rejected Product shall be returned to Seller at Seller's sole risk and expense. If Buyer does not reject the Product and instead accepts the delivery of Product at the increased or reduced quantity, the Price for the Products shall be adjusted on a pro-rata basis.

6. Shipping Terms. Except as otherwise specifically provided in a PO, shipment of domestic Product shall be pursuant to DAP Incoterms 2010 and shipment of international Product shall be pursuant to DDP Incoterms 2010. The PO number must appear on all shipping documents, shipping labels, invoices, and correspondence pertaining to the PO. The Bill of Lading (BOL) and Certificate of Analysis shall accompany any shipment and a copy of both documents shall be provided to the appropriate person within Buyer's organization within twenty four (24) hours. Title and Risk will transfer to Buyer upon delivery of the Product at the Delivery Point. All shipments are to adhere to the following requirements: (a) appropriate temperature control during transport where required; (b) Monitor and maintain sanitary condition of transportation vehicles, including pest control; (c) Monitor and manage shipping to prevent cross contamination or hauling with hazardous materials; (d) Perform and maintain proper tanker wash records where applicable; (e) Ensure driver training and knowledge of food handling safety and security; (f) Perform preventative maintenance to prevent leaks, door gaps, and condensation; (g) Maintain good employee hygiene; and (h) Employ proper secure transport methods, including security seals of full loads and locks on LTL shipments. Sealing trailers of full loads must be completed by Seller prior to shipment with corresponding seal number printed on the BOL. Failure to do so may result in full or partial rejection of the shipment. Any changes or additions to current FDA guidelines must also be followed.

7. Inspection and Rejection of Nonconforming Product. Buyer has the right to inspect the Product on or after the Delivery Date. Buyer, at its sole option, may inspect all or a sample of the Product, and may reject all or any portion of the Product if it determines the Product is nonconforming or defective or if it has been delivered with a sufficient shelf life remaining. If Buyer rejects any portion of the Product, Buyer has the right, effective upon written notice to Seller, to: (a) rescind this Agreement in its entirety; (b) accept the Product at a reasonably reduced price; or (c) reject the Product and require replacement of the rejected Product. If Buyer requires replacement of the Product, Seller shall, at its expense, promptly replace the nonconforming or defective Product and pay for all related expenses, including, but not limited to,transportation charges for the return of the defective Product and the delivery of replacement Product. If Seller fails to timely deliver replacement Product, Buyer may replace them with goods from a third party and charge Seller the cost thereof and terminate this Agreement. Any inspection or other action by Buyer under this Section shall not reduce or

otherwise affect Seller's obligations under the Agreement, and Buyer shall have the right to conduct further inspections after Seller has carried out its remedial actions.

8. Price. The price of the Product is the price stated in the PO, or, if applicable, the price set forth in a written pricing agreement between the Parties (the "Price"). If no price is included in the PO or contained in a separate pricing agreement, then the Price shall be the price set out in Seller's published price list in force as of the date of the PO. Unless otherwise specified in the PO, the Price includes all packaging, transportation costs to the Delivery Location, insurance, customs duties and fees and applicable taxes, including, but not limited to, all sales, use or excise taxes. No increase in the Price is effective, whether due to increased material, labor or transportation costs or otherwise, without the prior written consent of Buyer.

9. Payment Terms. Seller shall issue an invoice to Buyer on or after the completion of delivery and only in accordance with these Terms. Buyer shall pay all properly invoiced amounts due to Seller within 60 days after Buyer's receipt of such invoice, except for any amounts disputed by Buyer in good faith. All payments hereunder must be in US dollars. Without prejudice to any other right or remedy it may have, Buyer reserves the right to set off at any time any amount owing to it by Seller against any amount payable by Buyer to Seller under this Agreement. In the event of a payment dispute, the parties shall seek to resolve all such disputes expeditiously and in good faith. Seller shall continue performing its obligations under this Agreement notwithstanding any such dispute.

10. Change Orders. Buyer may at any time, by written instructions and/or drawings issued to Seller (each a "Change Order"), order changes to the Product or its Specifications. Seller shall within ten (10) days of receipt of a Change Order submit to Buyer a firm cost proposal for the Change Order; if Seller fails to respond within such ten (10) days then Seller is deemed to have accepted the change order without changes to pricing and Seller shall promptly proceed with the changes. If Buyer accepts such cost proposal, Seller shall proceed with the changed Products subject to the cost proposal and the Terms and Specifications. If Buyer does not accept the cost proposal, then the Parties shall exert good faith efforts to resolve, with Buyer having the right to terminate any PO and/or the Agreement upon notice to Seller.

11. Samples and Quality Assurance. (a) Seller shall submit, free of any charges to Buyer, such samples of the Product as Buyer may reasonably require, so that Buyer may assure itself that the Product is being packed and processed in accordance with the Specifications. Buyer shall be entitled to one case of samples per lot. Buyer shall notify Seller within ten (10) business days of receiving the samples for evaluation if, in Buyer's view, any Product does not conform to its particular Specifications. Should Buyer reject any Product or samples as not conforming to the Specifications, Buyer shall provide samples of the rejected Product to Seller for its inspection. If Seller disputes Buyer's judgment as to whether the particular Product conforms to the Specifications, the matter in dispute will be resolved by submitting a sample of such Product for analysis to a mutually agreed independent third party certified laboratory. The findings of such third party shall be final and binding on the parties, and the party whose opinion does not prevail shall bear the cost of the independent evaluation and report.
(b) Seller will provide Buyer with a Certificate of Analysis for each batch of Product with the shipment. Seller's Certificate of Analysis will provide results for such tests or other requirements Buyer specifies as necessary to show compliance with the applicable Product Specifications and all applicable laws and regulations.
(c) In response to Buyer's request, Seller shall promptly (as soon as possible) based upon the type of information needed and the situation necessitating the request, and in no event longer than two business days, provide Buyer with accurate and comprehensive information about the Products, including, (without limitation) information related to nutritional content, allergens, and specification targets. Seller hereby (i) warrants and represents that said information shall be complete and accurate and that Seller shall promptly and proactively notify Buyer if updates to said information become necessary, (ii) acknowledges and expressly permits Buyer to share the information with those of its customers who require/request it as part of their supplier qualification process; (iii) acknowledges that Buyer (and its customers) will rely upon such information, and (iv) agrees that Buyer may cancel any PO's (without liability to Buyer) should Seller fail to promptly provide such information and updates.
(d) Seller shall register, or ensure its suppliers register, all facilities used to manufacture, process, pack, and/or hold the Products with the United States Food and Drug Administration ("FDA") and will maintain all other licenses and registrations required by other federal, state or local regulatory bodies. Upon request, Seller will provide Buyer with the FDA facility registration numbers for all foreign or domestic facilities that are or will be used to manufacture, process, pack or hold the Products.
(e) Seller shall perform such auditing and verification activities of its suppliers as are necessary to (i) ensure Products it supplies are of a consistently high quality and not adulterated or misbranded under United States law; (ii) comply with Seller's obligations under the U.S. FDA Food Safety Modernization Act; and (iii) ensure compliance with all other international or domestic laws.
(f) If any portion of the facilities used to manufacture, process, pack or hold Product, including the facilities utilized by Seller's suppliers, are in an unsanitary condition or do not otherwise comply with the applicable Product Specifications, all laws, or with the other terms and conditions of this Agreement, Seller will promptly take such action as will correct the deficiencies and bring such processes, inventories and/or equipment into compliance with the Product Specifications, all laws, and with the terms and conditions of this Agreement.
(g) Seller shall immediately notify Buyer and provide Buyer with all documents relating to any non-routine inquiry, investigation, inspection, revocation or suspension of license or

registration, recall, detention of goods, or any other action by any governmental body or agency regarding quality, safety, labeling, marketing or distribution of the Products (including, without limitation, any FDA Form 483 or similar forms). If Seller becomes aware of any information regarding the Products that may indicate that the Products are adulterated or misbranded or otherwise indicate a potential quality, safety or labeling defect or error, Seller shall notify Buyer immediately by personal contact with Buyer's quality control representative and its account representative in addition to any notification required by applicable law. Seller shall consult with Buyer regarding any evaluation and decision to place the Product on HOLD, the process to retrieve such Products or the decision to report to any governmental body or regulatory agency or to recall Products due to suspected quality, safety or labeling defect or error.

(h) Seller shall have a system in place to enable Seller to trace promptly, but in all cases within twenty-four (24) hours of Buyer's request, the entire history of a particular lot of Product while in Seller's control, including but not limited to records pertaining to all raw materials, ingredients, packaging materials, manufacturing processes and procedures, packaging, storing, shipment and delivery.

(i) Seller shall provide Buyer with a copy of continuing product guarantees and warranties on an as-requested basis. Such continuing product guarantees and warranties act to supplement, but do not limit, the representations and warranties, and terms of this Agreement.

12. **Warranties.** (a) From and after the Delivery Date, Seller warrants to Buyer that all Products will:

(i) not be adulterated or misbranded, as those terms are defined by the U.S. Federal Food, Drug and Cosmetic Act ("FFDCA");

(ii) be free from any defects in workmanship, material and design;

(iii) conform to applicable Specifications, drawings, designs, samples and other requirements specified by Buyer;

(iv) be fit for their intended purpose and operate as intended;

(v) be merchantable;

(vi) be free and clear of all liens, security interests or other encumbrances; not infringe or misappropriate any third party's patent or other intellectual property rights; comply with Buyer's Specifications for the Products; comply with all applicable laws and regulations, including but not limited to the FFDCA, and all amendments, supplements and regulations promulgated thereunder, the U.S. Food Safety Modernization Act and all amendments, supplements and regulations promulgated thereunder, the U.S. Federal Hazardous Substances Act, and all amendments, supplements and regulations promulgated thereunder, all state laws applicable to food products, and California's Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65); and

(vii) be produced in accordance with current Good Manufacturing Practices ("cGMPs"), and other governing industry regulations, guidance and standards.

(viii) These warranties survive any delivery, inspection, acceptance or payment of or for Product by Buyer.

