# EXHIBIT "B"

**A000422602**

**OFFICE OF THE COUNTY RECORDER**

**STEELE COUNTY, MINNESOTA**

**CERTIFIED, FILED, RECORDED ON**

**02/28/2019 11:10 AM**

**WELL CERT: N**

**PAGES: 25 FEES: 46.00**

**MORTGAGE TAX: 0.00 RECEIPT #: 0**

**STATE DEED TAX:**

**RICK G. KVIEN**

**STEELE COUNTY RECORDER**

**This document was eRecorded**

**CLAY COUNTY, MINNESOTA**
RECORDED ON:
02/27/2019 AT 04:16PM
**AS DOCUMENT # 787469**
KIMBERLY S. SAVAGEAU
COUNTY RECORDER
RECORDING FEE: $46.00

ELECTRONICALLY RECORDED

**This Cover Sheet is now a permanent part of the Recorded Document.**

**Do Not Remove.**

LORI J. JOHNSON, County Auditor-Treasurer
MRT: $59800.00
Date: 2/27/2019

*Execution Copy*

58.417.0100

**MORTGAGE,**
**SECURITY AGREEMENT,**
**ASSIGNMENT OF LEASES AND RENTS,**
**AND FIXTURE FINANCING STATEMENT**

**THIS MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS, AND FIXTURE FINANCING STATEMENT** (this "**Mortgage**") made February 22, 2019, by and between **PIPELINE FOODS, LLC**, a Delaware limited liability company, as mortgagor (the "**Mortgagor**"), whose mailing address is 1250 E. Moore Lake Drive, Suite #200, Minneapolis, MN 55432 , and **COMPEER FINANCIAL, PCA**, a United States instrumentality, as mortgagee (the "**Mortgagee**"), whose mailing address is 1921 Premier Drive, P.O. Box 4249, Mankato, Minnesota 56002-4249.

This Mortgage shall secure the original principal amount of Twenty-Six Million and No/100 Dollars ($26,000,000.00) the "**Initial Amount of the Debt**", within the meaning of Minnesota Statutes section 287.03 and this Mortgage is further intended to secure the entire "**Secured Indebtedness**" as hereinafter defined.

Mortgagor and Mortgagee entered into that certain Credit Agreement of even date herewith, executed by and among the Mortgagor and the Mortgagee in its capacity as administrative agent ("Agent") thereunder, and the banks, financial institutions and other entities from time to time parties thereto as lenders (the "Lenders") (as the same may from time to time be amended, modified, extended, renewed, refinanced or restated, the " **Credit Agreement**") and the other Loan Documents (as defined in the Credit Agreement) referenced therein. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Credit Agreement.

To secure the performance of the covenants and commitments of the Mortgagor to the Mortgagee and the Lenders, and the payment to the Mortgagee of: (i) the Initial Amount of the Debt, as evidenced by the Term Notes of even date herewith (the "Notes"), the balance of the Notes being

1

*Execution Copy*

due and payable on or before the Maturity Date of February 22, 2025; (ii) the Credit Agreement; (iii) the Notes; and (iv) all other obligations and liabilities of Mortgagor to the Mortgagee or the Lenders pursuant to terms of this Mortgage, the Credit Agreement, the Notes, or any other Loan Documents; and for and to secure the payment to the Mortgagee, its successors and assigns, at the times demanded and with interest thereon at the Default Rate specified in the Credit Agreement, of all sums advanced in protecting the lien of this Mortgage, including all Protective Advances (all sums referred to in (i) and (iv) being collectively referred to herein as the "**Secured Indebtedness**"), and in consideration of the sum of $1.00 paid by the Mortgagee to the Mortgagor and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Mortgagor does hereby MORTGAGE, WARRANT, GRANT, BARGAIN, SELL AND CONVEY unto the Mortgagee, its successors and assigns, forever, and GRANTS A SECURITY INTEREST to the Mortgagee, its successors and assigns, in the following properties (all of the following being hereafter collectively referred to as the "**Mortgaged Property**"):

## A. **Real Property**

All the tracts or parcels of real property lying and being in Clay County and Steele County, Minnesota, as more fully described in <u>Exhibit A</u> (the "**Land**") attached hereto and made a part hereof, together with all improvements, buildings or structures owned by Mortgagor, situated, now or hereafter placed or constructed upon the Land ("**Improvements**"), all right, title, and interest of the Mortgagor in and to the Land and in and to lands lying in any and all streets, lanes, alleys, passages and roads adjoining the Land, and together with all right, title, and interest of the Mortgagor in and to all annexations, access rights, easements, rights of way or use, servitudes, licenses, tenements, hereditaments, appurtenances, minerals, mineral rights, water and water rights, now or hereafter belonging or pertaining to the Land (the "**Real Property**"); and

## B. **Personal Property**

All right, title, and interest of the Mortgagor in and to all equipment, fixtures, improvements, building supplies and materials and other personal property now or hereafter attached to, located in, placed in or necessary to the use of the improvements on the Land or Improvements (the "**Personal Property**"); and

## C. **Leases, Rents, Issues and Profits**

All right, title, and interest of the Mortgagor in and to all leases, accounts, rents, issues and profits now due or which may hereafter become with respect to the Mortgaged Property or any part thereof; and

2

*Execution Copy*

### D. Judgments and Awards

All right, title, and interest of the Mortgagor in and to any and all awards or compensation made by any governmental or other lawful authorities for the taking or damaging by eminent domain of the whole or any part of the Mortgaged Property or any rights appurtenant thereto, including any awards for a temporary taking, change of grade of streets or taking of access; and

### E. After-Acquired Property

All right, title, and interest of the Mortgagor in and to all extensions, improvements, betterments, renewals, substitutes, and replacements of, and all additions and appurtenants to the items or types of property described in Sections A through D above, which are hereafter acquired by or released to the Mortgagor, or are hereafter constructed, assembled or placed by the Mortgagor on the Mortgaged Property, and all conversions of the security constituted thereby, immediately upon such acquisition, release, construction, assembling, placement, or conversion, as the case may be, and in each such case, without any further mortgage, conveyance, assignment, or other act by the Mortgagor, shall become subject to the lien of this Mortgage as fully and completely, and with the same effect, as though now owned by the Mortgagor and specifically described in the granting clause hereof, but at any and all times the Mortgagor will execute and deliver to the Mortgagee any and all such further assurances, mortgages, conveyances, or assignments thereof as the Mortgagee may reasonably require for the purpose of expressly and specifically subjecting the same to the lien of this Mortgage.

TO HAVE AND TO HOLD the Mortgaged Property unto the Mortgagee forever.

### ARTICLE I
### Mortgagor's
### Representations, Warranties
### Covenants and Agreements

The Mortgagor makes and includes in this Mortgage the Statutory Covenants and other provisions set forth in Minnesota Statutes Section 507.15 or in any future Minnesota Statute providing for a statutory form of real estate mortgage, and the Mortgagor makes the following additional representations, warranties, covenants and agreements with the Mortgagee:

**1.1.    First Lien Status.** The Mortgagor owns the Mortgaged Property free and clear of any and all Liens except the Liens described on **Exhibit B** attached hereto ("**Permitted Encumbrances**") and any other Permitted Liens from time to time affecting the Mortgaged Property. Except for the Permitted Encumbrances, this Mortgage creates a valid first priority lien and security interest against the Mortgaged Property. The Mortgagor shall preserve and protect the first priority lien and security interest status of this Mortgage subject to Permitted Encumbrances.

CORE/3508725.0022/150594075.4

*Execution Copy*

**1.2.** **Payment and Performance**. The Mortgagor shall pay the Secured Indebtedness when due under the terms of the Credit Agreement and the other Loan Documents and shall duly perform and observe all of the covenants, agreements and provisions contained in this Mortgage, the Credit Agreement and the other Loan Documents. No payment or collection of any of the Secured Indebtedness shall reduce the amount secured by this Mortgage.