(b) If applicable, Seller warrants to Buyer that it shall perform services contemplated by under this Agreement using personnel of required skill, experience and qualifications and in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services and shall devote adequate resources to meet its obligations under this Agreement.

13. **Employment and Affirmative Action Obligations. The parties hereby incorporate the requirements of 41 C.F.R. ☐☐ 60-1.4(a)(1)-(7) and 29 CFR Part 471, Appendix A to Subpart A, if applicable. In addition, this contractor and subcontractor shall abide by the requirements of 41 CFR 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status.**

14. General Indemnification. Seller shall defend, indemnify and hold harmless Buyer and Buyer's parent company, its subsidiaries, affiliates, successors or assigns and its respective directors, officers, shareholders, agents, contractors, consultants, and employees (collectively, "Indemnitees") from and against any and all loss, injury, death, damage, liability, claim, deficiency, action, judgment, interest, award, penalty, fine, cost or expense, including reasonable attorney and professional fees and costs, and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers (collectively, "Losses") arising out of or occurring in connection with (a) the Product purchased from Seller or (b) Seller's negligence, willful misconduct or breach of the Terms. Seller shall not enter into any settlement without Buyer's prior written consent.

15. Ownership, Proprietary Rights. Seller and Buyer agree that each party will continue to own all intellectual property rights that such party owned or held prior to these Terms becoming effective. Seller hereby grants to Buyer a perpetual, worldwide license to use and practice any intellectual property rights in the Products and any intellectual property that is otherwise provided by Seller under this Agreement, and to sell, offer for sale, make, have made, import, export and use merchandise containing Products. Seller shall not sell or otherwise provide Products developed specially for Buyer to any of its customers for use in the same type of application that Buyer is using such Product without first obtaining prior written consent from Buyer.

16. Intellectual Property Indemnification. Seller shall, at its expense, defend, indemnify and hold harmless Buyer and any Indemnitee against any and all Losses arising out of or in connection with any claim that Buyer's or Indemnitee's use or possession of the Product infringes or misappropriates the patent, copyright,trade secret or other intellectual property

right of any third party. In no event shall Seller enter into any settlement without Buyer's or Indemnitee's prior written consent.

17. Termination. In addition to any remedies that may be provided under these Terms, Buyer may terminate this Agreement with immediate effect upon written notice to Seller before or after the acceptance of the Product, if Seller has not performed or complied with these Terms, in whole or in part. If Seller becomes insolvent, files a petition for bankruptcy or commences or has commenced against it proceedings relating to bankruptcy, receivership, reorganization or assignment for the benefit of creditors, then Buyer may terminate this Agreement upon written notice to Seller to the extent permitted by law. If Buyer terminates the Agreement for any reason, Seller's sole and exclusive remedy is payment for the Products received and accepted and services accepted by Buyer prior to the termination.

18. Confidentiality. All non-public, confidential or proprietary information of Buyer, including but not limited to, Specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, customer lists, supplier lists, pricing, discounts or rebates, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential" in connection with this Agreement is confidential, is provided solely for the purpose of performing this Agreement and may not be disclosed or copied unless authorized in advance by Buyer in writing. Upon Buyer's request, Seller shall promptly return or destroy all documents and other materials received from Buyer. Buyer shall be entitled to injunctive relief for any violation of this Section. This Section does not apply to information that is: (a) in the public domain; (b) known to Seller at the time of disclosure by Buyer or its representatives; or (c) rightfully obtained by Seller on a non-confidential basis from a third party.

19. Insurance. Seller shall maintain, and cause its subcontractors to maintain at their expense, sufficient insurance coverage with generally acceptable insurers. Such insurance shall include contractual liability coverage, name Buyer as additional insured on all policies where applicable in connection with Sellers' performance of the PO, contain no material exclusions, and include a provision that waives the insurer's subrogation rights against Buyer.

20. Title and Risk. Unless otherwise stated on the face of the PO, title and risk of loss of the Product shall pass to Buyer, at Buyer's option, (a) upon receipt by Buyer at Buyer's warehouse or facilities, or (b) upon loading of Product onto an approved Buyer carrier.

21. Currency. Unless otherwise stated on the face of the PO, all payments and other financial requirements under this Agreement shall be in the currency of United States Dollar.

22. Waiver. No waiver by Buyer of any of the provisions of this Agreement is effective unless explicitly set forth in writing and signed by Buyer. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement operates, or may be construed, as a waiver thereof. No single or partial exercise of any right, remedy, power or privilege hereunder precludes any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

23. Assignment. Seller shall not assign, transfer, delegate or subcontract any of its rights or obligations under this Agreement without the prior written consent of Buyer. Any purported assignment or delegation in violation of this Section shall be null and void. No assignment or delegation shall relieve the Seller of any of its obligations hereunder.

24. Relationship of the Parties. The relationship between the Parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the Parties, and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever.

25. No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

26. Severability. If any term of this Agreement shall be held to be unenforceable, then the remainder shall not be affected thereby, and shall be valid and enforceable to the fullest extent permitted by law.

27. Notices. All notices, consents, claims, demands, waivers and other required communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth on the face of the PO or to such other address that may be designated by the receiving party in writing. A copy of any Notice provided under this Agreement to Buyer shall also be sent via email to legal@sunopta.com. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), email (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) upon receipt of the receiving party, and (b) if the party giving the Notice has complied with the requirements of this Section.

28. Code of Conduct. This Agreement shall be subject to and Seller shall adhere to Buyer's Code of Conduct, available at
http://www.sunopta.com/files/sunopta_supplier_partner_code_of_conduct.pdf as amended from time to time.

29. Governing Law. This Agreement shall be interpreted and construed in accordance with Minnesota law. Seller consents to the jurisdiction of Minnesota courts.

30. Governing Terms. In the event of a conflict or inconsistency between the provisions of these Terms and any non-preprinted term on the PO, the provisions of the non-preprinted terms on the PO shall prevail. In the event of a conflict or inconsistency between the provisions of this Agreement and any Definitive Agreement, the provisions of the Definitive Agreement shall prevail.



| Type | **Standard Purchase Order** |
|---|---|
| Order | **3398996** |
| Revision | **0** |
| Order Date | **02-JUN-2021** |
| Created By | **KLEINDL, EUGENE** |
| Telephone | |
| Fax | |
| Revision Date | |
| Current Buyer | |

Supplier: **PIPELINE FOODS LLC**
**3824 SW 93RD ST**
**HOPE, MN 56046**
**UNITED STATES**

Ship To: **601 3rd Avenue W**
**Alexandria, MN 56308**
**UNITED STATES**

Bill To: **7301 Ohms Lane, Suite 600**
**Edina, MN 55439**
**UNITED STATES**

E-Mail: **shared.services@sunopta.com**

| Customer Account No. | Supplier No. | Payment Terms | Freight Terms | FOB | Transportation | Ship Via |
|---|---|---|---|---|---|---|
| | **21604** | **NET 30** | | | | |
| Confirm To/Telephone | | | Requester/Deliver To | | | |
| **RAQUEL, HANSEN 507686-0707** | | | | | | |

*Notes:*   All dates referenced in this document are in GMT-6 America/Chicago
 Your invoice must contain this Oracle PO number in order for us to process payment.
All prices and amounts on this order are expressed in USD
Our preference is that you email your invoice to shared.services@sunopta.com.
 SunOpta Foods Inc. General Terms and Conditions of Purchase, a copy of which is attached, shall be
incorporated and apply to this purchase order.

| Line | Part Number / Description | Delivery Date/Time | Quantity | UOM | Unit Price (USD) | Tax Amount (USD) | Amount (USD) |
|---|---|---|---|---|---|---|---|
| 1 | 1243920 | Needed: 15-JUL-2021 17:00:00 | 44000 | Pound | .5530 | 0.00 | 24,332.00 |
| | SOYBEANS ORGANIC PCR TESTED | | | | | | |
| | Vesely hauling | | | | | | |
| | | | | | | Subtotal: 24,332.00 |
| | | | | | | Tax: 0.00 |
| | | | | | | Total: **24,332.00 (USD)** |

**SunOpta Foods Inc.**
**General Terms and Conditions of Purchase**

These General Terms and Conditions of Purchase ("Terms") apply to all offers made and tenders submitted to SunOpta Foods Inc., a Delaware corporation and any of its subsidiaries listed on the face of an attached purchase order ("SunOpta") and to all agreements to which SunOpta is a party as a buyer/commissioning party, except to the extent separately negotiated terms and conditions of purchase have been adopted by both parties in a written agreement to govern such offers made and tenders submitted ("Definitive Agreement").

1. Definitions.  "Buyer" means SunOpta. "Seller" means the person, firm, or other business entity indicated on the face of the Purchase Order ("PO")..

2. Offer and Acceptance. The PO is an offer by the Buyer or its designated affiliate to enter into the agreement it describes, including, without limitation, to purchase the materials, goods or services (collectively, the "Product") identified in such PO. Seller will be deemed to have accepted Buyer's offer and the PO in its entirety without modification, upon the earliest of (i) Seller's acceptance via a formal written acknowledgement to the Buyer, (ii) Seller's delivery of any Product that is the subject of the PO or (iii) any other conduct by Seller that recognizes the existence of the PO, including, but without limitation, preparation for the commencement of any of the work stated in the PO. Acceptance is expressly subject to these Terms and such other terms as are expressly referenced on the face of the PO (collectively, the "Agreement"). Any addition or modification proposed by Seller are expressly rejected by Buyer and are not part of this Agreement in the absence of an agreement in writing signed by an authorized representative of Buyer. By selling any Product to Buyer, Seller agrees to be bound by this Agreement.

3. Purchase. Subject hereto, Buyer agrees to purchase from Seller and Seller agrees to provide to Buyer the Product identified in the PO, which such Product shall conform to all current specifications, standards, drawings, samples and requirements of Buyer, including, without limitation those described in the PO and those pertaining to quantity, scope, dates for delivery and performance, and remaining shelf life (all such specifications and requirements "Specifications") provided by Buyer. Seller shall be prohibited from making any changes to its sourcing, processors, ingredient suppliers, or Specifications of the Product without first notifying Buyer and obtaining Buyer's written consent.