**1.3.** **Care of Mortgaged Property; No Waste**. Subject to the terms of the Credit Agreement, the Mortgagor shall, at all times, keep and maintain the Mortgaged Property in good repair and operating condition, subject to ordinary wear and tear, and shall not commit, or suffer to be committed, any material waste or misuse of the Mortgaged Property, and shall repair, restore or replace, any buildings, improvements or structures now or hereafter placed or located on the Mortgaged Property which may become damaged or destroyed in accordance with the terms of this Mortgage and the Credit Agreement. The Mortgagor shall not, without the prior written consent of this Mortgagee, or except as permitted under the Credit Agreement: (i) remove or permit the removal of any material buildings, structures or other material improvements or material fixtures, or (ii) otherwise make any material alterations in any improvements which will adversely alter the basic structure or adversely affect the market value of the Mortgaged Property, and the Mortgagor will complete within a reasonable time any structures which are now or at any time in the process of erection in accordance with the terms of the Credit Agreement. The Mortgagor will not acquiesce in any rezoning classification, modification or public or private restriction which in any way limits or otherwise adversely affects the Mortgaged Property, or any part thereof. The Mortgagor shall not vacate or abandon the Mortgaged Property.

**1.4.** **Payment of Utilities and Operating Costs**. To the extent required under the Credit Agreement, the Mortgagor shall pay, or cause to be paid, when due, all charges made for electricity, gas, heat, water, sewer, and all other utilities and operating costs and expenses incurred in connection with the Mortgaged Property.

**1.5.** **Liens**. To the extent required under the Credit Agreement, the Mortgagor shall pay, from time to time when the same shall become due, all lawful claims and demands of mechanics, materialmen, laborers, and others which, if unpaid, might result in, or permit the creation of a lien on the Mortgaged Property, or any part thereof, or on the revenues, rents, issues, income and profits arising therefrom, and in general will do or cause to be done everything necessary so that the lien of this Mortgage shall be fully preserved, at the cost of the Mortgagor, without expense to the Mortgagee. The Mortgagor shall not do, or permit to be done, anything that may in anyway impair the value of the Mortgaged Property, or weaken, diminish, or impair the security of this Mortgage. Should any fixture be installed to the Mortgaged Property from or after the date hereof, the lien of this Mortgage shall immediately attach to said fixture and shall be prior and superior to all other liens or claims. The Mortgagor will promptly perform and observe, or cause to be performed or observed, all of the terms, covenants, and conditions of all Permitted Encumbrances, as set forth in Exhibit B attached hereto, the noncompliance with which may affect the security of this Mortgage, or may impose duty or obligation upon the Mortgagor or any sublessee or occupant of the Mortgaged Property or any part thereof, and the Mortgagor shall do or cause to be done all things necessary to preserve intact and unimpaired all easements,

4

*Execution Copy*

appurtenances, and other interests and rights in favor of or constituting any portion of the Mortgaged Property.

      **1.6.**   <u>**Real Property Taxes and Assessments**</u>. The Mortgagor agrees to pay all real property taxes, assessments, and other similar charges made against the Mortgaged Property in accordance with the terms and conditions of the Credit Agreement.

      **1.7.**   <u>**Mortgage Taxation**</u>. In the event of a court decree or an enactment after the date hereof by any legislative authority of any law imposing upon a mortgagee the payment of the whole or any part of the amounts herein required to be paid by the Mortgagor, or changing in any way the laws relating to the taxation of mortgages or debts secured by mortgages or a mortgagee's interest in the Mortgaged Property, so as to impose such imposition on the Mortgagee or on the interest of the Mortgagee in the Mortgaged Property, then, in any such event, the Mortgagor shall bear and pay the full amount of such imposition, provided that if for any reason payment by the Mortgagor of any such imposition would be unlawful, or if the payment thereof would constitute usury or render the Secured Indebtedness wholly or partially usurious, the Mortgagee shall pay that amount or portion of such impositions as renders the Indebtedness secured hereby unlawful or usurious, in which event the Mortgagor shall concurrently therewith pay the remaining lawful and nonusurious portion or balance of said imposition.

      **1.8.**   <u>**Compliance with Laws**</u>. The Mortgagor shall comply with all present and future laws, ordinances, regulations, covenants, conditions and restrictions affecting the Mortgaged Property or the operation thereof, and shall pay all fees or charges of any kind in connection therewith to the extent required under the Credit Agreement.

      **1.9.**   <u>**Permitted Contests**</u>. Notwithstanding any provision of this Mortgage to the contrary, the Mortgagor shall not be required to: (a) pay any charge referred to Section 1.4 hereof; (b) discharge or remove any lien, encumbrance or charge referred to in Section 1.5 hereof; (c) pay the tax, assessment or other charged referred to in Sections 1.6 and 1.7 hereof, or (d) comply with any statute, law, rule, regulation or ordinance referred to in Section 1.8 hereof, so long as the Mortgagor shall in good faith contest the same or the validity thereof by appropriate legal proceedings which shall operate to prevent the collection of the imposition so contested, or the sale, forfeiture or loss of the Mortgaged Property, or any part thereof to satisfy the same, and further provided that the Mortgagor shall, prior to the date such imposition is due and payable, have given the Mortgagee such reasonable security as may be reasonably demanded by the Mortgagee to ensure such payments and prevent any sale or forfeiture of the Mortgaged Property by reason of such nonpayment. Any such contest shall be prosecuted with due diligence and the Mortgagor shall, after final determination thereof, promptly pay the amount of any such imposition so determined, together with all interest and penalties which may be payable in connection therewith. Notwithstanding the provisions of this Section 1.9, the Mortgagor shall (and if the Mortgagor shall fail so to do, the Mortgagee may but shall not be required to) pay any such imposition notwithstanding such contest if, in the reasonable opinion of the Mortgagee, the Mortgaged Property shall be in jeopardy or in danger of being forfeited or foreclosed.

CORE/3508725.0022/150594075.4

*Execution Copy*

**1.10.  Duty to Defend**. The Mortgagor shall promptly notify the Mortgagee of and appear in and defend any suit, action or proceeding that affects the value of the Mortgaged Property, the Secured Indebtedness, or any right or interest of the Mortgagee under this Mortgage.  Mortgagee may, at its option, elect to appear in or defend any such action or proceeding, and the Mortgagor agrees to indemnify and reimburse the Mortgagee from any and all loss, damage, reasonable expense or cost arising out of, or incurred in connection with any such suit, action or proceeding, including, but not limited to, costs of evidence of title and reasonable attorneys' fees except for losses, damages or liabilities to the extent caused by the gross negligence or willful misconduct of Mortgagee.

**1.11.  Insurance Coverage**. The Mortgagor shall obtain and keep in full force and effect during the term of this Mortgage at its sole cost and expense, the following policies of insurance:

a.     Property insurance, in broad form covering causes of loss customarily covered in the industry of Mortgagor's business, in the amount of not less than the full insurable value or full replacement cost, without deduction for depreciation, of the improvements on the Real Property, whichever is greater, covering all buildings, structures, fixtures, personal property and other improvements now existing or hereafter erected or placed on the Real Property, which insurance shall at all times be in an amount at least equal to the unpaid Secured Indebtedness at any given time.

b.     If the Mortgaged Property is now or hereafter located in a flood plain as defined by the Federal Insurance Administration, the Mortgagor shall obtain flood insurance in the maximum obtainable amount.

c.     If steam boilers or similar equipment for the generation of steam are located in, on or about the Mortgaged Property, the Mortgagor shall maintain insurance against loss or damage by explosion, rupture or bursting of such equipment and appurtenances thereto, without a co-insurance clause, in an amount satisfactory to the Mortgagee.

d.     Comprehensive general public liability insurance covering the legal liability of the Mortgagor against claims for bodily injury, death or property damage occurring on, in or about the Mortgaged Property in such amounts and with such limits as the Mortgagee may reasonably require.