4. Order Procedure.
(a) Seller shall deliver the Product in the quantities and on the date(s) specified in the PO or as otherwise agreed in writing by the parties (the "Delivery Date"). If Seller fails to deliver the Product in full on the Delivery Date, Buyer may terminate this Agreement immediately by providing written notice to Seller, and Seller shall indemnify Buyer against any losses, claims, damages, and reasonable costs and expenses directly attributable to Seller's failure to deliver the Products on the Delivery Date. Buyer has the right to return any Product delivered prior to the Delivery Date at Seller's expense, and Seller shall redeliver such Product on the Delivery Date.
(b) Seller shall deliver all Product to the address specified in the PO (the "Delivery Point") during Buyer's normal business hours or as otherwise instructed by Buyer. Seller shall pack all goods for shipment according to Buyer's instructions or, if there are no instructions, in a manner sufficient to ensure that the Product is delivered in undamaged condition. Seller must provide Buyer prior written notice if it requires Buyer to return any packaging material. Any return of such packaging material shall be made at Seller's risk of loss and expense.
(c) Seller acknowledges that time is of the essence with respect to Seller's obligations hereunder and the timely delivery of the Product.

5. Quantity. If Seller delivers more than 5% of the quantity of Product ordered or less than the quantity of the Product ordered, Buyer may, at its election, reject all or any of the Product. Any such rejected Product shall be returned to Seller at Seller's sole risk and expense. If Buyer does not reject the Product and instead accepts the delivery of Product at the increased or reduced quantity, the Price for the Products shall be adjusted on a pro-rata basis.

6. Shipping Terms. Except as otherwise specifically provided in a PO, shipment of domestic Product shall be pursuant to DAP Incoterms 2010 and shipment of international Product shall be pursuant to DDP Incoterms 2010. The PO number must appear on all shipping documents, shipping labels, invoices, and correspondence pertaining to the PO. The Bill of Lading (BOL) and Certificate of Analysis shall accompany any shipment and a copy of both documents shall be provided to the appropriate person within Buyer's organization within twenty four (24) hours. Title and Risk will transfer to Buyer upon delivery of the Product at the Delivery Point. All shipments are to adhere to the following requirements: (a) appropriate temperature control during transport where required; (b) Monitor and maintain sanitary condition of transportation vehicles, including pest control; (c) Monitor and manage shipping to prevent cross contamination or hauling with hazardous materials; (d) Perform and maintain proper tanker wash records where applicable; (e) Ensure driver training and knowledge of food handling safety and security; (f) Perform preventative maintenance to prevent leaks, door gaps, and condensation; (g) Maintain good employee hygiene; and (h) Employ proper secure transport methods, including security seals of full loads and locks on LTL shipments. Sealing trailers of full loads must be completed by Seller prior to shipment with corresponding seal number printed on the BOL. Failure to do so may result in full or partial rejection of the shipment. Any changes or additions to current FDA guidelines must also be followed.

7. Inspection and Rejection of Nonconforming Product. Buyer has the right to inspect the Product on or after the Delivery Date. Buyer, at its sole option, may inspect all or a sample of the Product, and may reject all or any portion of the Product if it determines the Product is nonconforming or defective or if it has been delivered with a sufficient shelf life remaining. If Buyer rejects any portion of the Product, Buyer has the right, effective upon written notice to Seller, to: (a) rescind this Agreement in its entirety; (b) accept the Product at a reasonably reduced price; or (c) reject the Product and require replacement of the rejected Product. If Buyer requires replacement of the Product, Seller shall, at its expense, promptly replace the nonconforming or defective Product and pay for all related expenses, including, but not limited to,transportation charges for the return of the defective Product and the delivery of replacement Product. If Seller fails to timely deliver replacement Product, Buyer may replace them with goods from a third party and charge Seller the cost thereof and terminate this Agreement. Any inspection or other action by Buyer under this Section shall not reduce or

otherwise affect Seller's obligations under the Agreement, and Buyer shall have the right to conduct further inspections after Seller has carried out its remedial actions.

8. Price. The price of the Product is the price stated in the PO, or, if applicable, the price set forth in a written pricing agreement between the Parties (the "Price"). If no price is included in the PO or contained in a separate pricing agreement, then the Price shall be the price set out in Seller's published price list in force as of the date of the PO. Unless otherwise specified in the PO, the Price includes all packaging, transportation costs to the Delivery Location, insurance, customs duties and fees and applicable taxes, including, but not limited to, all sales, use or excise taxes. No increase in the Price is effective, whether due to increased material, labor or transportation costs or otherwise, without the prior written consent of Buyer.

9. Payment Terms. Seller shall issue an invoice to Buyer on or after the completion of delivery and only in accordance with these Terms. Buyer shall pay all properly invoiced amounts due to Seller within 60 days after Buyer's receipt of such invoice, except for any amounts disputed by Buyer in good faith. All payments hereunder must be in US dollars. Without prejudice to any other right or remedy it may have, Buyer reserves the right to set off at any time any amount owing to it by Seller against any amount payable by Buyer to Seller under this Agreement. In the event of a payment dispute, the parties shall seek to resolve all such disputes expeditiously and in good faith. Seller shall continue performing its obligations under this Agreement notwithstanding any such dispute.

10. Change Orders. Buyer may at any time, by written instructions and/or drawings issued to Seller (each a "Change Order"), order changes to the Product or its Specifications. Seller shall within ten (10) days of receipt of a Change Order submit to Buyer a firm cost proposal for the Change Order; if Seller fails to respond within such ten (10) days then Seller is deemed to have accepted the change order without changes to pricing and Seller shall promptly proceed with the changes. If Buyer accepts such cost proposal, Seller shall proceed with the changed Products subject to the cost proposal and the Terms and Specifications. If Buyer does not accept the cost proposal, then the Parties shall exert good faith efforts to resolve, with Buyer having the right to terminate any PO and/or the Agreement upon notice to Seller.

11. Samples and Quality Assurance. (a) Seller shall submit, free of any charges to Buyer, such samples of the Product as Buyer may reasonably require, so that Buyer may assure itself that the Product is being packed and processed in accordance with the Specifications. Buyer shall be entitled to one case of samples per lot. Buyer shall notify Seller within ten (10) business days of receiving the samples for evaluation if, in Buyer's view, any Product does not conform to its particular Specifications. Should Buyer reject any Product or samples as not conforming to the Specifications, Buyer shall provide samples of the rejected Product to Seller for its inspection. If Seller disputes Buyer's judgment as to whether the particular Product conforms to the Specifications, the matter in dispute will be resolved by submitting a sample of such Product for analysis to a mutually agreed independent third party certified laboratory. The findings of such third party shall be final and binding on the parties, and the party whose opinion does not prevail shall bear the cost of the independent evaluation and report.
(b) Seller will provide Buyer with a Certificate of Analysis for each batch of Product with the shipment. Seller's Certificate of Analysis will provide results for such tests or other requirements Buyer specifies as necessary to show compliance with the applicable Product Specifications and all applicable laws and regulations.
(c) In response to Buyer's request, Seller shall promptly (as soon as possible) based upon the type of information needed and the situation necessitating the request, and in no event longer than two business days, provide Buyer with accurate and comprehensive information about the Products, including (without limitation) information related to nutritional content, allergens, and specification targets. Seller hereby (i) warrants and represents that said information shall be complete and accurate and that Seller shall promptly and proactively notify Buyer if updates to said information become necessary, (ii) acknowledges and expressly permits Buyer to share the information with those of its customers who require/request it as part of their supplier qualification process; (iii) acknowledges that Buyer (and its customers) will rely upon such information, and (iv) agrees that Buyer may cancel any PO's (without liability to Buyer) should Seller fail to promptly provide such information and updates.
(d) Seller shall register, or ensure its suppliers register, all facilities used to manufacture, process, pack, and/or hold the Products with the United States Food and Drug Administration ("FDA") and will maintain all other licenses and registrations required by other federal, state or local regulatory bodies. Upon request, Seller will provide Buyer with the FDA facility registration numbers for all foreign or domestic facilities that are or will be used to manufacture, process, pack or hold the Products.
(e) Seller shall perform such auditing and verification activities of its suppliers as are necessary to (i) ensure Products it supplies are of a consistently high quality and not adulterated or misbranded under United States law; (ii) comply with Seller's obligations under the U.S. FDA Food Safety Modernization Act; and (iii) ensure compliance with all other international or domestic laws.
(f) If any portion of the facilities used to manufacture, process, pack or hold Product, including the facilities utilized by Seller's suppliers, are in an unsanitary condition or do not otherwise comply with the applicable Product Specifications, all laws, or with the other terms and conditions of this Agreement, Seller will promptly take such action as will correct the deficiencies and bring such processes, inventories and/or equipment into compliance with the Product Specifications, all laws, and with the terms and conditions of this Agreement.
(g) Seller shall immediately notify Buyer and provide Buyer with all documents relating to any non-routine inquiry, investigation, inspection, revocation or suspension of license or

registration, recall, detention of goods, or any other action by any governmental body or agency regarding quality, safety, labeling, marketing or distribution of the Products (including, without limitation, any FDA Form 483 or similar forms). If Seller becomes aware of any information regarding the Products that may indicate that the Products are adulterated or misbranded or otherwise indicate a potential quality, safety or labeling defect or error, Seller shall notify Buyer immediately by personal contact with Buyer's quality control representative and its account representative in addition to any notification required by applicable law. Seller shall consult with Buyer regarding any evaluation and decision to place the Product on HOLD, the process to retrieve such Products or the decision to report to any governmental body or regulatory agency or to recall Products that so indicate a potential quality, safety or labeling defect or error.

(h) Seller shall have a system in place to enable Seller to trace promptly, but in all cases within twenty-four (24) hours of Buyer's request, the entire history of a particular lot of Product while in Seller's control, including but not limited to records pertaining to all raw materials, ingredients, packaging materials, manufacturing processes and procedures, packaging, storing, shipment and delivery.