All such insurance shall be written on forms and with companies satisfactory to the Mortgagee, shall name as the insured parties the Mortgagor and the Mortgagee as their interests may appear, shall be in amounts sufficient to prevent the Mortgagor from becoming a co-insurer of any loss thereunder, shall name the Mortgagee as an additional insured and loss payee, shall bear a satisfactory mortgagee clause in favor of the Mortgagee, and shall contain an agreement of the insurer that the coverage shall not be terminated or materially modified without providing to the Mortgagee thirty (30) days' prior written notice of such termination or modification. All

6

*Execution Copy*

required policies of insurance or acceptable certificates thereof, together with evidence of the payment of current premiums therefor shall be delivered to the Mortgagee. The Mortgagor shall, within thirty (30) days prior to the expiration of any such policy, deliver other original policies or certificates of the insurer evidencing the renewal of such insurance together with evidence of the payment of current premiums therefor. In the event of a foreclosure of this Mortgage or any acquisition of the Mortgaged Property by the Mortgagee, all such policies and any proceeds payable therefrom, whether payable before or after a foreclosure sale, or during the period of redemption, if any, shall become the absolute property of the Mortgagee to be utilized at its discretion. In the event of foreclosure or the failure to obtain and keep any required insurance, the Mortgagor empowers the Mortgagee to effect insurance upon the Mortgaged Property at the Mortgagor's expense and for the benefit of the Mortgagee in the amounts and types aforesaid for a period of time covering the time of redemption from a foreclosure sale, and if necessary therefore, to cancel any or all existing insurance policies. The Mortgagor agrees to furnish the Mortgagee with copies of all inspection reports and insurance recommendations received by the Mortgagor from any insurer.

1.12.  **Notice of Damage**. The Mortgagor shall give the Mortgagee prompt notice of any material damage to or destruction of the Mortgaged Property and authorize the Mortgagee to make proof of loss if not made promptly by the Mortgagor. In case of loss covered by policies of insurance held (whether before or after foreclosure sale), the Mortgagee is hereby authorized at its option and without the consent of the Mortgagor to settle, adjust and compromise any claim arising out of such policies, and to collect and receive the proceeds payable therefrom. Any expense incurred by the Mortgagee in the adjustment and collection of insurance proceeds (including the cost of any independent appraisal of the loss or damage on behalf of the Mortgagee) shall be reimbursed to the Mortgagee first out of any proceeds. Notwithstanding the foregoing, provided no "Event of Default" has occurred and is continuing, Mortgagor shall have the sole right to settle, adjust and compromise any claim reasonably estimated to be under $1,000,000 or less. The proceeds or any part thereof shall be applied, at the Mortgagor's option to the repair or replacement of the assets subject to such casualty or, upon or in reduction of the Secured Indebtedness or to the restoration or repair of the Mortgaged Property.

1.13.  **Condemnation**. The Mortgagor shall give the Mortgagee prompt notice of any action, actual or threatened, in condemnation or eminent domain. The Mortgagor may in good faith contest any condemnation or eminent domain action by appropriate legal action or proceedings. Any such contest shall be prosecuted with due diligence. The Mortgagor hereby irrevocably assigns, transfers, and sets over to the Mortgagee, to the extent of the remaining unpaid Secured Indebtedness, the entire proceeds of any award, payment or claim for damages for all or any part of the Mortgaged Property taken or damaged, whether temporary or permanent, under the power of eminent domain or condemnation, and authorizes the Mortgagee to intervene in any such action in the name of the Mortgagor and to collect and receive from the condemning authorities and give proper receipts and acquaintances for such proceeds. Any expenses incurred by the Mortgagee in intervening in such action or collecting such proceeds shall be reimbursed to the Mortgagee first out of the proceeds. So long as no Event of Default exists, the proceeds or any part thereof shall be applied upon or in reduction of the Secured Indebtedness then most remotely

7

*Execution Copy*

to be paid, whether due or not, without the application of any prepayment premium, or to the restoration or repair of the Mortgaged Property, the choice of application to be solely at the discretion of the Mortgagee.

**1.14.    Restoration of Mortgaged Property After Loss**.    Should any insurance or condemnation proceeds be applied to the restoration or repair of the Mortgaged Property, the restoration or repair shall be done under the supervision of an architect reasonably acceptable to the Mortgagee, pursuant to plans and specifications reasonably approved by the Mortgagee, and in accordance in all material respects with all applicable building laws, regulations and ordinances, including, but not limited to, the Accessibility Guidelines set forth in the Americans with Disabilities Act.  In such case, the proceeds shall be held by the Mortgagee for such purposes and will be disbursed by the Mortgagee to defray the costs of such restoration or repair under such safeguards and controls as the Mortgagee may reasonably require to assure completion in accordance with the approved plans and specifications and free of Liens, other than Permitted Liens.  Any surplus which may remain after payment of all costs of restoration or repair may, at the option of the Mortgagee, be applied on account of the Secured Indebtedness then most remotely to be paid, whether due or not, without application of any prepayment premium, or shall be returned to the Mortgagor as its interest may appear, the choice of application to be solely at the discretion of the Mortgagee.

**1.15.    Environmental Compliance.**    Mortgagor shall comply with all applicable Environmental Laws as required in the Credit Agreement, the Environmental Indemnity Agreement, and the other Loan Documents.

**1.16.    Financial and Operating Statements.** Mortgagor shall provide all Financial Statements and operating statements as required in the Credit Agreement.

**1.17.    Mortgagee's Right of Entry**.  The Mortgagor shall permit the Mortgagee or its authorized representatives to enter the Mortgaged Property on the terms and conditions set forth in the Credit Agreement.

**1.18.    Due on Sale**.  Mortgagor shall not voluntarily or involuntarily sell, convey, transfer, further mortgage, encumber, or dispose of the Mortgaged Property, or any part thereof, or any interest therein, legal or equitable, or agree to do so, without first obtaining the written consent of the Mortgagee. The Mortgagee's consent to any one transaction shall not be deemed to be a waiver of the requirement to receive the Mortgagee's consent to future or successive transactions.

**1.19.    Mortgagee's Right to Cure**.  If the Mortgagor shall fail to comply with any of the covenants or obligations of this Mortgage, then the Mortgagee may, but shall not be obligated to, without further demand upon or notice to the Mortgagor, and without waiving or releasing the Mortgagor from any obligation contained in this Mortgage, perform such covenants and agreements, investigate and defend against such action or proceeding, and take such other action as the Mortgagee deems reasonably necessary to protect its interest in the Mortgaged Property or this Mortgage.  Subject to the terms of the Credit Agreement, the Mortgagor agrees to repay upon

8

*Execution Copy*

demand all sums incurred by the Mortgagee in remedying any such failure, together with interest at the Default Rate. All such sums, together with interest as aforesaid, shall become so much additional Secured Indebtedness, but no such advance shall be deemed to relieve the Mortgagor from any failure hereunder.

**1.20.** __Uniform Commercial Code Security Interest__. This Mortgage shall constitute a security agreement as defined in the Uniform Commercial Code and SHALL BE EFFECTIVE AS A FINANCING STATEMENT FILED AS A FIXTURE FILING which is to be filed in the real estate records of the County where the Mortgaged Property is situated. The name of the record owner of said real estate is the Mortgagor set forth on page one of this Mortgage. Information concerning the security interest created by this Mortgage may be obtained from the Mortgagee, as secured party, at its address as set forth on page one of this Mortgage. The name and address of the Mortgagor, as debtor, and the name and address of the Mortgagee, as secured party, are as set forth on page one of this Mortgage. This Mortgage covers goods which are, or are to become, "fixtures" as defined in the Uniform Commercial Code. This Mortgage is sufficient as a financing statement, and as a financing statement it covers goods which are, or are to become, fixtures on the Land. In addition, the Mortgagor shall execute and deliver to the Mortgagee, upon the Mortgagee's request, any financing statements or amendments thereto or continuation statements thereto that the Mortgagee may require to perfect a security interest in said items or types of property. The Mortgagor shall pay all costs of filing such instruments. All references to the Uniform Commercial Code in this Mortgage shall mean the Uniform Commercial Code as in effect in the State of Minnesota.