(i) Seller shall provide Buyer with a copy of continuing product guarantees and warranties on an as-requested basis. Such continuing product guarantees and warranties act to supplement, but do not limit, the representations and warranties, and terms of this Agreement.

**12. Warranties.** (a) From and after the Delivery Date, Seller warrants to Buyer that all Products will:

(i) not be adulterated or misbranded, as those terms are defined by the U.S. Federal Food, Drug and Cosmetic Act ("FFDCA");

(ii) be free from any defects in workmanship, material and design;

(iii) conform to applicable Specifications, drawings, designs, samples and other requirements specified by Buyer;

(iv) be fit for their intended purpose and operate as intended;

(v) be merchantable;

(vi) be free and clear of all liens, security interests or other encumbrances; not infringe or misappropriate any third party's patent or other intellectual property rights; comply with Buyer's Specifications for the Products; comply with all applicable laws and regulations, including but not limited to the FFDCA, and all amendments, supplements and regulations promulgated thereunder, the U.S. Food Safety Modernization Act and all amendments, supplements and regulations promulgated thereunder, the U.S. Federal Hazardous Substances Act, and all amendments, supplements and regulations promulgated thereunder, all state laws applicable to food products, and California's Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65); and

(vii) be produced in accordance with current Good Manufacturing Practices ("cGMPs"), and other governing industry regulations, guidance and standards.

(viii) These warranties survive any delivery, inspection, acceptance or payment of or for Product by Buyer.

(b) If applicable, Seller warrants to Buyer that it shall perform services contemplated by under this Agreement using personnel of required skill, experience and qualifications and in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services and shall devote adequate resources to meet its obligations under this Agreement.

**13. Employment and Affirmative Action Obligations. The parties hereby incorporate the requirements of 41 C.F.R. □□ 60-1.4(a)(1)-(7) and 29 CFR Part 471, Appendix A to Subpart A, if applicable. In addition, this contractor and subcontractor shall abide by the requirements of 41 CFR 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status.**

14. General Indemnification. Seller shall defend, indemnify and hold harmless Buyer and Buyer's parent company, its subsidiaries, affiliates, successors or assigns and its respective directors, officers, shareholders, agents, contractors, consultants, and employees (collectively, "Indemnitees") from and against any and all loss, injury, death, damage, liability, claim, deficiency, action, judgment, interest, award, penalty, fine, cost or expense, including reasonable attorney and professional fees and costs, and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers (collectively, "Losses") arising out of or occurring in connection with (a) the Product purchased from Seller or (b) Seller's negligence, willful misconduct or breach of the Terms. Seller shall not enter into any settlement without Buyer's prior written consent.

15. Ownership, Proprietary Rights. Seller and Buyer agree that each party shall own and will continue to own all intellectual property rights that such party owned or held prior to these Terms becoming effective. Seller hereby grants to Buyer a perpetual, worldwide license to use and practice any intellectual property rights in the Products and any intellectual property that is otherwise provided by Seller under this Agreement, and to sell, offer for sale, make, have made, import, export and use merchandise containing Products. Seller shall not sell or otherwise provide Products developed specially for Buyer to any of its customers for use in the same type of application that Buyer is using such Product without first obtaining prior written consent from Buyer.

16. Intellectual Property Indemnification. Seller shall, at its expense, defend, indemnify and hold harmless Buyer and any Indemnitee against any and all Losses arising out of or in connection with any claim that Buyer's or Indemnitee's use or possession of the Product infringes or misappropriates the patent, copyright,trade secret or other intellectual property

right of any third party. In no event shall Seller enter into any settlement without Buyer's or Indemnitee's prior written consent.

17. Termination. In addition to any remedies that may be provided under these Terms, Buyer may terminate this Agreement with immediate effect upon written notice to Seller before or after the acceptance of the Product, if Seller has not performed or complied with these Terms, in whole or in part. If Seller becomes insolvent, files a petition for bankruptcy or commences or has commenced against it proceedings relating to bankruptcy, receivership, reorganization or assignment for the benefit of creditors, then Buyer may terminate this Agreement upon written notice to Seller to the extent permitted by law. If Buyer terminates the Agreement for any reason, Seller's sole and exclusive remedy is payment for the Products received and accepted and services accepted by Buyer prior to the termination.

18. Confidentiality. All non-public, confidential or proprietary information of Buyer, including but not limited to, Specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, customer lists, supplier lists, pricing, discounts or rebates, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential" in connection with this Agreement is confidential, is provided solely for the purpose of performing this Agreement and may not be disclosed or copied unless authorized in advance by Buyer in writing. Upon Buyer's request, Seller shall promptly return or destroy all documents and other materials received from Buyer. Buyer shall be entitled to injunctive relief for any violation of this Section. This Section does not apply to information that is: (a) in the public domain; (b) known to Seller at the time of disclosure by Buyer or its representatives; or (c) rightfully obtained by Seller on a non-confidential basis from a third party.

19. Insurance. Seller shall maintain, and cause its subcontractors to maintain at their expense, sufficient insurance coverage with generally acceptable insurers. Such insurance shall include contractual liability coverage, name Buyer as additional insured on all policies where applicable in connection with Sellers' performance of the PO, contain no material exclusions, and include a provision that waives the insurer's subrogation rights against Buyer.

20. Title and Risk. Unless otherwise stated on the face of the PO, title and risk of loss of the Product shall pass to Buyer, at Buyer's option, (a) upon receipt by Buyer at Buyer's warehouse or facilities, or (b) upon loading of Product onto an approved Buyer carrier.

21. Currency. Unless otherwise stated on the face of the PO, all payments and other financial requirements under this Agreement shall be in the currency of United States Dollar.

22. Waiver. No waiver by Buyer of any of the provisions of this Agreement is effective unless explicitly set forth in writing and signed by Buyer. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement operates, or may be construed, as a waiver thereof. No single or partial exercise of any right, remedy, power or privilege hereunder precludes any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

23. Assignment. Seller shall not assign, transfer, delegate or subcontract any of its rights or obligations under this Agreement without the prior written consent of Buyer. Any purported assignment or delegation in violation of this Section shall be null and void. No assignment or delegation shall relieve the Seller of any of its obligations hereunder.

24. Relationship of the Parties. The relationship between the Parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the Parties, and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever.

25. No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

26. Severability. If any term of this Agreement shall be held to be unenforceable, then the remainder shall not be affected thereby, and shall be valid and enforceable to the fullest extent permitted by law.

27. Notices. All notices, consents, claims, demands, waivers and other required communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth on the face of the PO or to such other address that may be designated by the receiving party in writing. A copy of any Notice provided under this Agreement to Buyer shall also be sent via email to legal@sunopta.com. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), email (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) upon receipt of the receiving party, and (b) if the party giving the Notice has complied with the requirements of this Section.

28. Code of Conduct. This Agreement shall be subject to and Seller shall adhere to Buyer's Code of Conduct, available at http://www.sunopta.com/files/sunopta_supplier_partner_code_of_conduct.pdf as amended from time to time.

29. Governing Law. This Agreement shall be interpreted and construed in accordance with Minnesota law. Seller consents to the jurisdiction of Minnesota courts.

30. Governing Terms. In the event of a conflict or inconsistency between the provisions of these Terms and any non-preprinted term on the PO, the provisions of the non-preprinted terms on the PO shall prevail. In the event of a conflict or inconsistency between the provisions of this Agreement and any Definitive Agreement, the provisions of the Definitive Agreement shall prevail.



| Type | **Standard Purchase Order** |
|---|---|
| Order | **3400652** |
| Revision | **0** |
| Order Date | **23-JUN-2021** |
| Created By | **REGALADO, JUAN** |
| Telephone | |
| Fax | |
| Revision Date | |
| Current Buyer | |

Supplier:   **PIPELINE FOODS LLC**
**3824 SW 93RD ST**
**HOPE, MN 56046**
**UNITED STATES**

Ship To:   **555 Mariposa Road**
**Modesto, CA 95354**
**UNITED STATES**

Bill To:   **7301 Ohms Lane, Suite 600**
**Edina, MN 55439**
**UNITED STATES**

E-Mail:   **shared.services@sunopta.com**

| Customer Account No. | Supplier No. | Payment Terms | Freight Terms | FOB | Transportation | Ship Via |
|---|---|---|---|---|---|---|
| | **21604** | **NET 30** | **Free On Board** | **Origin** | | |
| Confirm To/Telephone | | | | Requester/Deliver To | | |
| **RAQUEL, HANSEN 507686-0707** | | | | | | |

*Notes:*   All dates referenced in this document are in GMT-6 America/Chicago
 Your invoice must contain this Oracle PO number in order for us to process payment.
All prices and amounts on this order are expressed in USD
Our preference is that you email your invoice to shared.services@sunopta.com.
SunOpta Foods Inc. General Terms and Conditions of Purchase, a copy of which is attached, shall be
incorporated and apply to this purchase order.

| Line | Part Number / Description | Delivery Date/Time | Quantity | UOM | Unit Price (USD) | Tax Amount (USD) | Amount (USD) |
|---|---|---|---|---|---|---|---|
| 2 | 1055572<br><br>SOYBEAN CRACKED DEHULLED CONV 2000LB TOTE | Needed:<br>14-JUL-2021 02:00:00 | 42900 | Pound | .2808 | 0.00 | 12,047.75 |
| | | | | | | Subtotal: | 12,047.75 |
| | | | | | | Tax: | 0.00 |
| | | | | | | Total: | **12,047.75  (USD)** |

**SunOpta Foods Inc.**
**General Terms and Conditions of Purchase**

These General Terms and Conditions of Purchase ("Terms") apply to all offers made and tenders submitted to SunOpta Foods Inc., a Delaware corporation and any of its subsidiaries listed on the face of an attached purchase order ("SunOpta") and to all agreements to which SunOpta is a party as a buyer/commissioning party, except to the extent separately negotiated terms and conditions of purchase have been adopted by both parties in a written agreement to govern such offers made and tenders submitted ("Definitive Agreement").

1. Definitions. "Buyer" means SunOpta. "Seller" means the person, firm, or other business entity indicated on the face of the Purchase Order ("PO")..