**1.21.** __Leases__. The Mortgagor shall, at its own cost and expense, perform, comply with and discharge all of the obligations of the Mortgagor under all leases and agreements for the use of the Mortgaged Property and use reasonable efforts to enforce or secure the performance of each obligation and undertaking of the respective tenants under such leases and shall appear in and defend, at its own cost and expense, any action or proceeding arising out of or in any manner connected with the Mortgagor's interest in any leases of the Mortgaged Property. The Mortgagor shall permit no surrender nor assignment of any tenant's interest under said leases unless the right to assign or surrender is expressly reserved under the lease, nor receive any installment of rent for more than one (1) month in advance of its due date unless otherwise required pursuant to the terms of the applicable lease, nor execute any mortgage or create or permit a lien which may be or become superior to any such leases, nor permit a subordination of any lease to such mortgage or lien. The Mortgagor shall not materially modify or amend the terms of any such leases, nor borrow against or pledge the rentals from such leases, nor exercise or waive any default of the tenant thereunder without the prior consent of the Mortgagee. The Mortgagor agrees to obtain the Mortgagee's prior written approval before entering into any lease with a term of five (5) years or more. Should the Mortgagor fail to perform, comply with or discharge any material obligations of the Mortgagor under any lease or should the Mortgagee become aware of or be notified by any tenant under any lease of a material failure on the part of the Mortgagor to so perform, comply with or discharge its obligations under said lease, the Mortgagee may, but shall not be obligated to, and without further demand upon or notice to the Mortgagor, and without waiving or releasing the Mortgagor from any obligation in this Mortgage contained, remedy such failure, and the

9

*Execution Copy*

Mortgagor agrees to repay upon demand all sums incurred by the Mortgagee in remedying any such failure together with interest at the Default Rate. All such sums, together with interest as aforesaid, shall become so much additional Secured Indebtedness, but no such advance shall be deemed to relieve the Mortgagor from any Event of Default hereunder.

**1.22.** **No Consent**. Nothing contained in this Mortgage shall constitute any consent or request by the Mortgagee, express or implied, for the performance of any labor or services or for the furnishing of any materials or other property in respect of the Mortgaged Property or any part thereof, nor as giving the Mortgagor or any party in interest with the Mortgagor any right, power or authority to contract for or permit the performance of any labor or services or the furnishing of any materials or other property in such fashion as would create any personal liability against the Mortgagee in respect thereof, or would permit the making of any claim that any lien based on the performance of such labor or services or the furnishing of any such materials or other property is prior to the lien of this Mortgage.

**1.23.** **Further Assurances**. The Mortgagor shall execute and deliver to the Mortgagee from time to time, on demand, such further instruments, security agreements, financing statements under the Uniform Commercial Code and assurances and do such further acts as Mortgagee may reasonably require to carry out more effectively the purposes of this Mortgage and without limiting the foregoing, to make subject to the lien hereof any property agreed to be subjected hereto or covered by the granting clause hereof, or so intended to be. The Mortgagor shall pay any recording fees, filing fees, mortgage registry taxes, stamp taxes and other charges arising out of such further assurances and instruments in accordance with the terms of the Credit Agreement.

**1.24.** **Miscellaneous Rights of Mortgagee**. Without affecting the liability of any party liable for payment of the Secured Indebtedness or the performance of any obligation contained herein, and without affecting the rights of the Mortgagee with respect to any security not expressly released in writing, the Mortgagee may, at any time, and without notice to or the consent of the Mortgagor or any party with an interest in the Mortgaged Property or the Notes (a) release any person or entity liable for payment of all or any part of the Secured Indebtedness or for the performance of any obligation herein, (b) make any agreement extending the time or otherwise altering the terms of payment of all or any part of the Secured Indebtedness or modifying or waiving any obligation, or subordinating, modifying or otherwise dealing with the lien or charge hereof, (c) accept any additional security, (d) release or otherwise deal with any property, real or personal, including any or all of the Mortgaged Property, including making partial releases of the Mortgaged Property, or (e) resort to any security agreements, pledges, contracts of guaranty, assignments of rents and leases or other securities, and exhaust any one or more of said securities and the security hereunder, either concurrently or independently and in such order as it may determine. No act or thing, except full payment of the Secured Indebtedness, which but for this provision could act as a release, termination, satisfaction or impairment of this Mortgage shall in any way release, terminate, satisfy or impair this Mortgage.

**1.25.** **Other Covenants**. Until this Mortgage is released (or required to be released pursuant to the terms of the Credit Agreement) and to the extent permitted by law, all of the

10

*Execution Copy*

representations, warranties and covenants of Mortgagor in the Credit Agreement, including all applicable cure and grace periods with respect to any failure to comply with the same, are incorporated herein by reference.

## ARTICLE II
## Defaults and Remedies

**2.1.**    **Events of Default**.  The occurrence of an Event of Default (as defined in the Credit Agreement) shall constitute an "Event of Default" hereunder.

**2.2.**    **Remedies**.  Upon the occurrence and during the continuance of an Event of Default, subject to the terms of the Credit Agreement the Mortgagee may, at its option, and without notice to the Mortgagor, unless otherwise provided herein, exercise any or all of the following rights and remedies, and any other rights and remedies now or then available to it, either hereunder or at law or in equity, including, without limitation, the rights and remedies provided in the assignment of rents contained herein:

    a.    Mortgagee may immediately, and without notice to the Mortgagor, declare the entire unpaid principal balance of the Notes together with all accrued interest thereon to be immediately due and payable and thereupon all such and all other Secured Indebtedness shall be and become immediately due and payable.

    b.    The Mortgagee may foreclose this Mortgage by action or by advertisement, power of sale being expressly granted to the Mortgagee, and the Mortgagor hereby authorizes and fully empowers the Mortgagee to do so, with full authority to sell the Mortgaged Property at a Sheriff's Sale upon giving notice of the sale to Mortgagor in the manner required by law, and convey the same to the Purchaser in fee simple all in accordance with and in the manner prescribed by law, and out of the proceeds arising from sale and foreclosure to retain the principal and interest due on the Notes and the Secured Indebtedness together with all such sums of money as the Mortgagee shall have expended or advanced pursuant to this Mortgage or pursuant to statute together with interest thereon as herein provided and all costs and expenses of such foreclosure, including lawful, reasonable attorneys' fees, with the balance, if any, to be paid to the persons entitled thereto by law.

    c.    The Mortgagee may collect, receive, and retain all rents, income, and profits (the "Rents") from the Mortgaged Property in accordance with Minn. Stat. 576.25, Subd. 5, either through the appointment of a receiver or by self-help and without appointment of a receiver.  The Mortgagee shall be entitled as a matter of right and without regard to the solvency or insolvency of the Mortgagor, or waste of the Mortgaged Property or adequacy of the security

11

*Execution Copy*

of the Mortgaged Property, to apply for the appointment of a receiver in accordance with applicable law; and Mortgagor does hereby irrevocably consent to such appointment. The Rents collected in accordance with this Mortgage, whether collected by a receiver appointed in accordance with applicable law or collected directly by the Mortgagee exercising self-help, shall be applied in such order as mandated by applicable Minnesota law, and to the extent not specifically covered under Minnesota law, in the sole discretion of the Mortgagee according to the terms of the Credit Agreement. Nothing contained in this Mortgage and no actions taken pursuant to this Mortgage shall be construed as constituting the Mortgagee a mortgagee in possession.

d.     In addition to the rights available to a mortgagee of real property, the Mortgagee shall also have all the rights, remedies and recourse available to a secured party under the Uniform Commercial Code, including without limitation the right to proceed under the provisions of the Uniform Commercial Code governing default as to any personal property which may be included in the Mortgaged Property or which may be deemed nonrealty in a foreclosure of this Mortgage or to proceed as to such personal property in accordance with the procedures and remedies available pursuant to a foreclosure of real estate.