2. Offer and Acceptance. The PO is an offer by the Buyer or its designated affiliate to enter into the agreement it describes, including, without limitation, to purchase the materials, goods or services (collectively, the "Product") identified in such PO. Seller will be deemed to have accepted Buyer's offer and the PO is in entirety without modification, upon the earliest of (i) Seller's acceptance via a formal written acknowledgement to the Buyer, (ii) Seller's delivery of any Product that is the subject of the PO or (iii) any other conduct by Seller that recognizes the existence of the PO, including, but without limitation, preparation for the commencement of any of the work stated in the PO. Acceptance is expressly subject to these Terms and such other terms expressly referenced on the face of the PO (collectively, the "Agreement"). Any addition or modification proposed by Seller are expressly rejected by Buyer and are not part of this Agreement in the absence of an agreement in writing signed by an authorized representative of Buyer. By selling any Product to Buyer, Seller agrees to be bound by this Agreement.

3. Purchase. Subject hereto, Buyer agrees to purchase from Seller and Seller agrees to provide to Buyer the Product identified in the PO, which such Product shall conform to all current specifications, standards, drawings, samples and requirements of Buyer, including, without limitation those described in the PO and those pertaining to quantity, scope, dates for delivery and performance, and remaining shelf life (all such specifications and requirements "Specifications") provided by Buyer. Seller shall be prohibited from making any changes to its sourcing, processors, ingredient suppliers, or Specifications of the Product without first notifying Buyer and obtaining Buyer's written consent.

4. Order Procedure.
(a) Seller shall deliver the Product in the quantities and on the date(s) specified in the PO or as otherwise agreed in writing by the parties (the "Delivery Date"). If Seller fails to deliver the Product in full on the Delivery Date, Buyer may terminate this Agreement immediately by providing written notice to Seller, and Seller shall indemnify Buyer against any losses, claims, damages, and reasonable costs and expenses directly attributable to Seller's failure to deliver the Products on the Delivery Date. Buyer has the right to return any Product delivered prior to the Delivery Date at Seller's expense, and Seller shall redeliver such Product on the Delivery Date.
(b) Seller shall deliver all Product to the address specified in the PO (the "Delivery Point") during Buyer's normal business hours or as otherwise instructed by Buyer. Seller shall pack all goods for shipment according to Buyer's instructions or, if there are no instructions, in a manner sufficient to ensure that the Product is delivered in undamaged condition. Seller must provide Buyer prior written notice if it requires Buyer to return any packaging material. Any return of such packaging material shall be made at Seller's risk of loss and expense.
(c) Seller acknowledges that time is of the essence with respect to Seller's obligations hereunder and the timely delivery of the Product.

5. Quantity. If Seller delivers more than 5% of the quantity of Product ordered or less than the quantity of the Product ordered, Buyer may, at its election, reject all or any of the Product. Any such rejected Product shall be returned to Seller at Seller's sole risk and expense. If Buyer does not reject the Product and instead accepts the delivery of Product at the increased or reduced quantity, the Price for the Products shall be adjusted on a pro-rata basis.

6. Shipping Terms. Except as otherwise specifically provided in a PO, shipment of domestic Product shall be pursuant to DAP Incoterms 2010 and shipment of international Product shall be pursuant to DDP Incoterms 2010. The PO number must appear on all shipping documents, shipping labels, invoices, and correspondence pertaining to the PO. The Bill of Lading (BOL) and Certificate of Analysis shall accompany any shipment and a copy of both documents shall be provided to the appropriate person within Buyer's organization within twenty four (24) hours. Title and Risk will transfer to Buyer upon delivery of the Product at the Delivery Point. All shipments are to adhere to the following requirements: (a) appropriate temperature control during transport where required; (b) Monitor and maintain sanitary condition of transportation vehicles, including pest control; (c) Monitor and manage shipping to prevent cross contamination or hauling with hazardous materials; (d) Perform and maintain proper tanker wash records where applicable; (e) Ensure driver training and knowledge of food handling safety and security; (f) Perform preventative maintenance to prevent leaks, door gaps, and condensation; (g) Maintain good employee hygiene; and (h) Employ proper secure transport methods, including security seals of full loads and locks on LTL shipments. Sealing trailers of full loads must be completed by Seller prior to shipment with corresponding seal number printed on the BOL. Failure to do so may result in full or partial rejection of the shipment. Any changes or additions to current FDA guidelines must also be followed.

7. Inspection and Rejection of Nonconforming Product. Buyer has the right to inspect the Product on or after the Delivery Date. Buyer, at its sole option, may inspect all or a sample of the Product, and may reject all or any portion of the Product if it determines the Product is nonconforming or defective or if it has been delivered with a sufficient shelf life remaining. If Buyer rejects any portion of the Product, Buyer has the right, effective upon written notice to Seller, to: (a) rescind this Agreement in its entirety; (b) accept the Product at a reasonably reduced price; or (c) reject the Product and require replacement of the rejected Product. If Buyer requires replacement of the Product, Seller shall, at its expense, promptly replace the nonconforming or defective Product and pay for all related expenses, including, but not limited to,transportation charges for the return of the defective Product and the delivery of replacement Product. If Seller fails to timely deliver replacement Product, Buyer may replace them with goods from a third party and charge Seller the cost thereof and terminate this Agreement. Any inspection or other action by Buyer under this Section shall not reduce or

otherwise affect Seller's obligations under the Agreement, and Buyer shall have the right to conduct further inspections after Seller has carried out its remedial actions.

8. Price. The price of the Product is the price stated in the PO, or, if applicable, the price set forth in a written pricing agreement between the Parties (the "Price"). If no price is included in the PO or contained in a separate pricing agreement, then the Price shall be the price set out in Seller's published price list in force as of the date of the PO. Unless otherwise specified in the PO, the Price includes all packaging, transportation costs to the Delivery Location, insurance, customs duties and fees and applicable taxes, including, but not limited to, all sales, use or excise taxes. No increase in the Price is effective, whether due to increased material, labor or transportation costs or otherwise, without the prior written consent of Buyer.

9. Payment Terms. Seller shall issue an invoice to Buyer on or after the completion of delivery and only in accordance with these Terms. Buyer shall pay all properly invoiced amounts due to Seller within 60 days after Buyer's receipt of such invoice, except for any amounts disputed by Buyer in good faith. All payments hereunder must be in US dollars. Without prejudice to any other right or remedy it may have, Buyer reserves the right to set off at any time any amount owing to it by Seller against any amount payable by Buyer to Seller under this Agreement. In the event of a payment dispute, the parties shall seek to resolve all such disputes expeditiously and in good faith. Seller shall continue performing its obligations under this Agreement notwithstanding any such dispute.

10. Change Orders. Buyer may at any time, by written instructions and/or drawings issued to Seller (each a "Change Order"), order changes to the Product or its Specifications. Seller shall within ten (10) days of receipt of a Change Order submit to Buyer a firm cost proposal for the Change Order; if Seller fails to respond within such ten (10) days then Seller is deemed to have accepted the change order without changes to pricing and Seller shall promptly proceed with the changes. If Buyer accepts such cost proposal, Seller shall proceed with the changed Products subject to the cost proposal and the Terms and Specifications. If Buyer does not accept the cost proposal, then the Parties shall exert good faith efforts to resolve, with Buyer having the right to terminate any PO and/or the Agreement upon notice to Seller.

11. Samples and Quality Assurance. (a) Seller shall submit, free of any charges to Buyer, such samples of the Product as Buyer may reasonably require, so that Buyer may assure itself that the Product is being packed and processed in accordance with the Specifications. Buyer shall be entitled to one case of samples per lot. Buyer shall notify Seller within ten (10) business days of receiving the samples for evaluation if, in Buyer's view, any Product does not conform to its particular Specifications. Should Buyer reject any Product or samples as not conforming to the Specifications, Buyer shall provide samples of the rejected Product to Seller for its inspection. If Seller disputes Buyer's judgment as to whether the particular Product conforms to the Specifications, the matter in dispute will be resolved by submitting a sample of such Product for analysis to a mutually agreed independent third party certified laboratory. The findings of such third party shall be final and binding on the parties, and the party whose opinion does not prevail shall bear the cost of the independent evaluation and report.
(b) Seller will provide Buyer with a Certificate of Analysis for each batch of Product with the shipment. Seller's Certificate of Analysis will provide results for such tests or other requirements Buyer specifies as necessary to show compliance with the applicable Product Specifications and all applicable laws and regulations.
(c) In response to Buyer's request, Seller shall promptly (as soon as possible) based upon the type of information needed and the situation necessitating the request, and in no event longer than two business days, provide Buyer with accurate and comprehensive information about the Products, including, (without limitation) information related to nutritional content, allergens, and specification targets. Seller hereby (i) warrants and represents that said information shall be complete and accurate and that Seller shall promptly and proactively notify Buyer if updates to said information become necessary, (ii) acknowledges and expressly permits Buyer to share the information with those of its customers who require/request it as part of their supplier qualification process; (iii) acknowledges that Buyer (and its customers) will rely upon such information, and (iv) agrees that Buyer may cancel any PO's (without liability to Buyer) should Seller fail to promptly provide such information and updates.
(d) Seller shall register, or ensure its suppliers register, all facilities used to manufacture, process, pack, and/or hold the Products with the United States Food and Drug Administration ("FDA") and will maintain all other licenses and registrations required by other federal, state or local regulatory bodies. Upon request, Seller will provide Buyer with the FDA facility registration numbers for all foreign or domestic facilities that are or will be used to manufacture, process, pack or hold the Products.
(e) Seller shall perform such auditing and verification activities of its suppliers as are necessary to (i) ensure Products it supplies are of a consistently high quality and not adulterated or misbranded under United States law; (ii) comply with Seller's obligations under the U.S. FDA Food Safety Modernization Act; and (iii) ensure compliance with all other international or domestic laws.
(f) If any portion of the facilities used to manufacture, process, pack or hold Product, including the facilities utilized by Seller's suppliers, are in an unsanitary condition or do not otherwise comply with the applicable Product Specifications, all laws, or with the other terms and conditions of this Agreement, Seller will promptly take such action as will correct the deficiencies and bring such processes, inventories and/or equipment into compliance with the Product Specifications, all laws, and with the terms and conditions of this Agreement.
(g) Seller shall immediately notify Buyer and provide Buyer with all documents relating to any non-routine inquiry, investigation, inspection, revocation or suspension of license or

registration, recall, detention of goods, or any other action by any governmental body or agency regarding quality, safety, labeling, marketing or distribution of the Products (including, without limitation, any FDA Form 483 or similar forms). If Seller becomes aware of any information regarding the Products that may indicate that the Products are adulterated or misbranded or otherwise indicate a potential quality, safety or labeling defect or error, Seller shall notify Buyer immediately by personal contact with Buyer's quality control representative and its account representative in addition to any notification required by applicable law. Seller shall consult with Buyer regarding any evaluation and decision to place the Product on HOLD, the process to retrieve such Products or the decision to report to any governmental body or regulatory agency or to recall Products due to suspected quality, safety or labeling defect or error.