## ARTICLE III
## Miscellaneous

**3.1.    Mortgagor's Acknowledgment of Remedies**.  SUBJECT TO THE TERMS OF THE CREDIT AGREEMENT, UPON THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT, THE MORTGAGOR HEREBY CONSENTS AND AGREES TO THE FORECLOSURE AND SALE OF THE MORTGAGED PROPERTY BY ACTION PURSUANT TO MINNESOTA STATUTES CHAPTER 581 OR, AT THE OPTION OF THE MORTGAGEE, BY ADVERTISEMENT PURSUANT TO MINNESOTA STATUTES CHAPTER 580 (OR PURSUANT TO ANY SIMILAR OR REPLACEMENT STATUTES HEREAFTER ENACTED), WHICH PROVIDES FOR SALE AFTER SERVICE OF NOTICE THEREOF UPON THE OCCUPANT OF THE MORTGAGED PROPERTY AND PUBLICATION OF SAID NOTICE FOR SIX (6) WEEKS IN THE COUNTY IN MINNESOTA WHERE THE MORTGAGED PROPERTY ARE SITUATED; ACKNOWLEDGES THAT SERVICE NEED NOT BE MADE UPON THE MORTGAGOR PERSONALLY (UNLESS THE MORTGAGOR IS AN OCCUPANT) AND THAT NO HEARING OF ANY TYPE IS REQUIRED IN CONNECTION WITH THE SALE; AND EXCEPT AS MAY BE PROVIDED IN SAID STATUTES EXPRESSLY WAIVES ANY AND ALL RIGHTS TO A PRIOR HEARING OF ANY TYPE IN CONNECTION WITH THE SALE OF THE MORTGAGED PROPERTY. Notwithstanding the foregoing provision, the Mortgagor's foregoing acknowledgment does not constitute a waiver of the Mortgagor's defenses to the foreclosure. The Mortgagor further understands that upon the occurrence and during the continuance of an Event

12

of Default, the Mortgagee may also elect its rights under the Uniform Commercial Code and take possession of the Personal Property (as defined in this Mortgage) and dispose of the same by sale or otherwise in one or more parcels provided that at least ten (10) days' prior notice of such disposition must be given, all as provided for by the Uniform Commercial Code, as hereafter amended or by any similar or replacement statute hereafter enacted. THE MORTGAGOR ACKNOWLEDGES THAT IT IS REPRESENTED BY LEGAL COUNSEL; THAT BEFORE SIGNING THIS DOCUMENT THIS PARAGRAPH AND THE MORTGAGOR'S RIGHTS WERE FULLY EXPLAINED BY SUCH COUNSEL AND THAT THE MORTGAGOR UNDERSTANDS THE NATURE AND EXTENT OF THE RIGHTS WAIVED HEREBY AND THE EFFECT OF SUCH WAIVER.

      **3.2.**   **Continued Priority**.  Any agreement hereafter made by the Mortgagor and the Mortgagee pursuant to this Mortgage shall be superior to the rights of the holder of any intervening lien or encumbrance.

      **3.3.**   **Cumulative Rights**.  Each right, power or remedy herein conferred upon the Mortgagee is cumulative and in addition to every other right, power or remedy, express or implied, now or hereafter arising, available to the Mortgagee, at law or in equity, or under the Uniform Commercial Code or other law, or under any other Loan Document, and each and every right, power and remedy herein set forth or otherwise so existing may be exercised from time to time as often and in such order as may be deemed expedient by the Mortgagee and shall not be a waiver of the right to exercise at any time thereafter any other right, power or remedy.  No delay or omission by the Mortgagee in the exercise of any right, power or remedy arising hereunder or arising otherwise shall impair any such right, power or remedy or the right of the Mortgagee to resort thereto at a later date or be construed to be a waiver of any Event of Default under this Mortgage.

      **3.4.**   **Waiver**.  The Mortgagor hereby waives to the full extent lawfully allowed the benefit of any homestead, appraisement, evaluation, stay and extension laws now or hereafter in force.  The Mortgagor hereby waives any rights available with respect to marshaling of assets so as to require the separate sales of any portion of the Mortgaged Property, or as to require the Mortgagee or any other person to exhaust its remedies against a specific portion of the Mortgaged Property before proceeding against the other and does hereby expressly consent to and authorize the sale of the Mortgaged Property or any part thereof as a single unit or parcel.

      **3.5.**   **Satisfaction of Mortgage**.  When all Secured Indebtedness has been paid or if otherwise required to be released pursuant to the terms of the Credit Agreement, this Mortgage and all assignments herein contained shall be void and this Mortgage shall be satisfied and released by the Mortgagee at the cost and expense of the Mortgagor.

      **3.6.**   **Governing Law**.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MINNESOTA (WITHOUT REFERENCE TO THE CHOICE OF LAW PRINCIPLES THEREOF).

**3.7.     Binding Effect**.  This Mortgage and each and every covenant, agreement and other provision hereof shall be binding upon the Mortgagor and its successors and assigns including without limitation each and every from time to time record owner of the Mortgaged Property and any other person having an interest therein, shall run with the land and shall inure to the benefit of the Mortgagee and its successors and assigns.  As used herein the words "successors and assigns" shall also be deemed to include the heirs, representatives, administrators and executors of any natural person who is a party to this Mortgage.

**3.8.     Severability and Survival**.  The unenforceability or invalidity of any provisions hereof shall not render any other provision, or provisions herein contained unenforceable or invalid.  The foreclosure of this Mortgage will not affect or limit any remedy of the Mortgagee on account of any breach by the Mortgagor of the terms of this Mortgage occurring prior to such foreclosure, except to the extent of the amount bid at foreclosure.

**3.9.     Captions**.  The captions and headings of the various sections of this Mortgage are for convenience only and are not to be construed as confining or limiting in any way the scope or intent of the provisions hereof.  Whenever the context requires or permits the singular shall include the plural, the plural shall include the singular and the masculine, feminine and neuter shall be freely interchangeable.

**3.10.     Notices**.  Any notice which any party hereto may desire or may be required to give to any other party shall be in accordance with the notice provisions set forth in the Credit Agreement.

**3.11.     Credit Agreement**.  Notwithstanding anything in this Mortgage to the contrary, if any conflict or inconsistency exists between this Mortgage and the Credit Agreement, the Credit Agreement shall govern and control.

THE MORTGAGOR REPRESENTS, CERTIFIES, WARRANTS AND AGREES THAT THE MORTGAGOR HAS READ THIS MORTGAGE AND UNDERSTANDS ALL OF THE PROVISIONS OF THIS MORTGAGE.  THE MORTGAGOR ALSO AGREES THAT THE MORTGAGEE'S COMPLIANCE WITH THE EXPRESS PROVISIONS OF THIS MORTGAGE SHALL CONSTITUTE GOOD FAITH AND SHALL BE CONSIDERED REASONABLE FOR ALL PURPOSES.