(h) Seller shall have a system in place to enable Seller to trace promptly, but in all cases within twenty-four (24) hours of Buyer's request, the entire history of a particular lot of Product while in Seller's control, including but not limited to records pertaining to all raw materials, ingredients, packaging materials, manufacturing processes and procedures, packaging, storing, shipment and delivery.

(i) Seller shall provide Buyer with a copy of continuing product guarantees and warranties on an as-requested basis. Such continuing product guarantees and warranties act to supplement, but do not limit, the representations and warranties, and terms of this Agreement.

12. Warranties. (a) From and after the Delivery Date, Seller warrants to Buyer that all Products will:

(i) not be adulterated or misbranded, as those terms are defined by the U.S. Federal Food, Drug and Cosmetic Act ("FFDCA");

(ii) be free from any defects in workmanship, material and design;

(iii) conform to applicable Specifications, drawings, designs, samples and other requirements specified by Buyer;

(iv) be fit for their intended purpose and operate as intended;

(v) be merchantable;

(vi) be free and clear of all liens, security interests or other encumbrances; not infringe or misappropriate any third party's patent or other intellectual property rights; comply with Buyer's Specifications for the Products; comply with all applicable laws and regulations, including but not limited to the FFDCA, and all amendments, supplements and regulations promulgated thereunder, the U.S. Food Safety Modernization Act and all amendments, supplements and regulations promulgated thereunder, the U.S. Federal Hazardous Substances Act, and all amendments, supplements and regulations promulgated thereunder, all state laws applicable to food products, and California's Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65); and

(vii) be produced in accordance with current Good Manufacturing Practices ("cGMPs"), and other governing industry regulations, guidance and standards.

(viii) These warranties survive any delivery, inspection, acceptance or payment of or for Product by Buyer.

(b) If applicable, Seller warrants to Buyer that it shall perform services contemplated by under this Agreement using personnel of required skill, experience and qualifications and in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services and shall devote adequate resources to meet its obligations under this Agreement.

**13. Employment and Affirmative Action Obligations. The parties hereby incorporate the requirements of 41 C.F.R. □□ 60-1.4(a)(1)-(7) and 29 CFR Part 471, Appendix A to Subpart A, if applicable. In addition, this contractor and subcontractor shall abide by the requirements of 41 CFR 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status.**

14. General Indemnification. Seller shall defend, indemnify and hold harmless Buyer and Buyer's parent company, its subsidiaries, affiliates, successors or assigns and its respective directors, officers, shareholders, agents, contractors, consultants, and employees (collectively, "Indemnitees") from and against any and all loss, injury, death, damage, liability, claim, deficiency, action, judgment, interest, award, penalty, fine, cost or expense, including reasonable attorney and professional fees and costs, and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers (collectively, "Losses") arising out of or occurring in connection with (a) the Product purchased from Seller or (b) Seller's negligence, willful misconduct or breach of the Terms. Seller shall not enter into any settlement without Buyer's prior written consent.

15. Ownership, Proprietary Rights. Seller and Buyer agree that each party will continue to own all intellectual property rights that such party owned or held prior to these Terms becoming effective. Seller hereby grants to Buyer a perpetual, worldwide license to use and practice any intellectual property rights in the Products and any intellectual property that is otherwise provided by Seller under this Agreement, and to sell, offer for sale, make, have made, import, export and use merchandise containing Products. Seller shall not sell or otherwise provide Products developed specially for Buyer to any of its customers for use in the same type of application that Buyer is using such Product without first obtaining prior written consent from Buyer.

16. Intellectual Property Indemnification. Seller shall, at its expense, defend, indemnify and hold harmless Buyer and an Indemnitee against any and all Losses arising out of or in connection with any claim that Buyer's or Indemnitee's use or possession of the Product infringes or misappropriates the patent, copyright,trade secret or other intellectual property

right of any third party. In no event shall Seller enter into any settlement without Buyer's or Indemnitee's prior written consent.

17. Termination. In addition to any remedies that may be provided under these Terms, Buyer may terminate this Agreement with immediate effect upon written notice to Seller before or after the acceptance of the Product, if Seller has not performed or complied with these Terms, in whole or in part. If Seller becomes insolvent, files a petition for bankruptcy or commences or has commenced against it proceedings relating to bankruptcy, receivership, reorganization or assignment for the benefit of creditors, then Buyer may terminate this Agreement upon written notice to Seller to the extent permitted by law. If Buyer terminates the Agreement for any reason, Seller's sole and exclusive remedy is payment for the Products received and accepted and services accepted by Buyer prior to the termination.

18. Confidentiality. All non-public, confidential or proprietary information of Buyer, including but not limited to, Specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, customer lists, supplier lists, pricing, discounts or rebates, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential" in connection with this Agreement is confidential, is provided solely for the purpose of performing this Agreement and may not be disclosed or copied unless authorized in advance by Buyer in writing. Upon Buyer's request, Seller shall promptly return or destroy all documents and other materials received from Buyer. Buyer shall be entitled to injunctive relief for any violation of this Section. This Section does not apply to information that is: (a) in the public domain; (b) known to Seller at the time of disclosure by Buyer or its representatives; or (c) rightfully obtained by Seller on a non-confidential basis from a third party.

19. Insurance. Seller shall maintain, and cause its subcontractors to maintain at their expense, sufficient insurance coverage with generally acceptable insurers. Such insurance shall include contractual liability coverage, name Buyer as additional insured on all policies where applicable in connection with Sellers' performance of the PO, contain no material exclusions, and include a provision that waives the insurer's subrogation rights against Buyer.

20. Title and Risk. Unless otherwise stated on the face of the PO, title and risk of loss of the Product shall pass to Buyer, at Buyer's option, (a) upon receipt by Buyer at Buyer's warehouse or facilities, or (b) upon loading of Product onto an approved Buyer carrier.

21. Currency. Unless otherwise stated on the face of the PO, all payments and other financial requirements under this Agreement shall be in the currency of United States Dollar.

22. Waiver. No waiver by Buyer of any of the provisions of this Agreement is effective unless explicitly set forth in writing and signed by Buyer. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement operates, or may be construed, as a waiver thereof. No single or partial exercise of any right, remedy, power or privilege hereunder precludes any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

23. Assignment. Seller shall not assign, transfer, delegate or subcontract any of its rights or obligations under this Agreement without the prior written consent of Buyer. Any purported assignment or delegation in violation of this Section shall be null and void. No assignment or delegation shall relieve the Seller of any of its obligations hereunder.

24. Relationship of the Parties. The relationship between the Parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the Parties, and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever.

25. No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

26. Severability. If any term of this Agreement shall be held to be unenforceable, then the remainder shall not be affected thereby, and shall be valid and enforceable to the fullest extent permitted by law.

27. Notices. All notices, consents, claims, demands, waivers and other required communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth on the face of the PO or to such other address that may be designated by the receiving party in writing. A copy of any Notice provided under this Agreement to Buyer shall also be sent via email to legal@sunopta.com. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), email (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) upon receipt of the receiving party, and (b) if the party giving the Notice has complied with the requirements of this Section.

28. Code of Conduct. This Agreement shall be subject to and Seller shall adhere to Buyer's Code of Conduct, available at http://www.sunopta.com/files/sunopta_supplier_partner_code_of_conduct.pdf as amended from time to time.

29. Governing Law. This Agreement shall be interpreted and construed in accordance with Minnesota law. Seller consents to the jurisdiction of Minnesota courts.

30. Governing Terms. In the event of a conflict or inconsistency between the provisions of these Terms and any non-preprinted term on the PO, the provisions of the non-preprinted terms on the PO shall prevail. In the event of a conflict or inconsistency between the provisions of this Agreement and any Definitive Agreement, the provisions of the Definitive Agreement shall prevail.

Standard Purchase Order 3400653, 0



| | |
|---|---|
| Type | **Standard Purchase Order** |
| Order | **3400653** |
| Revision | **0** |
| Order Date | **23-JUN-2021** |
| Created By | **REGALADO, JUAN** |
| Telephone | |
| Fax | |
| Revision Date | |
| Current Buyer | |

Supplier:   **PIPELINE FOODS LLC**
**3824 SW 93RD ST**
**HOPE, MN 56046**
**UNITED STATES**

Ship To:   **555 Mariposa Road**
**Modesto, CA 95354**
**UNITED STATES**

Bill To:   **7301 Ohms Lane, Suite 600**
**Edina, MN 55439**
**UNITED STATES**

E-Mail:   **shared.services@sunopta.com**

| Customer Account No. | Supplier No. | Payment Terms | Freight Terms | FOB | Transportation | Ship Via |
|---|---|---|---|---|---|---|
| | **21604** | **NET 30** | **Free On Board** | **Origin** | | |

| Confirm To/Telephone | Requester/Deliver To |
|---|---|
| **RAQUEL, HANSEN 507686-0707** | |

*Notes:*    All dates referenced in this document are in GMT-6 America/Chicago
Your invoice must contain this Oracle PO number in order for us to process payment.
All prices and amounts on this order are expressed in USD
Our preference is that you email your invoice to shared.services@sunopta.com.
SunOpta Foods Inc. General Terms and Conditions of Purchase, a copy of which is attached, shall be
incorporated and apply to this purchase order.

| Line | Part Number / Description | Delivery Date/Time | Quantity | UOM | Unit Price (USD) | Tax Amount (USD) | Amount (USD) |
|---|---|---|---|---|---|---|---|
| 2 | 1055572 | Needed: 14-JUL-2021 02:00:00 | 42900 | Pound | .2808 | 0.00 | 12,047.75 |
| | SOYBEAN CRACKED DEHULLED CONV 2000LB TOTE | | | | | | |

|  |  |
|---|---|
| | Subtotal: 12,047.75 |
| | Tax: 0.00 |
| | Total: **12,047.75  (USD)** |

**SunOpta Foods Inc.**
**General Terms and Conditions of Purchase**

These General Terms and Conditions of Purchase ("Terms") apply to all offers made and tenders submitted to SunOpta Foods Inc., a Delaware corporation and any of its subsidiaries listed on the face of an attached purchase order ("SunOpta") and to all agreements to which SunOpta is a party as a buyer/commissioning party, except to the extent separately negotiated terms and conditions of purchase have been adopted by both parties in a written agreement to govern such offers made and tenders submitted ("Definitive Agreement").