**[Remainder of page intentionally blank. Signature page immediately follows.]**

**IN WITNESS WHEREOF**, the undersigned has executed this Mortgage as of the day and year first above written.

MORTGAGOR:

**PIPELINE FOODS, LLC**, a Delaware limited liability company

By: Eric Jackson
Its: Chief Executive Officer

STATE OF ___MN___          )
                                          )ss.
COUNTY OF ___Anoka___  )

On this ___21___ day of __February__, 2019, before me the undersigned, a Notary Public in and for the said County and State, personally appeared _Eric Jackson_ being the _____CEO_____ of PIPELINE FOODS, LLC a Delaware limited liability company, who is personally known to me to be the identical person whose name is affixed to the foregoing Mortgage and acknowledged the execution thereof to be his voluntary act and deed as such officer and the voluntary act and deed of said company.

Notary Public

ANDREA J BILLADEAU
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2023

THIS INSTRUMENT WAS DRAFTED BY:
Stinson Leonard Street
Adam M. Nathe
50 South Sixth Street
Suite 2600
Minneapolis, MN 55402

[Signature page to Mortgage, Security Agreement, Assignment of Leases and Rents, and Fixture Financing Statement]

15

CORE/3508725.0022/150594075.4

# Exhibit "A"

TRACT 1:    Clay County (Moorhead, MN)

Lots 1 and 2, Block 3 of McCara First Addition to the City of Moorhead, situate in the County of Clay and the State of Minnesota

Abstract Property

TRACT 2:    Steele County (Ellendale, MN)

All that part of the Northwest Quarter of Section 25, Township 105 North, Range 21 West, Steele County, Minnesota, described by:

Commencing at the southeast corner of said Northwest Quarter, thence North 89 degrees 59 minutes 30 seconds West, assumed bearing, 180.24 feet along the South line of said Northwest Quarter to the centerline of Creamery Street;; thence North 0 degrees 18 minutes 40 seconds East 1109.25 feet along said centerline to the centerline of 5th Avenue; thence North 90 degrees 00 minutes 00 seconds West 276.29 feet along the centerline of 5th Avenue to the True Point of Beginning; thence North 0 degrees 00 minutes 00 seconds West 460.23 feet; thence South 90 degrees 00 minutes 00 seconds West 250.96 feet to the easterly right of way line of Union Pacific Railroad; thence South 06 degrees 58 minutes 59 seconds West 463.67 feet along said easterly right of way line to the centerline of 5th Avenue; thence North 90 degrees 00 minutes 00 seconds East 307.33 feet to said True Point of Beginning, excepting therefrom: Outlot One of the Plat of the Village (now City) of Ellendale, Minnesota.

AND

Outlot One of the Plat of the Village (now City) of Ellendale, Minnesota.

The Two foregoing parcels together being described as:

All that part of the Northwest Quarter of Section 25, Township 105 North, Range 21 West, Steele County, Minnesota, described by:
Commencing at the southeast corner of said Northwest Quarter; thence North 89 degrees 59 minutes 30 seconds West, assumed bearing, 180.24 feet along the South line of said Northwest Quarter to the centerline of Creamery Street; thence North 0 degrees 18 minutes 40 seconds East 1109.26 feet along the centerline of 5th Avenue; thence North 90 degrees 00 minutes 00 seconds West 276.29 feet along the centerline of 5th Avenue to the True Point of Beginning; thence North 0 degrees 00 minutes 00 seconds West 460.23 feet; thence South 90 degrees 00 minutes 00 seconds West 250.96 feet to the easterly right of way of Union Pacific Railroad; thence South 06 degrees 58 minutes 59 seconds West 463.67 feet along said easterly right of way line to the centerline of 5th Avenue; thence North 90 degrees 00 minutes 00 seconds East 307.33 feet to said True Point of Beginning.

Together with and subject to a non-exclusive easement for ingress and egress 20 feet in width over, under and across all that art of the Northwest Quarter of Section 25, Township 105 North, Range 21 West, Steele County, Minnesota, the centerline being described as follows:

Commencing at the Southeast corner of said Northwest Quarter; thence North 89 degrees 59 minutes 30 seconds West, assumed bearing, 180.24 feet along the South line of said Northwest Quarter to the centerline of Creamery Street; thence North 0 derees 18 minutes 40 seconds East 1109.26 feet along said centerline to the centerline of 5th Avenue; thence North 90 degrees 00 minutes 00 seconds West 301.25 feet along the centerline of 5th Avenue to the True Point of Beginning; thence North 01 degrees 54 minutes 19 seconds East 320.18 feet; thence North 00 degrees 00 minutes 00 seconds West 140.23 feet; thence North 03 degrees 24 minutes 20 seconds West 329.78 feet; thence Northwesterly along a tangential curve concave to the Southwest, central angle 09 degrees 32 minutes 57 seconds, radius 600.00 feet, arc length 100.00 feet; and there terminating.

AND

A part of Chicago, Rock Island and Pacific Railroad Company's right of way and depot grounds in the Town of Ellendale, located in the Northwest Quarter of Section 25, Township 105 North, Range 21 West, Steele County, Minnesota, described by:

Commencing at the Northeast corner of Block 4 of the South Side Addition to th eTown of Ellendale; thence Easterly along the Easterly extension of the North line of said Block 4 a distance of 181.34 feet; thence Southwesterly at a deflection angle of 96 degrees 58 minutes to the right on a line parallel with and 50 feet Southeasterly of the centerline of said main track a distance of 61.49 feet; thence Southeasterly at right angles a distance of 40 feet to the point of beginning; thence continuing Southeasterly along the last described line a distance of 110 feet, more or less, to a point on the East line of said depot grounds; thence Northeasterly along the East line of said depot grounds a distance of 435 feet, more or less, to a point on the South line of said 5th Avenue extended Easterly; thence westerly along the South line of said 5th Avenue a distance of 112 feet, more or less, to a point 90 feet Southeasterly of , as measured perpendicular to the centerline of said main track; thence Southwesterly parallel with and 90 feet southeasterly of the centerline of said main track a distance of 420 feet, more or less, to the point of beginning.

Subject to a noexclusive easement for roadway purposes over the East 25 feet of the above parcels. Subject to an easement 12 feet on either side of the centerline of the railroad track is now located over and across the above parcel for railroad right of way purposes, together with all track and appurtenances located thereon.

TRACT 3:  Steele County (Hope, MN)

Parcel 1:

That part of the Northeast Quarter of Northwest Quarter of Section 30, Township 106 North,

Range 20 West of the Fifth Principal Meridian, bounded and described as follows:

Commencing at the Northeast corner of said Northwest Quarter of Section 30; thence South 0 degrees 00 minutes East (assumed bearing), along the East line of said Northwest Quarter of Section 30, a distance of 891.70 feet to a point on the North line of a 20 foot road; thence North 82 degrees 04 minutes West, along said North line of a 20 foot road, a distance of 268.87 feet to a point distant 50 feet Northwesterly, measured at right angles, from the center line of the main track of Midwestern Railroad Properties, Incorporated, said point being the point of beginning of the parcel of land herein described; thence continuing North 82 degrees 04 minutes West a distance of 62 feet to a point distant 12 feet Westerly, measured at right angles, from the center line of a spur track; thence North 07 degrees 56 minutes East, parallel with said main track center line, a distance of 250 feet; thence North 82 degrees 04 minutes West a distance of 88 feet, more or less, to a point distant 200 feet Northwesterly, measured at right angles, from the center line of the original main track of the former Chicago, Rock Island and Pacific Railroad Company; thence North 07 degrees 56 minutes East, parallel with said original main track center line a distance of 592 feet, more or less, to a point on the North line of said Section 30; thence Easterly along said North line of Section 30 a distance of 152.77 feet, more or less, to a point distant 50 feet Northwesterly, measured at right angles, from the center line of the main track of said Midwestern Railroad Properties, Incorporated; thence South 07 degrees 56 minutes West, parallel with said main track center line, a distance of 863 feet, more or less, to a point of beginning.