1. Definitions.  "Buyer" means SunOpta. "Seller" means the person, firm, or other business entity indicated on the face of the Purchase Order ("PO")..

2. Offer and Acceptance. The PO is an offer by the Buyer or its designated affiliate to enter into the agreement it describes, including, without limitation, to purchase the materials, goods or services (collectively, the "Product") identified in such PO. Seller will be deemed to have accepted Buyer's offer and the PO is in its entirety without modification, upon the earliest of (i) Seller's acceptance via a formal written acknowledgement to the Buyer, (ii) Seller's delivery of any Product that is the subject of the PO or (iii) any other conduct by Seller that recognizes the existence of the PO, including, but without limitation, preparation for the commencement of any of the work stated in the PO. Acceptance is expressly subject to these Terms and such other terms as are expressly referenced on the face of the PO (collectively, the "Agreement"). Any addition or modification proposed by Seller are expressly rejected by Buyer and are not part of this Agreement in the absence of an agreement in writing signed by an authorized representative of Buyer. By selling any Product to Buyer, Seller agrees to be bound by this Agreement.

3. Purchase. Subject hereto, Buyer agrees to purchase from Seller and Seller agrees to provide to Buyer the Product identified in the PO, which such Product shall conform to all current specifications, standards, drawings, samples and requirements of Buyer, including, without limitation those described in the PO and those pertaining to quantity, scope, dates for delivery and performance, and remaining shelf life (all such specifications and requirements "Specifications") provided by Buyer. Seller shall be prohibited from making any changes to its sourcing, processors, ingredient suppliers, or Specifications of the Product without first notifying Buyer and obtaining Buyer's written consent.

4. Order Procedure.
(a) Seller shall deliver the Product in the quantities and on the date(s) specified in the PO or as otherwise agreed in writing by the parties (the "Delivery Date"). If Seller fails to deliver the Product in full on the Delivery Date, Buyer may terminate this Agreement immediately by providing written notice to Seller, and Seller shall indemnify Buyer against any losses, claims, damages, and reasonable costs and expenses directly attributable to Seller's failure to deliver the Products on the Delivery Date. Buyer has the right to return any Product delivered prior to the Delivery Date at Seller's expense, and Seller shall redeliver such Product on the Delivery Date.
(b) Seller shall deliver all Product to the address specified in the PO (the "Delivery Point") during Buyer's normal business hours or as otherwise instructed by Buyer. Seller shall pack all goods for shipment according to Buyer's instructions or, if there are no instructions, in a manner sufficient to ensure that the Product is delivered in undamaged condition. Seller must provide Buyer prior written notice if it requires Buyer to return any packaging material. Any return of such packaging material shall be made at Seller's risk of loss and expense.
(c) Seller acknowledges that time is of the essence with respect to Seller's obligations hereunder and the timely delivery of the Product.

5. Quantity. If Seller delivers more than 5% of the quantity of Product ordered or less than the quantity of the Product ordered, Buyer may, at its election, reject all or any of the Product. Any such rejected Product shall be returned to Seller at Seller's sole risk and expense. If Buyer does not reject the Product and instead accepts the delivery of Product at the increased or reduced quantity, the Price for the Products shall be adjusted on a pro-rata basis.

6. Shipping Terms. Except as otherwise specifically provided in a PO, shipment of domestic Product shall be pursuant to DAP Incoterms 2010 and shipment of international Product shall be pursuant to DDP Incoterms 2010. The PO number must appear on all shipping documents, shipping labels, invoices, and correspondence pertaining to the PO. The Bill of Lading (BOL) and Certificate of Analysis shall accompany any shipment and a copy of both documents shall be provided to the appropriate person within Buyer's organization within twenty four (24) hours. Title and Risk will transfer to Buyer upon delivery of the Product at the Delivery Point. All shipments are to adhere to the following requirements: (a) appropriate temperature control during transport where required; (b) Monitor and maintain sanitary condition of transportation vehicles, including pest control; (c) Monitor and manage shipping to prevent cross contamination or hauling with hazardous materials; (d) Perform and maintain proper tanker wash records where applicable; (e) Ensure driver training and knowledge of food handling safety and security; (f) Perform preventative maintenance to prevent leaks, door gaps, and condensation; (g) Maintain good employee hygiene; and (h) Employ proper secure transport methods, including security seals of full loads and locks on LTL shipments. Sealing trailers of full loads must be completed by Seller prior to shipment with corresponding seal number printed on the BOL. Failure to do so may result in full or partial rejection of the shipment. Any changes or additions to current FDA guidelines must also be followed.

7. Inspection and Rejection of Nonconforming Product. Buyer has the right to inspect the Product on or after the Delivery Date. Buyer may, at its sole option, may inspect all or a sample of the Product, and may reject all or any portion of the Product if it determines the Product is nonconforming or defective or if it has been delivered with a sufficient shelf life remaining. If Buyer rejects any portion of the Product, Buyer has the right, effective upon written notice to Seller, to: (a) rescind this Agreement in its entirety; (b) accept the Product at a reasonably reduced price; or (c) reject the Product and require replacement of the rejected Product. If Buyer requires replacement of the Product, Seller shall, at its expense, promptly replace the nonconforming or defective Product and pay for all related expenses, including, but not limited to,transportation charges for the return of the defective Product and the delivery of replacement Product. If Seller fails to timely deliver replacement Product, Buyer may replace them with goods from a third party and charge Seller the cost thereof and terminate this Agreement. Any inspection or other action by Buyer under this Section shall not reduce or

affect Seller's obligations under the Agreement, and Buyer shall have the right to conduct further inspections after Seller has carried out its remedial actions.

8. Price. The price of the Product is the price stated in the PO, or, if applicable, the price set forth in a written pricing agreement between the Parties (the "Price"). If no price is included in the PO or contained in a separate pricing agreement, then the Price shall be the price set out in Seller's published price list in force as of the date of the PO. Unless otherwise specified in the PO, the Price includes all packaging, transportation costs to the Delivery Location, insurance, customs duties and fees and applicable taxes, including, but not limited to, all sales, use or excise taxes. No increase in the Price is effective, whether due to increased material, labor or transportation costs or otherwise, without the prior written consent of Buyer.

9. Payment Terms. Seller shall issue an invoice to Buyer on or after the completion of delivery and only in accordance with these Terms. Buyer shall pay all properly invoiced amounts due to Seller within 60 days after Buyer's receipt of such invoice, except for any amounts disputed by Buyer in good faith. All payments hereunder must be in US dollars. Without prejudice to any other right or remedy it may have, Buyer reserves the right to set off at any time any amount owing to it by Seller against any amount payable by Buyer to Seller under this Agreement. In the event of a payment dispute, the parties shall seek to resolve all such disputes expeditiously and in good faith. Seller shall continue performing its obligations under this Agreement notwithstanding any such dispute.

10. Change Orders. Buyer may at any time, by written instructions and/or drawings issued to Seller (each a "Change Order"), order changes to the Product or its Specifications. Seller shall within ten (10) days of receipt of a Change Order submit to Buyer a firm cost proposal for the Change Order; if Seller fails to respond within such ten (10) days then Seller is deemed to have accepted the change order without changes to pricing and Seller shall promptly proceed with the changes. If Buyer accepts such cost proposal, Seller shall proceed with the changed Products subject to the cost proposal and the Terms and Specifications. If Buyer does not accept the cost proposal, then the Parties shall exert good faith efforts to resolve, with Buyer having the right to terminate any PO and/or the Agreement upon notice to Seller.