Parcel 2:

That part of the Southeast Quarter of Northwest Quarter of Section 30, Township 106 North, Range 20 West of the Fifth Principal Meridian, bounded and described as follows:

Commencing at the Northeast corner of said Northwest Quarter of Section 30; thence South 0 degrees 00 minutes East, along the East line of said Northwest Quarter of Section 30, a distance of 891.70 feet to a point on the North line of a 20 foot road; thence North 82 degrees 04 minutes West, along said North line of a 20 foot road, a distance of 268.87 feet to a point distant 50 feet Northwesterly, measured at right angles, from the center line of the main track of Midwestern Railroad Properties, Incorporated, thence South 07 degrees 56 minutes West, parallel with said main track center line a distance of 635 feet to the point of beginning of the parcel of land herein described; thence continuing South 07 degrees 56 minutes West, parallel with said main track center line, a distance of 502 feet, more or less, to a point distant 2000 feet Southwesterly from the intersection thereof with th eNorth line of said Section 30, as measured along said parallel line; thence North 82 degrees 04 minutes West a distance of 150 feet, more or less, to a point distant 200 feet Northwesterly, measured at right angles, from the center line of the original main track of the former Chicago, Rock Island and Pacific Railroad Company; thence North 07 degrees 56 minutes East, parallel with said original main track center line a distance of 502 feet, more or less, to a point on a line drawn at right angles to said original main center line through the point of beginning; thence South 82 degrees 04 minutes East a distance of 150 feet, more or less, to the point of beginning.

Parcel 3:

All that part of the Northwest Quarter of Section 30, Township 106 North, Range 20 West, described by:

Commencing at the point of intersection of the West line of right of way of the Chicago, Rock Island and Pacific Railway (formerly Burlington, Cedar Rapids and Northern Railway) and the North line of said Section 30; running thence West on the North line of said Section 30, 152.77 feet; thence Southwesterly and parallel to and 150 feet distant at right angles from said West line of right of way 950 feet (this line, being 950 feet in length, is hereinafter referred to as the "reference line") to the True Point of Beginning; thence Westerly at a right angle 100 feet; thence Southwesterly and parallel with said right of way 217.8 feet; thence Westerly at a right angle 40 feet; thence Northeasterly along a line parallel with said right of way 732.8 feet; thence Easterly at a right angle 140 feet to a point on the "reference line" which is 515 feet Northwesterly from the True Point of Beginning; thence Southwesterly along said "reference line" 515 feet to the True Point of Beginning.

Parcel 4:

All that part of the Northwest Quarter of Section 30, Township 106 North, Range 20 West, described by:

Commencing at the Northeast corner of said Northwest Quarter; thence South 89 degrees 58 minutes 27 seconds West, assumed bearing, 298.94 feet along the North line of said Northwest Quarter to a point 150 feet Westerly, measured at right perpendicular to the Westerly right of way line of the Chicago, Rock Island and Pacific Railway (formerly Burlington, Cedar Rapids and Northern Railway), last said point being the Trus Point of Beginning; thence South 8 degrees 50 minutes 03 seconds West 435.00 feet along a line parallel with said Railway; thence North 81 degrees 09 minutes 57 seconds West 140 feet; thence South 8 degrees 50 minutes 03 seconds West 732.80 feet along a line parallel with said Railway; thence South 81 degrees 09 minutes 57 seconds East 140.00 feet; thence South 8 degrees 50 minutes 03 seconds West 819.10 feet along a line parallel with said Railway, thence South 81 degrees 09 minutes 57 seconds East 150.00 feet to the Westerly right of way line of said Railway; thence South 8 degrees 50 minutes 03 seconds West 659.34 feet along the Westerly right of way line of said Railway to the South line of said Northwest Quarter; thence North 90 degrees 00 minutes West 276.18 feet along the South line of said Northwest Quarter to the Southeast corner of a parcel recorded as Document No. 204616; thence North 0 degrees 00 minutes East 525.00 feet to the Northeast corner of said parcel recorded as Document No. 204616; thence North 90 degrees 00 minutes West 36.91 feet along the North line of said parcel recorded as Document No. 204616; thence North 8 degrees 50 minutes 03 seconds East 2138.36 feet along a line parallel with said Railway to the North line of said Northwest Quarter; thence North 89 degrees 58 minutes 27 seconds East 242.86 feet to said True Point of Beginning.

Parcel 5:

All that part of the Northwest Quarter of Section 30, Township 106 North, Range 20 West, described as:

Commencing at the Northeast Corner thereof; thence South 0 degrees East, assumed bearing, 891.70 feet along the East line thereof; thence North 82 degrees 4 minutes West 268.87 feet along the North line of 20 foot road to the True Point of Beginning, last said point being 50 feet Westerly measured at 90 degrees from the center line of Chicago, Rock Island and Pacific Railroad Main Track; thence North 82 degrees 4 minutes West 62 feet to a point 12 feet Westerly measured at 90 degrees to the Centerline of Spur Track; thence North 7 degrees 56 minutes East 250 feet parallel with said main track centerline; thence North 82 degrees 4 minutes West 88 feet; thence South 7 degrees 56 minutes West 885 feet; thence South 82 degrees 4 minutes East 150 feet to a point 50 feet Westerly measured at 90 degrees from said main track centerline; thence North 7 degrees 56 minutes East 635 feet to said True Point of Beginning

Parcel 6:

Beginning at a point 950 feet South of the Intersection of the West Boundary line of the Chicago, Rock Island and Pacific Railroad Right of Way and the North line of the Northwest Quarter of Section 30, Township 106 North, Range 20 West, thence following West Boundary Line of said Right of Way in a Southerly direction 217.80 feet; thence at right angles in Westerly direction 100 feet, thence 217.80 feet in a Northerly direction paralleling the Chicago, Rock Island and Pacific Railroad track, thence 100 feet in Easterly direction to place of beginning.

Parcel 7:

That part of the Northeast Quarter of Section 30, Township 106 North, Range 20 West, Steele County, Minnesota, described as follows:

Commencing at the Northeast corner of said Northwest Quarter; thence South 89 degrees 58 minutes 27 seconds West, assumed bearing, 121.85 feet along the North line of said Northwest Quarter to a point 25 feet Westerly, measured at right angles, from the center line of the main track of Midwestern Railroad Properties Incorporated, as said main track is now located, last said point being the True Point of Beginning; thence South 8 degrees 50 minutes 03 seconds West, 2,633.31 feet along a line parallel with said main track to a point 33 feet Northerly, measured at right angles, from the East-West center line of said Section 30; Thence South 89 degrees 58 minutes 27 seconds West 25.30 feet along a line parallel with the center line of said Section 30; thence North 8 degrees 50 minutes 03 seconds East 2,633.31 feet along a line parallel with said main track to the North line of said Northwest Quarter; thence North 89 degrees 58 minutes 27 seconds East 25.30 feet along the North line of said Northwest Quarter to said True Point of Beginning.

**EXHIBIT B**
**PERMITTED ENCUMBRANCES**

**Steele County (Ellendale, MN):**

1.  Terms and conditions of Driveway Easement dated August 13, 2004, filed September 8, 2004 as Document No. A325536.

2.  Easements and Rights acquired by the State of Minnesota in that Final Certificate dated May 22, 1962 recorded March 8, 1963 in Book 129 of Deeds Page 589.

3.  Easement for roadway purposes dated December 14, 1971, filed January 3, 1972 in Book 151 of Deeds Page 244.

4.  Reservations, obligations and easements set forth in Quit Claim Deed dated November 18, 1971, filed November 24, 1971 in Book 151 of Deeds page 230.

5.  Reservations, obligations and easements set forth in Quit Claim Deed dated December 2, 1969, filed April 21, 1978 in Book 164 of Deeds page 472.

6.  Easements and rights set forth in Easement Grant dated December 1, 1983, filed December 29, 1983 in Book 172 of Deeds Page 231.