11. Samples and Quality Assurance. (a) Seller shall submit, free of any charges to Buyer, such samples of the Product as Buyer may reasonably require, so that Buyer may assure itself that the Product is being packed and processed in accordance with the Specifications. Buyer shall be entitled to one case of samples per lot. Buyer shall notify Seller within ten (10) business days of receiving the samples for evaluation if, in Buyer's view, any Product does not conform to its particular Specifications. Should Buyer reject any Product or samples as not conforming to the Specifications, Buyer shall provide samples of the rejected Product to Seller for its inspection. If Seller disputes Buyer's judgment as to whether the particular Product conforms to the Specifications, the matter in dispute will be resolved by submitting a sample of such Product for analysis to a mutually agreed upon independent third party certified laboratory. The findings of such third party shall be final and binding on the parties, and the party whose opinion does not prevail shall bear the cost of the independent evaluation and report.
(b) Seller will provide Buyer with a Certificate of Analysis for each batch of Product with the shipment. Seller's Certificate of Analysis will provide results for such tests or other requirements Buyer specifies as necessary to show compliance with the applicable Product Specifications and all applicable laws and regulations.
(c) In response to Buyer's request, Seller shall promptly (as soon as possible) based upon the type of information needed and the situation necessitating the request, and in no event longer than two business days, provide Buyer with accurate and comprehensive information about the Products, including (without limitation) information related to nutritional content, allergens, and specification targets. Seller hereby (i) warrants and represents that said information shall be complete and accurate and that Seller shall promptly and proactively notify Buyer if updates to said information become necessary, (ii) acknowledges and expressly permits Buyer to share the information with those of its customers who require/request it as part of their supplier qualification process; (iii) acknowledges that Buyer (and its customers) will rely upon such information, and (iv) agrees that Buyer may cancel any PO's (without liability to Buyer) should Seller fail to promptly provide such information and updates.
(d) Seller shall register, or ensure its suppliers register, all facilities used to manufacture, process, pack, and/or hold the Products with the United States Food and Drug Administration ("FDA") and will maintain all other licenses and registrations required by other federal, state or local regulatory bodies. Upon request, Seller will provide Buyer with the FDA facility registration numbers for all foreign or domestic facilities that are or will be used to manufacture, process, pack or hold the Products.
(e) Seller shall perform such auditing and verification activities of its suppliers as are necessary to (i) ensure Products it supplies are of a consistently high quality and not adulterated or misbranded under United States law; (ii) comply with Seller's obligations under the U.S. FDA Food Safety Modernization Act; and (iii) ensure compliance with all other international or domestic laws.
(f) If any portion of the facilities used to manufacture, process, pack or hold Product, including the facilities utilized by Seller's suppliers, are in an unsanitary condition or do not otherwise comply with the applicable Product Specifications, all laws, or with the other terms and conditions of this Agreement, Seller will promptly take such action as will correct the deficiencies and bring such processes, inventories and/or equipment into compliance with the Product Specifications, all laws, and with the terms and conditions of this Agreement.
(g) Seller shall immediately notify Buyer and provide Buyer with all documents relating to any non-routine inquiry, investigation, inspection, revocation or suspension of license or

registration, recall, detention of goods, or any other action by any governmental body or agency regarding quality, safety, labeling, marketing or distribution of the Products (including, without limitation, any FDA Form 483 or similar forms). If Seller becomes aware of any information regarding the Products that may indicate that the Products are adulterated or misbranded or otherwise indicate a potential quality, safety or labeling defect or error, Seller shall notify Buyer immediately by personal contact with Buyer's quality control representative and its account representative in addition to any notification required by applicable law. Seller shall consult with Buyer regarding any evaluation and decision to place the Product on HOLD, the process to retrieve such Products or the decision to report to any governmental body or regulatory agency or to recall Products due to suspected quality, safety or labeling defect or error.

(h) Seller shall have a system in place to enable Seller to trace promptly, but in all cases within twenty-four (24) hours of Buyer's request, the entire history of a particular lot of Product while in Seller's control, including but not limited to records pertaining to all raw materials, ingredients, packaging materials, manufacturing processes and procedures, packaging, storing, shipment and delivery.

(i) Seller shall provide Buyer with a copy of continuing product guarantees and warranties on an as-requested basis. Such continuing product guarantees and warranties act to supplement, but do not limit, the representations and warranties, and terms of this Agreement.

12. Warranties. (a) From and after the Delivery Date, Seller warrants to Buyer that all Products will:

(i) not be adulterated or misbranded, as those terms are defined by the U.S. Federal Food, Drug and Cosmetic Act ("FFDCA");

(ii) be free from any defects in workmanship, material and design;

(iii) conform to applicable Specifications, drawings, designs, samples and other requirements specified by Buyer;

(iv) be fit for their intended purpose and operate as intended;

(v) be merchantable;

(vi) be free and clear of all liens, security interests or other encumbrances; not infringe or misappropriate any third party's patent or other intellectual property rights; comply with Buyer's Specifications for the Products; comply with all applicable laws and regulations, including but not limited to the FFDCA, and all amendments, supplements and regulations promulgated thereunder, the U.S. Food Safety Modernization Act and all amendments, supplements and regulations promulgated thereunder, the U.S. Federal Hazardous Substances Act, and all amendments, supplements and regulations promulgated thereunder, all state laws applicable to food products, and California's Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65); and

(vii) be produced in accordance with current Good Manufacturing Practices ("cGMPs"), and other governing industry regulations, guidance and standards.

(viii) These warranties survive any delivery, inspection, acceptance or payment of or for Product by Buyer.

(b) If applicable, Seller warrants to Buyer that it shall perform services contemplated by under this Agreement using personnel of required skill, experience and qualifications and in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services and shall devote adequate resources to meet its obligations under this Agreement.

**13. Employment and Affirmative Action Obligations. The parties hereby incorporate the requirements of 41 C.F.R. □□ 60-1.4(a)(1)-(7) and 29 CFR Part 471, Appendix A to Subpart A, if applicable. In addition, this contractor and subcontractor shall abide by the requirements of 41 CFR 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability or veteran status.**

14. General Indemnification. Seller shall defend, indemnify and hold harmless Buyer and Buyer's parent company, its subsidiaries, affiliates, successors or assigns and its respective directors, officers, shareholders, agents, contractors, consultants, and employees (collectively, "Indemnitees") from and against any and all loss, injury, death, damage, liability, claim, deficiency, action, judgment, interest, award, penalty, fine, cost or expense, including reasonable attorney and professional fees and costs, and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers (collectively, "Losses") arising out of or occurring in connection with (a) the Product purchased from Seller or (b) Seller's negligence, willful misconduct or breach of the Terms. Seller shall not enter into any settlement without Buyer's prior written consent.

15. Ownership, Proprietary Rights. Seller and Buyer agree that each party now and will continue to own all intellectual property rights that such party owned or held prior to these Terms becoming effective. Seller hereby grants to Buyer a perpetual, worldwide license to use and practice any intellectual property rights in the Products and any intellectual property that is otherwise provided by Seller under this Agreement, and to sell, offer for sale, make, have made, import, export and use merchandise containing Products. Seller shall not sell or otherwise provide Products developed specially for Buyer to any of its customers for use in the same type of application that Buyer is using such Product without first obtaining prior written consent from Buyer.

16. Intellectual Property Indemnification. Seller shall, at its expense, defend, indemnify and hold harmless Buyer and any Indemnitee against any and all Losses arising out of or in connection with any claim that Buyer's or Indemnitee's use or possession of the Product infringes or misappropriates the patent, copyright, trade secret or other intellectual property

right of any third party. In no event shall Seller enter into any settlement without Buyer's or Indemnitee's prior written consent.

17. Termination. In addition to any remedies that may be provided under these Terms, Buyer may terminate this Agreement with immediate effect upon written notice to Seller before or after the acceptance of the Product, if Seller has not performed or complied with these Terms, in whole or in part. If Seller becomes insolvent, files a petition for bankruptcy or commences or has commenced against it proceedings relating to bankruptcy, receivership, reorganization or assignment for the benefit of creditors, then Buyer may terminate this Agreement upon written notice to Seller to the extent permitted by law. If Buyer terminates the Agreement for any reason, Seller's sole and exclusive remedy is payment for the Products received and accepted and services accepted by Buyer prior to the termination.

18. Confidentiality. All non-public, confidential or proprietary information of Buyer, including but not limited to, Specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, customer lists, supplier lists, pricing, discounts or rebates, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential" in connection with this Agreement is confidential, is provided solely for the purpose of performing this Agreement and may not be disclosed or copied unless authorized in advance by Buyer in writing. Upon Buyer's request, Seller shall promptly return or destroy all documents and other materials received from Buyer. Buyer shall be entitled to injunctive relief for any violation of this Section. This Section does not apply to information that is: (a) in the public domain; (b) known to Seller at the time of disclosure by Buyer or its representatives; or (c) rightfully obtained by Seller on a non-confidential basis from a third party.

19. Insurance. Seller shall maintain, and cause its subcontractors to maintain at their expense, sufficient insurance coverage with generally acceptable insurers. Such insurance shall include contractual liability coverage, name Buyer as additional insured on all policies where applicable in connection with Sellers' performance of the PO, contain no material exclusions, and include a provision that waives the insurer's subrogation rights against Buyer.

20. Title and Risk. Unless otherwise stated on the face of the PO, title and risk of loss of the Product shall pass to Buyer, at Buyer's option, (a) upon receipt by Buyer at Buyer's warehouse or facilities, or (b) upon loading of Product onto an approved Buyer carrier.

21. Currency. Unless otherwise stated on the face of the PO, all payments and other financial requirements under this Agreement shall be in the currency of United States Dollar.

22. Waiver. No waiver by Buyer of any of the provisions of this Agreement is effective unless explicitly set forth in writing and signed by Buyer. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement operates, or may be construed, as a waiver thereof. No single or partial exercise of any right, remedy, power or privilege hereunder precludes any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

23. Assignment. Seller shall not assign, transfer, delegate or subcontract any of its rights or obligations under this Agreement without the prior written consent of Buyer. Any purported assignment or delegation in violation of this Section shall be null and void. No assignment or delegation shall relieve the Seller of any of its obligations hereunder.

24. Relationship of the Parties. The relationship between the Parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the Parties, and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever.

25. No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

26. Severability. If any term of this Agreement shall be held to be unenforceable, then the remainder shall not be affected thereby, and shall be valid and enforceable to the fullest extent permitted by law.

27. Notices. All notices, consents, claims, demands, waivers and other required communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth on the face of the PO or to such other address that may be designated by the receiving party in writing. A copy of any Notice provided under this Agreement to Buyer shall also be sent via email to legal@sunopta.com. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), email (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) upon receipt of the receiving party, and (b) if the party giving the Notice has complied with the requirements of this Section.

28. Code of Conduct. This Agreement shall be subject to and Seller shall adhere to Buyer's Code of Conduct, available at
http://www.sunopta.com/files/sunopta_supplier_partner_code_of_conduct.pdf as amended from time to time.

29. Governing Law. This Agreement shall be interpreted and construed in accordance with Minnesota law. Seller consents to the jurisdiction of Minnesota courts.

30. Governing Terms. In the event of a conflict or inconsistency between the provisions of these Terms and any non-preprinted term on the PO, the provisions of the non-preprinted terms on the PO shall prevail. In the event of a conflict or inconsistency between the provisions of this Agreement and any Definitive Agreement, the provisions of the Definitive Agreement shall prevail.