7.  Easements and rights reserved in Quit Claim Deed dated August 7, 1981, filed July30th, 1985 as Document No. 195503.

8.  Easement and rights in favor of the State of Minnesota set forth in Offtake Ditch Easement dated July 12, 1949, filed September 17, 1949 in Book 53 of Deeds Page 392.

**Clay County (Moorhead, MN)**

1.  Easements as reserved in Declaration of Industrial Standards and Protective Covenants for McCara First Addition dated November 11, 1981, filed November 12, 1981, under Micro. No. 367662.

    As amended by First Amendment to Declaration of Industrial Standards and Protective Covenants for McCara First Addition dated January 10, 1984, filed August 24, 1984, under Micro. No. 383540.

    As amended by Second Amendment to Declaration of Industrial Standards and Protective Covenants for McCara First Addition dated November 30, 1985, filed December 13, 1985, under Micro No. 392717.

As amended by Third Amendment to Declaration of Industrial Standards and Protective Covenants for McCara First Addition dated July 9, 1996, filed July 10, 1996, under Micro No. 493535.

As amended by Fourth Amendment to Declaration of Industrial Standards and Protective Covenants for McCara First Addition dated February 21, 1997, filed April 13, 1998, under Micro No. 509999.

As amended by Fifth Amendment to Declaration of Industrial Standards and Protective Covenants for McCara First Addition dated May 6, 1997, filed April 13, 1998, under Micro No. 510000.

2.  Easements for utilities and rail road right-of-way as set forth on the Plat of McCara First Addition filed September 9, 1980 under Micro No. 361302.


**Steele County (Hope, MN)**

1.  Easements and rights in favor of Steele Waseca Cooperative Electric dated February 3, 1941, filed April 23, 1941 in Book 104 of Deeds Page 251.

2.  Easements for private access roadway, rights reserved and maintenance, operation and use of utility lines as reserved in Deed filed October 13, 1967 in Book 140 of Deeds Page 363.

3.  Easement and rights for Township Road as set forth in Notice of Meeting of Somerset Township Board as T-36 filed June 28, 1988 in Book 180 of Deeds Page 442.

4.  Terms and conditions of Tile Easement dated December28, 1988, filed January 4, 1989 in Book 181 of Deeds Page 480.

5.  Terms and conditions of Tile Easement Agreement dated October 21, 1977. tiled November 23, 1977 in Book 163 of Deeds Page 792.

6.  Easements and rights in favor of Interstate Power Company as set forth in Easement Grant filed December 29, 1983 in Book 172 of Deeds Page 231.

7.  Terms and conditions of Easement Agreement dated June 5, 2008 by and between Sunrich, Inc. and Somerset Township filed, November 7, 2008 as Document No. A360529.

8.  Terms and conditions of Easement Agreement dated October 30, 2008 by and between Sunrich, Inc. and Somerset Township, filed November 7, 2008 as Document No.A360528.

9.  Terms and conditions of Variance of the Steele County Ordinance Variance #579 tiled as Document Nos. A373633 and A375317.

GP:3919403 v1

CORE/3508725.0022/150594075.4

*Execution Copy*

10.    Terms and conditions of Conditional Use Permit #361 filed December 13, 2010 as Document No. A375321.

11.    Terms and conditions of Resolution to Establish Subordinate Service District filed December 8, 2005 as Document No. A337571.

12.    Minerals and mineral interests as set forth in Mineral Quitclaim Deed dated March 15, 1985, filed April 11, 1985 in Book 174 of Deeds Page 800 and as transferred by Mineral Quitclaim Deed dated April 24, 1986, filed May 6, 1986 in Book 176 of Deeds Page 640. (as to Parcels 1, 2 and 7)

13.    Rights and matters reserved in Deed dated February 6, 1987, filedMarch 18, 1987 in Book 178 of Deeds Page 243.

14.    Rights and reservations as set forth in Deed dated March 4, 1991, filed April 18, 1991 as Document No. 222788.

GP:3919403 v1

CORE/3508725.0022/150594075.4



**MRT1**

# Mortgage Registry Tax

Form MRT1 may be used to document your claim for an exemption from mortgage tax or the basis of your tax. The mortgage registry tax rate is .0023 of the amount of the debt being secured (.0024 for Hennepin and Ramsey counties). Please note, a document or any record of the mortgage may not be received in evidence in any court, and is not valid notice, unless the tax has been paid. *(M.S. 287.10)*

**Mortgage Registry Tax**

Name of Borrower
Pipeline Foods, LLC

Name of Lender
Compeer Financial, PCA

| 1 New debt being secured with this instrument | 2 New Debt Subject to Tax | 3 Mortgage Tax Due | 4 Reason Code |
|---|---|---|---|
| $ 0 | $0 | $0 | 2 |

**Sign Here**

**Mortgagor or authorized agent, sign below.**

*I declare that the information on this certificate is correct and complete to the best of my knowledge and belief.*

| Signature of Mortgagor or Authorized Agent | Title | Date | Daytime Phone |
|---|---|---|---|
| *(signature)* | V P | 2/28/19 | 612-311-1109 |

Website: www.revenue.state.mn.us. Email: MortgageDeed.Taxes@state.mn.us
Phone: 651-556-4721.

## Reason Codes

**1 Supplemental Mortgage**
This instrument is modifying an existing mortgage and securing a new debt.

1. Debt Secured After Supplement _____
2. Principle Balance Before Supplement ( _____ )
3. New Debt Subject to Tax
   *(Subtract Line 2 from Line 1. Enter in boxes 1 and 2 at top)* _____

**2 Additional Security**
This is a new and separate mortgage that provides additional security for an outstanding debt for which tax has already been paid and whose other mortgage remains in place. *(M.S. 287.01.04[c])*.

Tax Paid $59,800.00

County Clay

Document # 787469

**3 Limiting Clause**
The limiting clause can be used when a lender chooses to secure only a portion of the debt amount recited in the mortgage.

*"Notwithstanding anything to the contrary herein, enforcement of this mortgage is limited to a debt amount of*
$ _____
*under M.S. 287.05, subd. 1a."*

**4 Mortgage Amendment**
This is a mortgage amendment, as defined in *M.S. 287.01, subd. 2,* and does not secure a new or increase an exisitng debt. *(M.S. 287.04[c])*.

**5** Decree of marriage dissolution or an instrument made pursuant to it.

**6** Mortgage given to correct a misdescription of the mortgaged property.

**7** Mortgage executed as part of a plan of reorganization under a Chapter 11 or Chapter 12 bankruptcy case. *(Federal bankruptcy codes 1146[a] and 1231[a])*

**8** Mortgage secured by real property subject to the minerals production tax. *(M.S. 298.24 to 298.28)*

**9** Mortgage loan made under a low and moderate income or other affordable housing program if the mortgage is a federal, state, or local government agency. *(Revenue Notice # 01-05)*

**10** A mortgage granted by a Fraternal Benefit Society (borrower). *(M.S. 64B)*

**11** Reverse Mortgage/Home Equity Conversion Mortgage — tax is due on the expected total disbursements less interest, mortgage insurance premiums, and lender service fees. *(M.S. 287.05, subd. 6)*

**12** Agricultural mortgage whose proceeds are being used to acquire or improve Minnesota real property that is or will be used for the production of agricultural products. Includes prior qualifying loans that are being re-financed. Note: The exemption does not apply to the portion of the proceeds used for nonexempt purposes (e.g., house, residential-use garage, machinery and seed).

**13** Mortgage encumbering real property located within the boundaries of a federally recognized American Indian tribe if the mortgagor (i.e., borrower) is (1) the tribe or a member of the tribe; or (2) purchasing the property from the tribe or a member of the tribe and the mortgage is a purchase-money mortgage.

**14** Exempt Federal Agencies— To see a list go to our website at **www.revenue.state.mn.us** and search *Mortgage Registry Tax.*

**15** If the above codes do not apply, please provide explanation below.
_____
_____
_____
_____

(Rev. 9/18)